NICOLA A. PISANO, CA Bar No. 151282
    npisano@foley.com
JOSE L. PATIÑO, CA Bar No. 149568
    jpatino@foley.com
JUSTIN E. GRAY, CA Bar No. 282452
    jegray@foley.com
SCOTT A. PENNER, CA Bar No. 253716
    spenner@foley.com
**FOLEY & LARDNER LLP**
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CALIFORNIA  92130
TELEPHONE:    858.847.6700
FACSIMILE:    858.792.6773

Attorneys for Defendants and Counter-Plaintiffs
ESET, LLC and ESET SPOL. S.R.O.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FINJAN, INC.,<br><br>              Plaintiff,<br><br>    v.<br><br>ESET, LLC, et al.,<br><br>              Defendants. | Case No. 3:17-cv-0183-CAB-BGS<br><br>**PUBLIC REDACTED VERSION**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ESET, LLC AND ESET SPOL. S.R.O.'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT DR. ALESSANDRO ORSO**<br><br>Judge:    Hon. Cathy Ann Bencivengo |
| AND RELATED COUNTERCLAIMS. | PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................. 1

II.   DR. ORSO'S EXPERT REPORT AND DEPOSITION TESTIMONY .............. 2

III.  APPLICABLE LAW ............................................................................ 3

IV.   ARGUMENT ...................................................................................... 4

      A.    Dr. Orso's Testimony Is Not "Scientific, Technical, or Other
            Specialized Knowledge [that] Will Help the Trier of Fact" Under FRE
            702(a) .................................................................................... 4

      B.    Dr. Orso's testimony Is Not "Based on Sufficient Facts or Data"
            Under FRE 702(b). .................................................................... 5

            1.    Dr. Orso's Introductory Opinions Should Be Excluded. .................. 5

            2.    Dr. Orso's Opinions Regarding Secondary Considerations
                  Are Baseless. ................................................................. 8

                  a.    Dr. Orso's Opinions on Problem Recognition Are
                        Uninformed. ......................................................... 9

                  b.    Dr. Orso's Opinions on Long-felt Need Are
                        Baseless. ............................................................ 10

                  c.    Dr. Orso's Opinions on Failures of Others Lack
                        Support. ............................................................. 11

                  d.    Dr. Orso's Opinions on Industry Praise Are
                        Inapposite. ......................................................... 13

                  e.    Dr. Orso's Opinions on Copying by Others Is
                        Legally and Factually Unsupportable. ...................... 14

                  f.    Dr. Orso's Opinions on Licensing Fail to
                        Demonstrate the Required Nexus. ........................... 15

                  g.    Dr. Orso's Opinions on Commercial Success Lack
                        Evidentiary Support. ............................................ 16

      C.    Dr. Orso's Testimony Is Not "the Product of Reliable Principles and
            Methods" under FRE 702(c). ...................................................... 19

      D.    Dr. Orso Did Not "Reliably Appl[y] the Principles and Methods to the
            Facts of the Case" Under FRE 702(d) ........................................... 20

      E.    Dr. Orso's Testimony Is Highly Prejudicial. ................................. 20

V.    CONCLUSION ................................................................................. 21

17cv0183

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Banks v. United States*,
   93 Fed. Cl. 41 (2010) ........................................................................... 4, 20

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
   650 F. Supp. 2d 314 (S.D.N.Y. 2009) ...................................................... 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ....................................................................... 1, 3, 19

*Deutz Corp. v. City Light & Power, Inc.*,
   No. 1:05-cv-3113-GET, 2008 U.S. Dist. LEXIS 110202
   (N.D. Ga. Mar. 21, 2008) ............................................................................ 4

*Finjan, Inc. v Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018) ......................................................... 16, 18

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) .................................................................................. 19

*In re GPAC Inc.*,
   57 F.3d 1573 (Fed. Cir. 1995) .................................................................. 13

*Johns v. Bayer Corp.*,
   No. 09cv1935 AJB (DHB), 2013 U.S. Dist. LEXIS 51823
   (S.D. Cal. Apr. 10, 2013) ............................................................................ 4

*In re Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) ................................................................ 13

*Merck & Co. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) ................................................................ 13

*Moses v. Payne*,
   555 F.3d 742 (9th Cir. 2009) ..................................................................... 3

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015) ................................................................. 3

## TABLE OF AUTHORITIES
### *(Continued)*

Page(s)

**Cases (*Cont'd*)**

*Tovey v. Nike, Inc.*,
  No. 1:12-CV-0448, 2014 U.S. Dist. LEXIS 93905
  (N.D. Ohio Apr. 2, 2014) ............................................................................ 20

**Other Authorities**

Federal Rules of Evidence:
  Rule 403 ...................................................................... 4, 12, 15, 16, 20
  Rule 702 ................................................................................... 1, 2, 3
  Rule 702(a) ...................................................................................... 3, 4
  Rule 702(b) ...................................................................................... 3, 5
  Rule 702(c) .................................................................................... 3, 19
  Rule 702(d) .................................................................................... 3, 19
  Rule 703 ............................................................................................... 4

# I.      **<u>INTRODUCTION</u>**

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), ESET, LLC and ESET, spol. s.r.o. (collectively, "ESET") move to exclude the testimony of Finjan's expert Dr. Alessandro Orso.   Dr. Orso purports to testify about Finjan's technologies and secondary considerations of non-obviousness for Finjan's asserted patents, notwithstanding that he has never seen nor used Finjan's products, has not read the patents-in-suit or the claims thereof, and does not understand that evidence of secondary considerations of non-obviousness must have a nexus with ***the claims***, not the ***disclosures***, of the asserted patents.

As revealed during his deposition, Dr. Orso's opinions are infected with a profound misunderstanding of the applicable law that renders his opinions factually and legally insupportable.   Not only was Dr. Orso unfamiliar with the claims of the asserted patents, he was unable even to offer a view as to what the claims meant.   Nor could he provide even a rudimentary description of Finjan's products.   He was also unaware that Finjan had ceased making and selling products a decade ago.   Dr. Orso was totally unaware that Finjan – as an operating company – ███████████████████████████████████████████ ████████████████████████████████████████████████████████████.   And that fact, once made known to him, had no impact on his opinion that Finjan's products were commercially successful.

Dr. Orso also was unable to recall or discuss with any specificity any of the prior art cited in ESET's invalidity contentions or expert's report.   He waffled throughout his deposition as to what nexus was required for secondary considerations.   At first he testified that the nexus is tied to the asserted claims.   But when asked how industry praise from 2003 supported his opinion that claims conceived, written, and issued a decade later were non-obvious, he testified that the nexus is with the disclosure of the application, not the claims.   Similarly, Dr. Orso testified that ████████████████████████████████████ ████████████████████████████████████████████████████.

Dr. Orso also opined that the "long" in long-felt need is a relative term, and for the present invention need only be a few months, and that an unproven *accusation* of infringement, such as that made by Finjan against ESET here, nonetheless constitutes *evidence* of copying supporting his opinion of non-obviousness.

Dr. Orso's testimony is so factually, legally, and logically unsupported that it could not possibly assist a trier-of-fact in assessing validity of the asserted patents. Such testimony does not qualify as expert analysis under FRE 702 and should be excluded.

## II.    DR. ORSO'S EXPERT REPORT AND DEPOSITION TESTIMONY

In his expert report, Dr. Orso purports to opine regarding the validity of Finjan's asserted patents, to discuss the technical background of the patents and to discuss factors and evidence relating to secondary considerations of non-obviousness of the asserted patents.  Declaration of Justin E. Gray in Support of ESET, LLC and ESET, spol. s.r.o.'s Motion to Exclude Plaintiff's Expert Dr. Alessandro Orso ("Gray Decl.")[1], Ex. 1 ("Orso Report") at ¶¶ 19-20.

In paragraphs 27-42 of his report, Dr. Orso generally sets forth the legal principles that he purported to apply in developing his opinions.  In paragraph 27 of his report, Dr. Orso acknowledges that obviousness determinations depend upon a detailed understanding of the prior art:  "Only if the differences between the claimed invention and the prior art are such that the claimed invention, as a whole, would have been obvious to a person having ordinary skill in the art at the time the invention was made without the benefit of hindsight is the claim is invalid." *Id.* at ¶ 27.  And in paragraph 42, Dr. Orso explains that "in assessing whether *a claimed invention* is obvious, secondary considerations may weigh towards the non-obviousness of the invention." *Id.* at ¶ 42 (emphasis added).

Also in paragraph 42, Dr. Orso lists the following factors that may be considered as secondary considerations of non-obviousness:

- Whether the claimed invention satisfied a long-felt need;

---

[1] All exhibits refer to those attached to the Gray Decl. unless otherwise stated.

- Whether the claimed invention was preceded by a history of failures by others to solve a problem or problems solved by such invention;

- Whether the claimed invention achieved a surprising or unexpected result;

- Whether the claimed invention exhibited performance superior to prior art devices and/or methods;

- Whether the claimed invention has achieved commercial success;

- Evidence of industry acquiescence;

- Licenses;

- Whether the claimed invention has been copied;

- Whether the claimed invention was the subject of skepticism by the industry; and

- Whether the prior art taught away from the claimed invention.

*Id.*

## III.   **APPLICABLE LAW**

FRE 702 creates "a gatekeeping role for the judge" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  Under FRE 702(a), expert testimony is admissible if it is based on "scientific, technical, or other specialized knowledge" that "will help the trier of fact [] understand the evidence or [] determine a fact in issue."  Fed. R. Evid. 702(a); *see also Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009) ("Under Rule 702, expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading.").  Additionally, under FRE 702, expert testimony must be based upon sufficient facts or data; be based on reliable principles and methods; and reliably apply principles and methods to the facts.  Fed. R. Evid. 702(b)-(d).

The admissibility of expert testimony is an issue not unique to patent law, requiring application of the law of the regional circuit.  *See, e.g., Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015) ("decision to admit expert testimony reviewed under the law of the regional circuit").  "And, as with other testimony, even expert

testimony which is relevant and reliable may be challenged under FRE 403, which permits the exclusion of evidence on the grounds of prejudice, confusion or waste of time." *Banks v. United States,* 93 Fed. Cl. 41, 47 (2010).  Further, experts are not permitted to adopt other experts' opinions without independent analysis.  *See, e.g., Deutz Corp. v. City Light & Power, Inc.*, No. 1:05-cv-3113-GET, 2008 U.S. Dist. LEXIS 110202, at *15-16 (N.D. Ga. Mar. 21, 2008).

## IV.  ARGUMENT

### A.  Dr. Orso's Testimony Is Not "Scientific, Technical, or Other Specialized Knowledge [that] Will Help the Trier of Fact" Under FRE 702(a).

Dr. Orso relies entirely on the opinions of Drs. Goodrich and Jaeger relating to non-obviousness because, as demonstrated at his deposition, he is ignorant of the content of the asserted patents, meaning of the asserted claims, and is unfamiliar with the prior art cited in Dr. Spafford's expert report.  Ex. 2 (Orso Deposition) at 46:17-62:25; 103:9-104:23; 150:13-23; 185:10-190:13; 205:5-25; 208:4-23; 210:20-25; 226:15-227:1. Moreover, Dr. Orso's testimony, *in vacuo*, regarding evidence of secondary considerations is based not any personal knowledge gained from experience, use, or testing of Finjan products, but instead is based on Finjan's interrogatory responses and a selection of documentary exhibits hand-picked by Finjan's lawyers.  *Id.* at 15:24-16:3; 131:17-23; 143:16-144:10; 223:17-25; 248:18-250:21.   However, experts are not permitted to adopt other experts' opinions without independent analysis.  *See, e.g., Deutz Corp.*, 2008 U.S. Dist. LEXIS 110202, at *15-16 ("Rule 703 … does not permit an expert to simply parrot the opinions of other experts"); *see also, Johns v. Bayer Corp.*, No. 09cv1935 AJB (DHB), 2013 U.S. Dist. LEXIS 51823 (S.D. Cal. Apr. 10, 2013).  Dr. Orso made no effort to independently verify Drs. Goodrich's and Jaeger's analysis of the prior art, nor to otherwise inform himself regarding the Finjan products, ███████████████ ████████████████████████████████.  Ex. 2 at 103:9-104:23; 131:17-23; 150:13-23; 226:15-227:1; 235:17-241:16.   Instead, he relied on a faulty understanding of the applicable law, and a small subset of documents that pre-date

1  ████████████████ to draw broad and unwarranted conclusions.  *Id.* at 39:6-17;

2  66:11-68:12; 79:15-84:16; 97:24-100:4; 220:21-211:5; 229:1-233:22.

3      Dr. Orso's proposed testimony could not help the jury because it is legally and

4  factually incorrect, and thus unreliable.

5  **B.   Dr. Orso's Testimony Is Not "Based on Sufficient Facts or Data" Under

6      FRE 702(b).**

7      As established at his deposition, Dr. Orso's opinions are based on a cherry-picked

8  set of facts and documents provided by his counsel.  His expert report lists as materials

9  considered tens of thousands of pages (if not hundreds of thousands of pages) of

10 documents, including about 100 pages of citations to documents never produced by Finjan

11 during discovery.  Ex. 1 at Appendix B.  Yet Dr. Orso testified at his deposition that he

12 had spent only 60-80 hours on this case for Finjan, including preparation and review of

13 his report.  Ex. 2 at 9:18-23, 18:3-19:15.  As was made plain during his deposition, Dr.

14 Orso did not ask for materials beyond those that were hand-picked for him by Finjan's

15 counsel, and that he lacked a basic knowledge of Finjan's history, its products, the asserted

16 patents, and the prior art cited in Dr. Spafford's expert report.  *Id.* at 27:11-42:17; 46:17-

17 62:25; 131:17-23; 143:16-24; 185:10-190:13; 205:5-25; 208:4-23; 210:20-25.

18     When confronted at his deposition with facts about ████████████████████

19 ██████████████████████████████████ and his erroneous

20 understanding of the applicable legal principles that undercut his opinions, Dr. Orso had

21 no response.  *Id.* at 37:4-42:17; 66:11-68:12; 79:15-84:16; 97:24-100:4.  As explained in

22 detail below, the problems in Dr. Orso's opinions are endemic, and render that proposed

23 testimony supremely unhelpful.

24     **1.   Dr. Orso's Introductory Opinions Should Be Excluded.**

25     Dr. Orso states in paragraph 44 of his report his understanding that each of the

26 asserted patents claims priority to ***November 6***, 1996, based on a priority date analysis

27 conducted by Drs. Jaeger and Goodrich.  Ex. 1 at ¶ 44.  Dr. Orso confirmed at deposition

28 that although he did not do an independent analysis, he did "form[ ] an opinion based on

other reports and documents" to inform his opinion that the priority date is November 6, 1996 for all patents, as set forth in paragraph 44 of his report. Ex. 2 at 44:3-23. Dr. Orso was unaware that Finjan contends that the priority date for all asserted patents is *November 8*, 1996, the first of many factual errors highlighted at his deposition. Ex. 3 (Finjan's Third Amended Infringement Contentions) at 15-16.

In paragraphs 48-54 of his report, Dr. Orso purports to provide an overview of "The Internet and Network Technologies," broadly covering topics of "computer security," "active content," "static and dynamic analysis," and "behavior monitoring." Ex. 1 at ¶¶ 48-54. Dr. Orso's proposed testimony here retreads the same ground as Finjan's other technical overview expert, Dr. Bims, and none of his opinions relate to the disclosures or claims of the asserted patents. *Compare* Ex. 1 at ¶¶ 48-54 *with* Ex. 9 at ¶¶ 8-52.

In paragraphs 56-62, Dr. Orso purports to provide an "Overview of the Asserted Patents." Dr. Orso's proposed testimony as set out in those paragraphs ignores the limitations of the asserted claims, as well as this Court's Claim Construction Order. For example, in paragraph 56, Dr. Orso erroneously opines that "linking *can* be performed before the web server makes the Downloadable available to web clients, which advantageously prevents the client from the malicious program before it is able to be executed (to cause damage)." Ex. 1 at ¶ 56. As construed by this Court, however, linking is not *optionally* performed (i.e. "can") before the web server makes the Downloadable available to web clients" as Dr. Orso opines; instead the linking *must* be done before the Downloadable is available on a web server to be called up or forwarded to a web client. D.I. 195 at 4. In paragraph 58, Dr. Orso mentions the portion of the '844 patent specification that describes "a network gateway that includes the network protection engine," further stating that "the network gateway can include components that generate security profiles that identify suspicious code in the received Downloadables." Ex. 1 at ¶ 58. That embodiment of the '844 patent does not relate to the asserted claims. To insist otherwise ignores the prosecution history of the asserted claims, in which the patentee specifically disclaimed that the claimed "inspector" could be a network gateway, so as to

distinguish over prior art.  Ex. 10 at 5-6.

Similarly, Dr. Orso erroneously opines in paragraph 59 that, in the '086 patent, a "representation of [the] security profile ***can*** be appended to the corresponding Downloadable, ***and/or transmitted*** to a destination computer for action, such as for inspection."  Ex. 1 at ¶ 59.  However, there is nothing optional about these claim limitations as Dr. Orso suggests: for claims 1 and 9, a representation of the DSP data ***must*** be appended to the Downloadable, while for claims 24 and 42, the Downloadable and a representation of the DSP data ***must*** be transmitted by the transmitter.  '086 patent at cls. 1, 9, 24, 42.

With respect to the '780 patent, Dr. Orso opines that the "'780 Patent describes the generation of a 'Downloadable ID' through hashing based on the Downloadable together with its fetched components."  Ex. 1 at ¶ 60.  Yet Dr. Orso was unable at deposition to explain what "hashing" or "fetching" means in the context of the '780 patent without conducting an extensive review of at least the patent and possibly the relevant prior art. Ex. 2 at 42:17-56:5.  Dr. Orso also testified that the claimed ID generator is "not what the court says" as a known construct, but rather only "a known concept" or "a general kind of functionality," not any specific structure.  *Id.* at 57:2-59:16.  He also opined that a benefit of the '780 patent is that "[i]t also allows the network security system to avoid expensive analysis operations for Downloadables that have been seen previously."  Ex. 1 at ¶ 60 (citing '780 patent at 8:7-20).  While mirroring Finjan's erroneous infringement theory vis-à-vis ESET's products, the cited portion of the '780 patent does not at all support Dr. Orso's opinions.  *Id.*

Dr. Orso's characterizations of the '621 and '755 patents also erroneously suggest that critical limitations of the asserted claims are optional.  Ex. 1 at ¶¶ 61-62.  For the '621 patent, he states "[t]he system ***can*** include a comparator coupled to the probes that will determine whether an operation of the Downloadable meets a security policy," whereas this is a positive recitation of all asserted claims.  *Compare id.* at ¶ 61 (emphasis added) *with* '621 patent at cl. 1.  For the '755 patent, Dr. Orso states that the "system of the '755

Patent *can* intercept OS calls and request messages (which include extension calls) that are issued by the Downloadable, compare the extension calls and the OS calls with a security policy before allowing the requests," whereas asserted claim 3 positively recites "a downloadable engine for intercepting a request message."  *Compare* Ex. 1 at ¶ 61 (emphasis added) *with* '755 patent at cl. 3.

Dr. Orso next purports to describe Finjan's Technologies. Ex. 1 at ¶¶ 63-68. While those paragraphs of his report purport to describe the benefits of Finjan's Vital Security products, Dr. Orso testified at deposition that he had never used or tested any Finjan product, and has no actual knowledge regarding those Finjan products. Ex. 2 at 131:17-23. Instead, Dr. Orso's report merely repeats what he saw set forth in Finjan's interrogatory responses. *Id.* at 33:20-34:15; 139:24-140:13; 223:17-25. For example, despite opining about the benefits of Finjan's products, it was painfully obvious at his deposition that Dr. Orso had no idea what those products were beyond "a security product." *Id.* at 30:4-34:23. Nor did he know whether Finjan was still making and selling those products today. *Id.* at 27:11-30:3.

## 2. Dr. Orso's Opinions Regarding Secondary Considerations Are Baseless.

In Section X of his report, Dr. Orso lists the prior art obviousness combinations identified by Dr. Spafford and states he finds the analyses of Finjan's experts, Drs. Jaeger and Goodrich, reasonable. Ex. 1 at ¶¶ 69, 72. Remarkably, Dr. Orso testified that he had spent only 60-80 total hours for this case and during that time managed to: (1) prepare, review, and draft a 59-page expert report; (2) review Finjan's other expert reports totaling over 1,500 pages; (3) review the patents-in-suit; (4) review the hundreds of pages of cited prior art; (5) review the Spafford Report containing over 850 pages of text and charts; (6) "consider" tens of thousands of pages of documents produced by the parties identified at pages 1-10 of Appendix B to his report; and (7) consider the hundreds of thousands of pages of Court filings and IPR materials from other cases identified at pages 11-107 of Appendix B (yes Appendix B, which contains the list of materials cited included over 100

pages of referenced documents)[2]. Ex. 2 at 8:13-23, 18:9-20:13. Unless Dr. Orso has hidden superhuman abilities, his testimony that he reviewed or considered all of these materials simply is not credible; examples illustrating this point abounded throughout his deposition.

For example, despite purporting to opine about the benefits of the Finjan patents in performing "behavioral monitoring" and stopping "zero-day attacks," Dr. Orso was unable to answer whether any claim of the asserted patents required such limitations without first reviewing the patents. *Id.* at 91:7-93:10, 206:1-207:25. Nor could Dr. Orso explain whether the "linking" recited by the asserted claims of the '844 patent was optional ("can") or required ("must"). *Id.* at 107:1-110:3. Dr. Orso also could not answer whether "before" in the phrase "before the web server makes Downloadable to web clients" means "before" or could also mean "after." *Id.* at 110:4-115:22.

Likewise, Dr. Orso was unable to offer any responsive testimony when asked if there is a difference between "deriving ... a list of suspicious computer operations that may be attempted by the downloadable" as recited in claim 1 of the '086 patent and "generating by the inspector a first downloadable security profile that identifies suspicious code in the received downloadable." *Id.* at 118:6-124:9. He also could not explain what the word "appending" in claim 1 of the '086 patent means even though the Court issued a claim construction on this very term. *Id.*

Dr. Orso could answer virtually no questions about the prior art – even though he opined that the analyses performed by Drs. Goodrich and Jaeger were "reasonable." *Id.* at 150:13-23. To support his opinion, Dr. Orso at least should have looked at the prior art discussed in Dr. Spafford's report. But his testimony at his deposition evidenced a complete lack of understanding of the prior art. Dr. Orso invariably responded to every question about prior art with a request to identify the relevant item of prior art, and if any was identified, a further request for the prior art itself. Lacking the prior art for review at the deposition, Dr. Orso testified he was unable to adequately formulate a response to

---

[2] The vast majority of which was not produced by Finjan during this case.

virtually any questions seeking to explore his understanding of such prior art.  *Id.* at 126:14-130:11, 135:1-137:16, 181:6-190:13, 191:19-192:24, 203:9-205:25, 208:4-209:1.

a.    Dr. Orso's Opinions on Problem Recognition Are Uninformed.

In Section X.A of his report, Dr. Orso discusses that "recognition of a problem can be evidence of non-obviousness" and notes that because "the Internet was not as popular as it is today … [p]roviding security measures against hostile Downloadables, particularly those Downloadables spreading through web pages" was a new area of endeavor.  Ex. 1 at ¶¶ 74-100.  Dr. Orso opined that "under the Court's construction, the security issues of Downloadables do not arise prior to the rise of computer networking since the Downloadable requires a program to be downloaded from one computer to another, which requires a network."  *Id.* at ¶ 75.  He further notes that "advanced programming languages, such as the introduction to Java, allowed malicious code to be wrapped into an executable file."  *Id.* at ¶ 77.  Dr. Orso next opined that Finjan developed its own technology, which was different from what was done by the antivirus companies at the time, and characterized existing technologies as "signature-based virus scanning."  *Id.* at ¶ 79.  He then attempted to distinguish the behavior-monitoring heuristic approach of ESET's prior art NOD-iCE program as focused on scanning files that already existed in the file system, as opposed to being downloaded over a network.  *Id.* at ¶ 80.

At his deposition, Dr. Orso was asked to comment on the relevance of prior art programs, such as the TBScan feature of ThunderByte, a terminate and stay-resident program that ran in the background on a Windows machine ("TSR"), and which could scan incoming files, such as the claimed Downloadables.  Ex. 4 (Spafford Invalidity Report) at ¶¶ 105, 223-232.  Dr. Orso testified he could not comment on that program without first reviewing the prior art. Ex. 2 at 205:5-25.  Dr. Orso's opinion on the novelty of scanning incoming Downloadables is based primarily on his misconception that the prior art lacked behavioral monitoring, such as the heuristic analyses employed by the prior art NOD-iCE, HVMS and ThunderByte software and his ignorance that at least ThunderByte included a TSR component that could address incoming files.  *Id.* at 127:1-

130:11, 203:5-205:25.   Dr. Orso should not be permitted to infect the jury with his uninformed opinions on non-obviousness when those opinions are founded on conjecture and ignorance of the prior art.

        b.    <u>Dr. Orso's Opinions on Long-felt Need Are Baseless.</u>

Dr. Orso opines that there was a "long-felt need in the art" for the alleged solutions provided by Finjan's asserted patents. Ex. 1 at ¶¶ 101-111.  Specifically, Dr. Orso opines that a long-felt need is evident "if an industry has a problem and efforts to solve it are unsuccessful for *a number of years*." *Id.* at ¶ 101 (emphasis added).  Here, the supposed long-felt need arose from the need to address the spread of malware via Downloadables, particularly those that could be created using the Java programming environment. *Id.* at ¶ 77.  And again, Dr. Orso identified the need as providing proactive/behavioral analysis in the context of protecting computers against new and unknown attacks. *Id.* at ¶ 106.

Finjan's earliest '639 provisional application, which Finjan erroneously claims provides support for all of the asserted patents, was filed on November 8, 1996.  As conceded by Dr. Orso, "at the time of the invention of the Asserted Patents, the Internet was not as popular as it is today." *Id.* at ¶ 75.  In the 1995-96 timeframe, Internet download speeds were in the range of 14.4 or 28.8 kilobits/second (versus 50-100 Megabits/second today – more than 2000 times faster) and the Internet was only starting to be adopted by the public.  *See* Ex. 2 at 168:13-169:15.  Further, the Java programming environment had only officially been released in January 1996.  *Id.* at 165:16-166:16.  Accounting for the time it took Finjan to contact a patent attorney and file the '639 provisional application, the "long-felt" need for Finjan's inventions existed (if at all) for at most 7-8 months.  Dr. Orso's testimony establishes that, despite supposedly responding to a long-felt need, Finjan's alleged invention arose promptly after the Internet began to gain in popularity and shortly after Java was publicly released.  Thus, the purported need for Finjan's alleged solutions did not meet Dr. Orso's own definition of "a number of *years*," as stated in his expert report.  *Compare id.* at 74:3-24 *with* Ex. 1 at ¶ 101.  And Dr. Orso once again disregards the existence of prior art behavioral monitoring programs.

17cv0183

c.    <u>Dr. Orso's Opinions on Failures of Others Lack Support.</u>

In Section X.C of his report, Dr. Orso opined that "the prior art asserted by Dr. Spafford does not achieve the same level of functionality as the technologies described in the Asserted Patents" and that Dr. Orso agrees with Drs. Jaeger's and Goodrich's analyses distinguishing the asserted prior art references from the asserted patents. Ex. 1 at ¶¶ 112-127. Dr. Orso opined that ThunderByte, HMVS, and NOD iCE are "signature based techniques" even though neither Dr. Goodrich nor Dr. Jaeger ever so characterized those references. *See id.* at ¶ 116. Rather, Dr. Goodrich challenged the prior-art status of ThunderByte (and does not mention HMVS or NOD-iCE), while Dr. Jaeger specifically recognized that each of those references employs a ***heuristic approach*** to behavioral analysis, not signature-based techniques. Ex. 5 (Goodrich Report) at ¶¶ 110-114; Ex. 6 (Jaeger Report) at ¶¶ 578 (ThunderByte), 950 (HMVS), 1030 (NOD-iCE). Even a cursory review of Dr. Spafford's expert report, or those of Drs. Goodrich and Jaeger, makes plain that none of those references are identified as "signature-based techniques." Dr. Orso plainly did not review or consider any of those experts' reports or that prior art, and accordingly should not be permitted to present his completely unsupported speculation to the jury.

Dr. Orso next opined on the alleged "failure of others" regarding solutions provided by the '780 patent. Ex. 1 at ¶ 117. However, at his deposition, Dr. Orso could not answer questions regarding the prior art without first reviewing the references. *Id.* at 208:4-209:1. Nor could he explain the concept of "hashing" or "fetching" as recited in the claims of the '780 patent, without first demanding to review that patent, and despite the fact that those terms were accorded plain and ordinary meanings. *Id.* at 46:14-56:5. And while Judge Alsup in the *Juniper Networks* case granted summary judgment in an opinion dated August 9, 2018, which provided a detailed, reasoned analysis of the motivations for the alleged invention of '780 patent, Dr. Orso was totally unaware of that opinion when he executed his expert report three months later. *Id.* at 194:5-196:9. Instead, Dr. Orso refers to a number of *Inter Partes* Review proceedings initiated by other Finjan defendants to

"support" his conclusion regarding "failure of others." Ex. 1 at ¶¶ 123-126.

In view of the 107 pages of documents and pleading citations set forth in Appendix B to Dr. Orso's expert report (which is substantially the same as the 103-page Appendices in each of the reports of Drs. Goodrich and Jaeger – presumptively compiled by Finjan's counsel), Dr. Orso's palpable ignorance even as to concepts upon which he opined at length in his report (as discussed herein), and the highly prejudicial effect under FRE 403 of introducing evidence regarding *other* defendants' deficient IPR challenges, Dr. Orso should be excluded from offering testimony on any of the topics set forth in Section X.C of his report. *See* Ex. 2 at 15:2-17:3.

d.    Dr. Orso's Opinions on Industry Praise Are Inapposite.

Section X.E of Dr. Orso's expert report fares no better as it is based on a series of non-sequiturs. Ex. 1 at ¶¶ 128-143. In that section, Dr. Orso first identified a number of industry reports from 2003 that he characterizes as praising Finjan's software products for their "proactive and behavior-based approach." *Id.* at ¶ 132. Dr. Orso then explained that the asserted patents are directed to a behavior-based approach, and thus this industry praise from 2003 extends not only to the '844 patent, which was in existence since 2000, but also the other four asserted patents, which did not issue until 2004 ('780 patent), 2011 ('086 patent) and 2015 ('621 and '755 patents)!

When asked to explain how a nexus could exist between industry praise from 2003 and patents that only later came into existence, Dr. Orso revised the statement set forth in paragraph 69 of his report that "the weight accorded to secondary considerations evidence depends on that evidence being reasonably commensurate with the scope of the claims and the existence of a nexus between the merits of the claimed invention and the evidence of secondary considerations." Ex. 2 at 81:3-84:17 (testifying that "the claims are to be interpreted in the context of the overall patent, and therefore to me the merits of the claimed invention are the merits of the invention disclosed in the patent."). According to Dr. Orso's revised opinion at his deposition, the nexus for secondary considerations need only be between the disclosure of the patent as a whole and the industry praise, and need

not relate directly to the claims of the patent.  Dr. Orso's understanding of the applicable law is fundamentally flawed, thus rendering his opinions on secondary considerations incorrect and unreliable.  *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005); *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995); *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (objective evidence that results from something that is not "both claimed and novel in the claim," lacks a nexus to the merits of the invention).

Dr. Orso also cited to industry reports as late as 2008 that he characterized as constituting industry praise for Finjan's products.  Ex. 1 at ¶¶ 135-143.  By then, the '780 patent had issued, but "nexus" problems persist for the later issued '086, '621, and '755 patents.  And furthermore, the industry reports related to Finjan's products as a whole without any specificity or tie (i.e. nexus) to the alleged inventions.

Dr. Orso's opinions on industry praise for the benefits provided by Finjan's products are based entirely on documents hand-picked by Finjan's counsel.  Dr. Orso testified he was unfamiliar with Finjan's products, had never used or tested any Finjan product, and could not even describe Finjan's products, whether software or hardware, beyond "a security product."  Ex. 2 at 30:4-34:23; 131:17-23.  Nor did he know whether Finjan was still making and selling those products today.  *Id.* at 27:11-30:3.  And while Dr. Orso relied on Finjan's interrogatory response that some Finjan products were marked with the '844 and '780 patents, he blindly accepted that representation by Finjan's lawyers, without ever examining the source code to confirm if that was indeed the case.  Ex. 1 at ¶¶ 65, 143; Ex. 2 at 143:16-150:2.  Further, despite relying on the deposition transcript of inventor Touboul for his opinion regarding marking for the '844 and '780 patents, Dr. Orso could not identify where in Mr. Touboul's testimony those patents are mentioned in his cited excerpt.  He also completely overlooked Mr. Touboul's testimony that ████████████████████████████████████████████.  Ex. 2 at 138:16-142:15; Ex. 7 (Touboul Deposition) at 57:12-59:1.  As with most of Dr. Orso's opinions, they are based upon only a selective reading of the record and an incorrect understanding of the applicable legal principles, and ignore key testimony.  Accordingly, Dr. Orso's

opinions regarding industry praise are unsupported, and would only mislead, rather than assist, the jury.

e.    Dr. Orso's Opinions on Copying by Others Is Legally and Factually Unsupportable.

In Section X.E, Dr. Orso purports to opine on copying by others. Ex. 1 at ¶¶ 144-152. Dr. Orso characterized evidence supposedly introduced in Finjan's cases against other defendants, including Blue Coat, Secure Computing, and Sophos, such as statements by Secure Computing's expert witness that "Secure wanted … something Finjan had." *Id.* at ¶¶ 146-150. The highly prejudicial impact of such materials, none of which were produced by Finjan during discovery and therefore none of which ESET could investigate during discovery, vastly outweighs the probative value in this case and should be excluded under FRE 403. The Court should exclude Dr. Orso from attempting to re-litigate Finjan's cases against other defendants – especially since, according to his CV, he did not participate as a witness in any of those cases. Ex. 1 at Appendix A.

Dr. Orso also offers the unsupported speculation that "ESET analyzed Finjan's technology based on competitive intelligence information it received." Ex. 1 at ¶¶ 145, 151-152. The cited document does not remotely support such a conclusion, and there is no documentary or testimonial support in the record that "ESET analyzed Finjan's technology," nor should Dr. Orso be permitted to so speculate. Moreover, Dr. Orso's suggestion that Finjan's *accusation* of infringement can be considered *evidence* that ESET has copied Finjan's patents is a self-referential non sequitur and neither a permissible or rational basis for opinion. *See* Ex. 2 at 95:17-97:10.

f.    Dr. Orso's Opinions on Licensing Fail to Demonstrate the Required Nexus.

In Section X.F, Dr. Orso describes ████████████████████████████████████████████████████████████. Ex. 1 at ¶¶ 153-159. Dr. Orso states that ██████████████████████████████████████████████████ *Id.* at ¶ 154. But Dr. Orso

conceded at his deposition that ███████████████████████████████████

██████████████████████. Ex. 2 at 245:5-246:5.

Similarly, Dr. Orso opined that ███████████████████████████████

███████████████████████████████████████████████████████████████████

████████████ Ex. 1 at ¶ 156.  Yet Dr. Orso acknowledged at his deposition that his

assertion "was a, you know, speculation on my side why I believe something like this

could be done, might be done." Ex. 2 at 238:9-23.  He further admitted that ███████████

███████████████████████████████████████████████████████████████████

████████, a virtual rounding error for the computer behemoth.  *Id.* at 238:24-239:18.

Dr. Orso also noted that a $15 million jury verdict that was awarded for
infringement of the '844 and '780 patents also included amounts for three other Finjan
patents not asserted here. Ex. 1 at ¶ 158.  Dr. Orso contends this establishes a nexus, but
does not explain how, or how the $15 million verdict should be apportioned between the
five patents asserted there. Ex. 2 at 241:5-16.  Dr. Orso also opines that a $24 million jury
verdict in the Blue Coat case is "evidence that shows the value of the '844 Patent."  Ex. 1
at ¶ 159.  Once again, Dr. Orso opines based on incomplete information that renders his
purported opinion invalid.  In particular, Dr. Orso had not been provided by Finjan's
counsel with the Federal Circuit opinion vacating that verdict as being based on a royalty
rate that was "plucked out of thin air."  *Id.* at 241:17-245:1; *Finjan, Inc. v Blue Coat Sys.,
Inc.*, 879 F.3d 1299, 1312 (Fed. Cir. 2018).  Dr. Orso's proposed opinions regarding
licensing, to the extent not excluded as prejudicial under FRE 403, should be excluded as
speculative and/or uninformed.

g.    Dr. Orso's Opinions on Commercial Success Lack Evidentiary
Support.

Finally, in Section X.G Dr. Orso opined on the topic of commercial success, relying
upon an amalgam of his earlier opinions relating to sales of Finjan's Vital Security
products, patent licensing, and Finjan's accusations of infringement as evidence of
copying. Ex. 1 at ¶¶ 160-166.  As described above, Dr. Orso's opinions are based on

selective knowledge of the relevant facts that ultimately render his opinions uninformed, unreliable, and unhelpful to a trier-of-fact.

Moreover, in paragraphs 160-161, Dr. Orso states that sales of Finjan's Vital Security products demonstrate a nexus between the asserted patents and sales of those products. As noted above, Dr. Orso has no basis – other than contentions prepared by Finjan's attorneys – that any of Finjan's products embodied any of the asserted patents. Dr. Orso had never seen, used, or tested any Finjan product, and could not even explain at his deposition whether the products were software, hardware of both. Ex. 2 at 30:4-34:23, 131:17-23. He says he relied upon the patent marking indicated in Finjan's product literature, but as discussed above, Mr. Touboul testified that patent marking was also handled by Finjan's attorney – and without his input.

In paragraph 162, Dr. Orso cites Finjan's product sales in 2004, 2005, and 2006 as additional evidence of commercial success of Finjan's Vital Security products, relying on Finjan's interrogatory responses prepared by Finjan's counsel. First, Dr. Orso was not aware of key information from Mr. Hartstein's deposition in this case, in which Mr. Hartstein ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. Ex. 2 at 37:4-42:17. Indeed, Dr. Orso conceded that "I didn't consider that, I didn't do that analysis, and I don't feel comfortable giving you an answer here at this moment" in response to the question at his deposition ██████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ *Id.* Dr. Orso's opinion that Finjan's products were a commercial success when ███████████████ ████████████████████████████ simply makes no sense, and could not possibly help the jury. *Id.* Second, Finjan bears the burden of showing that its products *did* in fact practice the patents and has come forth with no evidence of any such analysis; reliance on marking is insufficient to meet its burden in that regard. Third, there is no evidence that even if Finjan's products were commercially successful, that such success was due to the

1   *claims* of the patents asserted against ESET.  Because obviousness is determined on a

2   claim-by-claim basis, any alleged commercial success to defeat an obviousness

3   combination must have a nexus to the asserted claim.  Here, Dr. Orso wholly failed to

4   meet that threshold and his testimony should therefore be stricken.

5        In paragraph 163, Dr. Orso again speculated regarding industry praise and long felt

6   need, which opinions are subject to all of the flaws discussed *supra*.  He further speculated

7   regarding how the '844 and '780 patents "can work together as part of a proactive security

8   suite" stating that the relative value of the patents "can be determined based on monetary

9   awards from the jury verdicts explained above."  Ex. 1 at ¶ 163.  Dr. Orso, however,

10  identified only the Blue Coat case in paragraph 159 for such determination, in which

11  $110,000 was allocated to infringement of the '780 patent and the damages amount for

12  the '844 patent was vacated as based upon a royalty rate "plucked from thin air."  *Finjan,*

13  *Inc.*, 879 F.3d at 1312.

14       In paragraph 165, Dr. Orso responded to Dr. Spafford's assertion that a portfolio

15  license does not establish a nexus with any particular portfolio patent, countering with the

16  non sequitur that "a portfolio license does not necessarily mean that the patents in the

17  portfolio are somehow 'free'."  Dr. Spafford never opined that patents in a portfolio

18  license were free, but only that when a portfolio of 30+ patents has been licensed, there is

19  no basis for contending that any *specific* claim, or even any specific patent, motivated the

20  license.  Once again, Dr. Orso failed to establish the legally required nexus for purposes

21  of secondary considerations of nonobviousness.

22       Finally, in paragraph 166, Dr. Orso reprised his speculation that because Drs.

23  Mitzenmacher, Cole, and Medvidovic (wrongfully) assert that the asserted patents are

24  employed in ESET's products, then that accusation provides evidence of commercial

25  success.  Dr. Orso presumably did not review or consider the report of ESET's damages

26  expert, Mr. Britven, who noted that there was no evidence that ESET's customers showed

27  a preference for the features that Finjan says infringes, or that sales of ESET's products

28  experienced a substantial increase after the alleged infringement began in 2005.  Ex. 8

18

17cv0183

(Britven Report) at ¶ 165.  Dr. Orso's circular logic that sales of ESET's products demonstrate commercial success of Finjan's patents, based on Finjan's infringement accusations, cannot possibly assist the trier-of-fact.

Dr. Orso's speculation, ignorance of the prior art, and selective understanding of the documentary and testimonial evidence in this case cannot possibly assist the trier-of-fact to reach sensible conclusions with respect to the matters at issue.  *See, e.g., Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 320 (S.D.N.Y. 2009) (excluding expert opinion that transshipping occurred in same proportion outside of the studied sales territories because expert offered no basis for the assumption that the studied sales territory was representative of the facts-in-suit).

**C.    Dr. Orso's Testimony Is Not "the Product of Reliable Principles and Methods" Under FRE 702(c).**

For all of the reasons discussed above, Dr. Orso's understanding of the record in this case was unduly influenced by what Finjan's counsel provided to him, as well as what they elected not to provide to him.  As discussed above, Dr. Orso's report cites to the reports of Drs. Jaeger and Goodrich as support for things they never said in those reports (e.g., that NOD-iCE, HMVS, and ThunderByte are "signature based techniques.").  Dr. Orso also cites to fictional statements of Mr. Touboul as support for opinions relating to patent marking, but Mr. Touboul never said those things either.  And Dr. Orso's testimony that there was a long-felt need for the claimed inventions of the asserted patents contradicts his own definition of long-felt need.

Dr. Orso's opinions that the legally required nexus for secondary considerations can be based on the disclosure of the patent, rather than the claims themselves, misunderstands the relevant law, as does his contention that industry praise is an indicia of patents not issued until decades later.  Similarly, Dr. Orso's contention that a product is a commercial success when it precipitates ████████████████████ defies common sense.  Still other examples of Dr. Orso's flawed analyses abound, as discussed above.

As the U.S. Supreme Court has aptly held: "[N]othing in either *Daubert* or the

Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Dr. Orso's opinions fall squarely within the Supreme Court's admonition, and should be excluded.

## D. Dr. Orso Did Not "Reliably Appl[y] the Principles and Methods to the Facts of the Case" Under FRE 702(d).

As also detailed extensively above, Dr. Orso did not apply reliable principles or methods to the facts of this case because he did not consider the materials facts contained in the documentary and testimonial record, but instead considered only selective information that provided an incomplete view of the record. *See, e.g., Tovey v. Nike, Inc.*, No. 1:12-CV-0448, 2014 U.S. Dist. LEXIS 93905, at *24-25 (N.D. Ohio Apr. 2, 2014) (excluding expert testimony regarding consumer confusion not predicated on a consumer survey because there was no "reliable support for her conclusion," and the "opinion amounts to only speculation, which is generally inadmissible") (citation and internal marks omitted). Such a lop-sided and stilted view of the relevant facts cannot help the jury, but instead only lead to confusion.

## E. Dr. Orso's Testimony Is Highly Prejudicial.

On the foregoing record, the risk of jury confusion and undue prejudice to ESET in allowing Dr. Orso to testify is extraordinarily high. *See* Fed. R. Evid. 403. Dr. Orso's admitted speculation is not based on facts, nor can it lead to reasonable conclusions since it lacks documentary and testimonial support in the record. Dr. Orso's efforts to inject snippets of trial testimony or verdicts from Finjan's cases against other defendants, in cases in which Dr. Orso was not even a witness, or IPR results obtained by other defendants, can only cause jury confusion and undue prejudice to ESET.

Thus, even if Dr. Orso's testimony could somehow be deemed relevant and reliable, it should be excluded under FRE 403 as confusing and prejudicial. *See, e.g., Banks,* 93 Fed. Cl. at 47.

1

## V.    CONCLUSION

2      For the foregoing reasons, the entirety of Dr. Orso's opinions should be excluded.

3

4   Dated:  April 23, 2019                    Respectfully submitted,

5                                             **FOLEY & LARDNER LLP**

6

7

8                                             */s/ Justin E. Gray*
                                              NICOLA A. PISANO, CA Bar No. 151282
9                                                  npisano@foley.com
                                              JOSE L. PATIÑO, CA Bar No. 149568
10                                                 jpatino@foley.com
                                              JUSTIN E. GRAY, CA Bar No. 282452
11                                                 jegray@foley.com
                                              SCOTT A. PENNER, CA Bar No. 253716
12                                                 spenner@foley.com
                                              3579 VALLEY CENTRE DRIVE, SUITE 300
13                                            SAN DIEGO, CALIFORNIA  92130
                                              TELEPHONE:    858.847.6700
14                                            FACSIMILE:    858.792.6773

15                                            Attorneys for Defendants and Counter-Plaintiffs
16                                            ESET, LLC and ESET SPOL. S.R.O.

17

18

19

20

21

22

23

24

25

26

27

28

17cv0183