1                  UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF CALIFORNIA

3               THE HONORABLE CATHY ANN BENCIVENGO

4

5    FINJAN, INC.,                    )
                                      )
6                       Plaintiff,    )   CASE NO. 17CV183-CAB-BGS
                                      )
7              vs.                    )   SAN DIEGO, CALIFORNIA
                                      )
8    ESET, LLC and ESET SPOL, S.R.O.,)   TUESDAY, MARCH 10, 2020
                                      )
9                       Defendants.   )

10

11

12

13

14

15

16        Reporter's Transcript of Jury Trial, Day 1, Volume 1
                          Pages 1-219

17

18

19

20

21

22

23   Proceedings reported by stenography, transcript produced by
     computer assisted software                            ___

24
              Mauralee Ramirez, RPR, CSR No. 11674
25              Federal Official Court Reporter
                   ordertranscript@gmail.com

```
 1   APPEARANCES:

 2   For The Plaintiff:      Kramer Levin Naftalis & Frankel, LLP
                             Paul Andre
 3                           James Hannah
                             Lisa Kobialka
 4                           Kristopher Kaskins
                             990 Marsh Road
 5                           Menlo Park, California 94025

 6                           Cristina Lynn Martinez
                             1177 Avenue of the Americas
 7                           New York, New York 10036

 8

 9   For the Defendants:     Eversheds Sutherland (US) LLP
                             Justin E. Gray
10                           Nicola A. Pisano
                             Scott A. Penner
11                           Jose Patino
                             Regis Worley
12                           12255 El Camino Real, Suite 100
                             San Diego, California 92130
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       San Diego, California; Tuesday, March 10, 2020; 8:45 a.m.

2        (Case called)

3        (Appearances stated)

4           THE COURT:  All right.  I've received your briefs

5    about the opening statement demonstratives and exhibits that

6    Mr. Hartstein is going to use.  I'm going to wait on the depo

7    designations.  I have to look at them in context, and I don't

8    think I need to do that before we start this morning.

9           MR. ANDRE:  It's probably unlikely we get to those

10   today, but we can get to it in the afternoon to see how things

11   progress.

12          THE COURT:  Regarding Finjan's PowerPoint, first of

13   all, I expect all of these are demonstrative, correct?  None of

14   these are going to be admitted?

15          MR. ANDRE:  That's correct.

16          THE COURT:  I don't have any issue really with the

17   timeline and the explanation.  I understand that Finjan has

18   some concerns that it shows a company that -- and we've had

19   this conversation before -- that evolved over time, and so

20   we're going back to when it was something else and then

21   ultimately became Finjan, Inc.  But it's a timeline that shows

22   when the patents issued.  I'm okay with that.

23          I'm a little more concerned about the product and the

24   awards because I'm not quite sure in terms of relevance in the

25   case, which is what ESET raised is this -- I mean, when was

1    this product sold?  Does it actually practice the patents?

2    What is its relevance?  Why pick that one out of however many?

3    Do the awards have anything to do with these patents?

4         MR. ANDRE:  Your Honor, I'd like to have Ms. Cristina

5    Martinez argue this, if you don't mind.

6         THE COURT:  That's fine.

7         Good morning.

8         MS. MARTINEZ:  Good morning, your Honor.  So these

9    slides are really just a demonstrative of what the product

10   looked like at the time.  We're not planning on introducing any

11   evidence attempting to map the product to any of the patents in

12   this case.  It's really to provide a background about the

13   company and say Finjan did, in fact, have products as of a

14   certain time frame.

15        And then with respect to the awards, just to say that

16   Finjan was recognized in the industry and did receive awards as

17   a company.  We attached some of ESET's opening slides to show

18   that they are really planning on attacking Finjan as not a real

19   company, not a successful company, and so this is really

20   important for us to be able to say yes, we did, in fact, have a

21   product, and to kind of rebut those attacks on Finjan as an

22   operating entity.

23        So just demonstrating -- this really is a

24   demonstrative to just show what the product looked like and,

25   again, to just mention some industry recognition.  It will not

1   be going into detail in terms of either the exhibits or the

2   demonstrative.  It's really to just sort of say what the

3   industry was saying about Finjan at the time.

4           THE COURT:  Thank you.

5           MR. PENNER:  Good morning.  As we discussed earlier in

6   the motions in limine conference, the use of the -- the use of

7   the appliances or Finjan's products are basically to provide

8   the jury with an understanding that they practice these patents

9   as well as won awards for them.  And, as Your Honor noted,

10  during that time, there is simply no evidence in the record, or

11  witnesses, that can tie any of the products or the awards to

12  any of the patents at issue.  And so, it's going to be leaving

13  the jury with the impression that these products practiced the

14  five patents that they're going to wind up discussing this

15  entire time.  Otherwise, there's really no reason to introduce

16  them at this point.

17          Also, Your Honor, this image of the actual appliance,

18  they have used this image in other slides as well.  And so, for

19  example, there's a slide deck that we'll probably be discussing

20  this tomorrow that uses the same image, and they actually put

21  it on a slide that shows the patent numbers.  And so, they're

22  trying to create the impression by showing this to the jury

23  today, and then later on, showing the same images with the

24  patent numbers that these products are practicing those

25  patents.  And that's the impression that we discussed at the

1    motion in limine.

2          THE COURT:  All right.  I'm not going to strike the

3    slides for opening or Mr. Hartstein's testimony.  With the

4    understanding, as counsel has just represented, that there

5    isn't going to be an inference made that these awards somehow

6    were made for these particular patents or what they claim, and

7    the testimony will be subject to a motion to strike and an

8    instruction to the jury to disregard any testimony in that

9    regard because I don't believe there has been -- if you lay

10   foundation for it during his testimony, but they've said that

11   no one has ever testified to that.  And certainly,

12   Mr. Hartstein has never testified to the fact that he believes

13   this particular product, which -- the vital security product,

14   is a commercial embodiment of the patents at issue in the case.

15         So, again, in the context of explaining the nature of

16   the company, where it came from, how it evolved, it's fine,

17   that the company has been recognized and received industry

18   awards generally is fine, but be careful on the line, that we

19   don't cross it to leave an inference with the jury that these

20   awards are specific to the patents at issue in the case.

21   You'll have lots of opportunity to cross-examine Mr. Hartstein.

22         All right.  I think that was the bulk of the arguments

23   for your opening slides.

24         MR. ANDRE:  As for Mr. Hartstein, yeah, that was, Your

25   Honor.

```
 1              THE COURT:  Okay.  And then?

 2              MR. ANDRE:  Our objections to their opening slides,

 3   Your Honor, is legal in nature regarding claim instruction, and

 4   I don't think you have a copy of their opening slides.  I can

 5   hand it up if you like.  Can I hand this up, Your Honor?

 6              THE COURT:  Sure.

 7              MR. ANDRE:  This was not part of the letter briefing,

 8   Your Honor.  The opening slides give a different timeline for

 9   disclosures.  The purple flags are the ones we have the primary

10   problem with slides.  And it's slides 13, 14, 16 -- 12, 13, 14,

11   and 16.  The problem I have with the slides is they take Your

12   Honor's claim construction and put emphasis on certain words.

13              Your Honor, when you gave a claim construction, you

14   didn't emphasize those aspects of your claim instruction, so I

15   asked my colleague to take this -- play it straight and just

16   put it in text.  We don't have a problem with the claim

17   instruction, but emphasizing certain aspects of the

18   construction is not appropriate.  That's not the law of the

19   case.  They put an asterisk on there and put emphasis added,

20   but I don't think that solves the problem.  That's the issue

21   with slide 12 and 14.

22              Slide 13 is a little more problematic.  They put the

23   word "fetched" in there and gave definition to the word

24   "fetched," which Your Honor did not construe.  That's on slide

25   13.  They never asked to have the word "fetch" construed by
```

 1   this Court.

 2          THE COURT:  Yes.

 3          MR. ANDRE:  They put their own construction on it

 4   saying that's required.  We don't think that's appropriate.

 5          THE COURT:  In the context, the way it is presented, I

 6   am a little concerned it's not a construction the Court gave.

 7          MR. PISANO:  Your Honor, let me first deal with the

 8   "emphasis added."  This was simply so we could save time in

 9   having the Trial Director guy outcize (sic) the words.

10   Clearly, we've added "emphasis added" on pages 12 and 14 so

11   that -- to focus the jury's attention on those words.  I can

12   state to the jury that those were not emphasized in the Court's

13   constructions.  But they are, in fact, italicized because those

14   are things that we're going to be bringing to their attention.

15          Now with respect to the "fetched" on slide 13, for

16   example, we don't say that's the Court's construction.  In that

17   middle box, we say what the claims require.  Now, for the first

18   element, "Performing hashing function of the Downloadable

19   together with express software components," that's Your Honor's

20   construction.

21          There was no construction for the word "fetch," but

22   this is what we believe the evidence will show, and we believe

23   this is what our experts will testify that the evidence

24   requires.  So, you know, we're not saying that it doesn't say

25   that's your construction.  That's the way we're interpreting

1   it.  That's the way we believe the jury should interpret it for

2   the purposes of this trial.  And, obviously, Finjan has a

3   different view, and their interpretation of fetched is in the

4   next column.  So we're not at all saying that's what you said.

5           THE COURT:  Okay.

6           MR. ANDRE:  Your Honor.

7           MR. PISANO:  We're making that distinction.  We think

8   the jury will be able to understand that distinction.

9           MR. ANDRE:  But it's put with your construction, Your

10  Honor.  It says what the claims require and with your

11  construction right above it.  And that is what the claims

12  require, your construction.  Then they put "fetch" right below

13  it so that gives the impression that that is required.  And we

14  would just disagree, that is not what the claims require.  What

15  is required is what Your Honor construed.

16          THE COURT:  Well, it may end up that we're ultimately

17  going to have to construe what that term means during the

18  course of the trial since there seems to be no clear and plain

19  and ordinary meaning since the experts have different points of

20  view.  But we'll have to wait to see how their testimony comes

21  in.

22              With the understanding that you're going to make this

23  clear and that this is opening statement, it's not evidence,

24  it's sort of argument, and you make it clear when you turn to

25  this slide that you're talking about your party's position as

1     to how the patent should be applied, I don't have a problem

2     with either of the slides or with the emphasis you've added,

3     again, because this is argument -- well, opening.

4          MR. ANDRE:  On the last one, slide 16, Your Honor, and

5     there's an issue there about the changing claim construction.

6     Our experts are applying the Court's claim construction and

7     they put in there "the construction may change over time,"

8     which is not our understanding.

9          THE COURT:  I'm sorry.  On 16?

10          MR. PISANO:  On 16, Your Honor.

11          MR. ANDRE:  Slide 16.  You'll see they have the "small

12     executable."

13          THE COURT:  Yes.

14          MR. ANDRE:  And on the right, they put in the -- some

15     megabit size, et cetera, and at the bottom, they say "they

16     change over time."

17          MR. PISANO:  Well, Your Honor --

18          MR. ANDRE:  And it's something, that, once again,

19     depending on how they argue it, it's a -- claim construction

20     doesn't change over time.

21          THE COURT:  My recollection of this when I did the

22     claim construction and put in "small" and raised the issue at

23     the time that I might be creating a problem by using the word

24     "small," that that was the definition that was used in the

25     patents and the family tree.  And then I looked at the

```
 1   testimony and did not give them summary judgment on this
 2   because there was an argument that the meaning of "small" would
 3   evolve over time depending on the size of files that a computer
 4   could handle.  And I think that's what you're reflecting.
 5            MR. PISANO:  That's right, Your Honor.
 6            THE COURT:  So it really isn't that they're saying
 7   that claim construction works.  It's what the plain and
 8   ordinary meaning of what "small" would be as these patents roll
 9   out.  So that's fine.  You can keep that.
10            All right.  This blue tab in the front here?
11            MR. ANDRE:  Your Honor, that's a trivial argument.
12   The law changed.  They're going to try to argue that we have
13   submarine patents.  I don't know if Your Honor was -- and back
14   in the day, this was over 20 years ago, there is such things
15   as-- I think Mr. Lemelson --
16            THE COURT:  Yes.
17            MR. ANDRE:  -- created submarine patents.  And they're
18   going to bring up this issue of submarine patents.  And, you
19   know, the law changed back then.  I think it was '94, 95 that
20   submarine patents were done.  They got rid of those and they,
21   you know --
22            THE COURT:  Pull this slide out.  I don't want this
23   slide.
24            MR. PISANO:  Your Honor.
25            THE COURT:  I'm not going to define submarine patents
```

```
 1   to the jury.  You can talk about this being continuations, but

 2   that whole --

 3            MR. PISANO:  I understand, Your Honor.  That's fine.

 4   I'll pull it, but just if I might, you can still have a

 5   submarine patent.  If you look it up on Wikipedia, the

 6   definition --

 7            THE COURT:  Oh, yes, there's a good source.

 8            MR. PISANO:  Okay.  But the definition of a submarine

 9   patent, Your Honor, is something in which the prosecution has

10   been delayed a very long time.  As to two of the patents in the

11   case, that seemed to be inappropriate.  I'm not aware of any

12   case law --

13            THE COURT:  I understand you have an equitable defense

14   of prosecution laches.  That's for the Court.

15            MR. PISANO:  Thank you for mentioning that, Your

16   Honor, because that is actually an issue.  So on prosecution

17   laches, we agree that is an issue for your determination, but

18   whether there is prejudice or not due to the delay, we believe

19   that is it something that the jury gets to decide.  That is

20   something I do plan to talk about in the opening, the amount of

21   time it took them to prosecute the patents.

22            THE COURT:  That's fine.  I looked at the verdict

23   form, and I think for that purpose, we might have to get an

24   advisory opinion on the ultimate issue but allow the jury to

25   make a factual finding on whether or not there's been
```

```
 1   prejudice.

 2           MR. PISANO:  Thank you, Your Honor.

 3           THE COURT:  Okay.  Anything else?

 4           MR. PISANO:  Your Honor, there was one more issue on

 5   Mr. Hartstein's exhibits.  One of those things, in the chart

 6   that deals with Finjan negotiating with ESET, it's our

 7   understanding that plaintiff intends to introduce

 8   communications between Finjan and ESET and Finjan and ESET's

 9   counsel, which is me.  So they're going to be -- they want to

10   put in letters that went back and forth between me and

11   Mr. Chaperon, who is no longer with Finjan, about what we were

12   doing.  I think that is totally inappropriate because your

13   Honor has already set the start date from infringements.

14           And all of the discussions under NDA -- or all the

15   negotiations were under NDA.  So I think for them to bring in

16   any of those letters talking about what the parties' positions

17   were or what we were saying back and forth to one another under

18   the NDA, totally inappropriate.

19           MS. MARTINEZ:  So, first of all, the communications

20   that we were seeking to mark with Mr. Hartstein were not under

21   the NDA.  They all predated the NDA.

22           And, second, just again, this is really just going to

23   the context of setting up how we got here, what the

24   communications had been between ESET and Finjan that predated

25   this lawsuit.  Again, there's going to be arguments -- it
```

1   appears anyway, that there's going to be arguments sort of

2   saying Finjan is an entity that just wants to litigate.  Again,

3   in their opening slide, you can see that they were trying to

4   identify how many licenses arose out of the litigation.  So

5   this is kind of giving the history to say this is when the

6   parties were in communication with each other prior to any

7   litigation.

8          And with regard to notice, yes, there is.  Your Honor

9   did issue a summary judgment issue regarding the notice date,

10  but it's not a stipulated fact, so it's important that Finjan,

11  who bears the burden of proof, has the foundation that its

12  damages expert can then say, you know, this was the date that

13  Finjan first provided notice to ESET and kind of discuss that

14  set of communications.  So we're not seeking to introduce any

15  of the letters that were post NDA or really to go into detail

16  about the letters themselves, but it's really, you know, the

17  date that Finjan first sent that letter out, to lay the

18  foundation and also to establish sort of the course of the

19  communication between the parties.

20         THE COURT:  I don't know how you're going to establish

21  the course of communications without getting into the NDA,

22  because my recollection was that almost immediately following

23  the initial notification on the -- the first patent, they

24  launched into the NDA and the negotiation, none of which is

25  admissible.

```
 1              So the fact that a letter was sent in January to ESET

 2      is fine, that you can use that to mark the date of the first

 3      notification to them, actual notice to them regarding that

 4      patent.  And there were two I think that were covered in that

 5      patent.  But I don't want to see any communications from

 6      counsel because I don't want it to make it look like counsel is

 7      a witness and he's not going to be able to take the stand to

 8      talk about it and have people interpreting what he wrote or

 9      what he said.  So the timeline that just shows you sent them a

10      letter for opening is fine, but communication back and forth is

11      not acceptable.

12              MS. MARTINEZ:  Your Honor, just to ask a question, so

13      that January 22nd, 2015 letter which was from Finjan to ESET

14      and not to counsel, is that okay to use and mark with

15      Mr. Hartstein?

16              THE COURT:  That's fine, yes.

17              MR. PISANO:  Your Honor, in their slide, they have a

18      period that says -- after that letter, they say Finjan

19      negotiates with ESET.  And during that period --

20              THE COURT:  Well, that's a fact, Counsel.  They sent

21      you a letter, they were having communications with you.  If

22      you're going to argue some sort of laches, it needs to be fair

23      that they didn't send you a letter and then never talked to you

24      for four years.

25              MR. PISANO:  Your Honor, we're not going to argue that
```

1    for the period after the letter.  But during that NDA period,

2    they tried out a lot of patents before we ended up with the

3    patents here.  So the problem is that, negotiations, there is a

4    lot of back and forth.  There were things that came in, there

5    were things that went out.  We went back and forth.  And,

6    again, if they want to put the first letter in, 2015, Your

7    Honor, I have no objection to that.  We're not going to object

8    to 2015 and filing the suit.  But a year later there was

9    laches.  Besides, laches went away anyway, so, you know, we're

10   just concerned, as you say, that they're going to open the

11   door.

12        THE COURT:  All right.  Again, understanding the

13   initial letter that kicked off your notification to them so

14   that you have a start point for your experts to talk about when

15   they were on notice is fine and when the suit was filed,

16   obviously, is a matter of public record.  The negotiations that

17   went on in between, we're not going to discuss with the jury,

18   and if anybody starts to go down that road, I'll cut it off and

19   tell them they're not to be concerned about prior to the suit

20   being filed, other than the letter was sent.  All right?

21        MR. PISANO:  Thank you, Your Honor.

22        THE COURT:  Is that it now?

23        MR. PISANO:  Your Honor, I have a couple housekeeping

24   issues.  We're just going to deal with them very quickly.

25        MR. PENNER:  One issue, Your Honor, is at the motion

 1    in limine conference, the pretrial conference, the parties had

 2    discussed about adding the Court's claim constructions to the

 3    jury binder.  The parties could not agree on what the claim

 4    constructions should look like.  We believe that the claim

 5    construction should include all of the terms that Your Honor

 6    construed that are relevant to the patents-in-suit, and Finjan

 7    argued that we should not include the term "appended

 8    Downloadable" because they have dropped that from their

 9    infringement contentions.  But, of course, we still have it as

10    our invalidity contentions, and we still plan to invalidate

11    that claim.  And, therefore, it seems appropriate art.  We

12    believe it's appropriate for the jury to have that in their

13    binder.  If it never comes up, it doesn't matter if the jury

14    saw it or not.  So we do have two sets of instructions, one

15    with the word "appended," which we believe should be there, and

16    one without, but right now, the jury binder does not have any

17    of the claim constructions.

18         THE COURT:  All right.

19         MR. HANNAH:  Your Honor, as counsel said, we've

20    narrowed the case based on the number of hours that you've

21    allowed us.  We have dropped a number of claims.  They've

22    indicated that they want to keep in some -- to challenge some

23    of the claims that we're not asserting for infringement, which

24    is, I think, another issue for this Court.

25         But one issue that we have is, is we have dropped

 1    claims from the '086 patent.  And in your claim construction

 2    order, there's a definition of the word "Destination Computer."

 3    And I have a copy of your order if you would like me to hand it

 4    up to you.

 5              THE COURT:  Sure.

 6              MR. HANNAH:  May I approach, Your Honor?

 7              THE COURT:  Yes.

 8              MR. HANNAH:  I'm also handing you ESET's claim

 9    construction brief.  The issue that we have here is that in

10    your order for "Destination Computer," it's "a separate

11    computer receiving the appended Downloadable."  And the parties

12    agreed that that construction only applies to claim 1, the

13    earlier claims, and not claim 24, which does not require the

14    appended Downloadable.

15              It's actually not in the claim at all.  It's evident

16    from the fact that Your Honor put in "a separate computer

17    receiving the appended Downloadable," which is antecedent

18    basis.  And if you look at ESET's opening claim construction

19    brief on page 7 at line 11, ESET flatly admitted -- said:

20              Claim 24 further confirms this construction, because

21    it recites transmission of a Downloadable and a representation

22    of the Downloadable Security Profile data as multiple pieces of

23    informations, while claims 1 and 9 each teach transmitting a

24    singular appended Downloadable.

25              So I think what they're trying to do is import this

1  definition of "a destination computer requiring an appended

2  Downloadable" into claim 24.  So if they want to keep in claim

3  1 from the '086 and challenge it, even though it's not being

4  asserted for infringement, we think there should be some type

5  of notation that this claim construction only applies to claim

6  1.

7       MR. PENNER:  First of all, we are not arguing that the

8  appended Downloadable is required for claims 24 or 42, and it

9  would apply to both claim 1 and claim 9 since both claims 1 and

10 9 use the "appended Downloadable" term.  We simply copied

11 directly out of Your Honor's claim construction order the sets

12 of claim constructions for the jury binder.

13      THE COURT:  All right.  I'm going to leave it in the

14 jury binder.  I think that at the end of the day if it's in

15 there and it never gets discussed, it's not going to be

16 prejudicial.  No one is going look at it and say oh, wait, we

17 didn't talk about this.  I can guarantee you.

18      But if you're still planning on pursuing an invalidity

19 challenge to a claim they're no longer asserting for

20 infringement and they're not willing to dismiss it with

21 prejudice, the claim, then I will allow you to continue to

22 assert your dec relief claim for validity on that claim.

23      MR. HANNAH:  Your Honor, we are willing to dismiss

24 with prejudice, by the way.

25      THE COURT:  All right.  Let's talk about that in

1   the -- at another time.  Okay.

2            MR. PENNER:  Thank you, Your Honor.

3            THE COURT:  That would help, I think.  Then they don't

4   have to go there.

5            MR. ANDRE:  The last thing, Your Honor, just for

6   opening statements, are we anchored to the podium there?

7            THE COURT:  No.  We have a lapel mic, so you can move

8   around.  And during jury, you can step into... obviously,

9   because you're going to need to -- oh, my God, where are we

10  going to put everybody?  How many do we have coming?

11           THE CLERK:  Thirty.

12           THE COURT:  I'm going to need -- everybody on that

13  side is going to need to move to that side of the courtroom so

14  that when the jury pool comes in.

15     (Discussion between Court and courtroom deputy off the

16  record)

17           THE COURT:  Never mind.

18           MR. PENNER:  Your Honor, there's one more thing that

19  has come up for tomorrow.  One of the witnesses, Mr. Kroll, you

20  had mentioned in the pretrial conferences that witnesses could

21  be taken out of order.  Mr. Kroll is going to be here live for

22  Finjan, and we intend to call Mr. Kroll in our case as well.

23  They've indicated he will not be available when we want to call

24  him and so that so we can simply play his deposition

25  transcripts.  Given that he is here, we would like the

1    opportunity to question him live.  It seems strange for the

2    jury to see him once live and then we're relegated to

3    videotape.  So we would like to call him out of order and take

4    him at the same time we do our cross-examination.

5              THE COURT:  Do you really have an objection to that?

6              MR. ANDRE:  Well, only to the extent that they

7    designated the deposition.  They said they were going to play

8    the deposition.  Now they want to take him out of order.  The

9    only objection I have with it, Your Honor, to be honest with

10   you, is it blows the flow of our case.

11             THE COURT:  I'm sorry.  It does what?

12             MR. ANDRE:  It blows the flow of our case.

13             THE COURT:  Well, that's not a reason.  Okay.  You may

14   take him tomorrow to facilitate for the witness and not have to

15   bring him back.  All right.  I think we'll get the jury in

16   then.

17             By the way, so normally, I read the list of all the

18   witnesses, but you might notice because there are so many and

19   they have some complicated names, I have provided the

20   prospective jurors each with a copy of the prospective witness

21   list, so I'll just have them look through.  All right.  Bring

22   them on in.

23        (Pause in the proceedings)

24        (Prospective jurors entering at 9:35 a.m.)

25        (Prospective jurors given an oath)

```
1        (Case recalled)

2        (Appearances restated)

3            THE COURT:  Good morning, ladies and gentlemen.

4    Welcome to courtroom 4C of the United States District Court,

5    Southern District of California.  I'm District Judge Cathy Ann

6    Bencivengo.  We'll be together until we take a break as a group

7    so if you have not already made sure your cellphone is

8    silenced, please do so at this time.

9            If anyone needs any hearing assistance, don't hesitate

10   to let us know.  We can give you a headset.

11           The Court and the parties appreciate the effort you

12   have all made to be here this morning.  Our system of justice

13   would not work without the willing and dedicated participation

14   of citizens like yourselves giving up your personal time to

15   come to court and assist in the resolution of disputes, so

16   thank you for your time and effort.

17           We are about to begin a civil trial between plaintiff,

18   Finjan, Inc. and defendant, ESET, LLC, a California corporation

19   and ESET S.R.O., a Slovakian corporation, jointly referred to

20   as ESET.

21           The first step in our trial process this morning will

22   be to select nine jurors to hear this case.  Each side in this

23   case is entitled to have a neutral and impartial jury to hear

24   and decide the case based solely on the evidence presented in

25   court and the law as you will be instructed.  The purpose of
```

1    jury selection is to allow the Court and the parties to inquire

2    as to whether a prospective juror can fulfill that role.  Your

3    participation in this step is very important.  You'll each have

4    an opportunity to tell us about yourself, so please give this

5    process your full attention.

6            If you are selected, you will be expected to be here

7    each trial morning by 8:30, and we will adjourn each day at

8    approximately 2:30 with two 20-to-30-minute breaks during the

9    day.  Given the length of the trial, it's my hope that the

10   schedule will provide some time during the trial days for

11   jurors to handle work and other family matters.

12           The presentations of evidence is expected to conclude

13   on or before Thursday, March 26th.  We will be in session today

14   through Thursday, then reconvene Monday through Thursday next

15   week and the week after.  I do not have trial on Fridays.  That

16   is the day I handle criminal sentencings and motion hearings.

17           Each side has been allotted 25 hours to present their

18   case to you.  Absent some unexpected event, the case should be

19   in your hands for deliberation by March 26th.

20           Now I realize that participating and responding to a

21   summons for jury duty and participating as a juror is an

22   inconvenience at some level for everyone.  However, jury duty

23   is not a responsibility to be avoided or disparaged.  The

24   Seventh Amendment of the Constitution preserves to each of us

25   the right to have a trial by jury in a civil matter.  The

 1   founders of our nation believed the rule of law and equal

 2   access to justice is best preserved by providing that members

 3   of the community hear the disputes of individuals and reach

 4   agreement as to the fair and lawful result.

 5          Here, your voice and your vote count, and I hope you

 6   will each consider it more than a duty or a responsibility, but

 7   a privilege to participate in our democratic process by serving

 8   on this jury, if selected.

 9          You have all responded to a prescreening questionnaire

10   regarding the length of time and indicated you're available at

11   this time.  However, does anyone have a serious problem or

12   concern that being able to sit for the time period and the

13   schedule I've just set forth?  Please raise your juror card.

14          Okay.  Number 7.  What's your problem?

15          PROSPECTIVE JUROR:  I have young children I'm

16   responsible to bring to school.

17          THE COURT:  You can't be here by 8:30?

18          PROSPECTIVE JUROR:  (Moving head)

19          THE COURT:  What time would you be able to be here by?

20          PROSPECTIVE JUROR:  The earliest is 8:50.

21          THE COURT:  Okay.  Thank you.  And somebody I can't

22   see.  Number 18.

23          PROSPECTIVE JUROR:  Good morning, Your Honor.  I

24   originally responded yes, and I would very much like to serve.

25   My girlfriend hurt her back on Friday.  We have no relatives in

1    the area and we have a 19-year-old dog who decided he's no

2    longer continent, so she's lying flat on her back on the floor

3    trying to do work and keeps having to get up to let him out.  I

4    would really love to serve, but can we postpone it to the next

5    month?

6                THE COURT:  Okay.  Thank you.

7                And number 19.

8                PROSPECTIVE JUROR:  When I -- I would also like to

9    serve, but when I said yes, I didn't realize that I wouldn't be

10   paid by my employer for the full time that I'm here, so that

11   became a concern for me.

12               THE COURT:  All right.  Thank you.

13               And number 30.

14               PROSPECTIVE JUROR:  I originally said yes, but the

15   time between then -- excuse me.  I'm getting over a cold.

16   Between then and now, we have a small office and someone

17   recently quit, and we're going to have a hard time filling that

18   position, which I would normally would be the backup for.  This

19   time of year is our busiest year with what we do, so.

20               THE COURT:  All right.  Thank you.

21               Does anyone else have time concerns?  I'm not going to

22   excuse you right now for the people who responded, but we'll

23   make a note of your time issues and the parties can take that

24   into consideration.

25               I know you saw the video, so you already have a hint

 1   this is a patent case.  I'm going to give you a summary of the

 2   nature of the case and the positions of the parties.  This is a

 3   case alleging the unauthorized use of a company's intellectual

 4   property, specifically plaintiff alleges infringement of five

 5   United States patents by the defendant.  The patents generally

 6   relate to computer systems in the field of cyber security, and

 7   more specifically, systems for protecting computers from

 8   malware and other malicious software attacks.

 9            Plaintiff, Finjan, is the owner the patents.  Finjan

10   alleges that products of defendant, ESET, infringe various

11   claims of the five patents asserted in this case and seeks

12   compensation for the alleged unauthorized use.  ESET denies

13   that its products infringe the Finjan patents.  The defendants

14   also allege that the asserted claims do not meet the

15   requirements for patent protection and are invalid.

16            Now, having heard the general nature of the case, is

17   there anyone based on that description who believes they could

18   not be neutral and impartial in hearing the evidence in this

19   case?  Please raise your card.  The Court sees no hands.  Thank

20   you.

21            Does anyone believe that a case of this nature between

22   companies alleging unauthorized use of intellectual property

23   should not be brought to court and decided by a jury?  You

24   think these cases should be decided in a different forum?

25   Anybody?  The Court sees no hands.

1              Does anybody have any knowledge of the facts or events
2    of this case?  The Court sees no hands.
3              Counsel has made their appearance for the record and
4    introduced their clients.  Does any of you know the parties or
5    counsel to this case?  The Court sees no hands.
6              Has anyone had any business dealing with Finjan or
7    ESET or the firms representing them that you're aware of?  The
8    Court sees no hands.
9              Does anybody have stock or other financial interest in
10   any party, again Finjan and ESET?  The Court sees no hands.
11             Does anyone use any product or service of either of
12   the parties?  The Court see no hands.
13             Now, you each have a list.  Rather than read all these
14   names, the Court has given you the names of people who are
15   prospective witnesses in the case.  I'll give you a moment to
16   look through that and let me know if you recognize any names on
17   this list, and we'll see if it's a person you actually might
18   know who might be testifying in the case.
19        (Prospective jurors looking over witness list)
20             THE COURT:  All right.  Does anybody see anyone that
21   looks like a familiar name to them?  All right.  The Court sees
22   no hands regarding any familiarity with the witnesses.
23             We are now going to begin a process called voir dire.
24   Each of you will be asked questions to -- to answer some
25   questions about who you are and your background.  This is not

1   intended in any way to embarrass anyone, but is designed to

2   assist counsel in selecting a fair and impartial jury.

3          Given the nature of the case, I hope none of the

4   questions will make any of you uncomfortable, but should that

5   happen and you want to respond privately, please let me know.

6          Each of you has a questionnaire.  We'll go through the

7   background questions, and then I will have some additional

8   questions for you, and then the attorneys will have an

9   opportunity to ask follow-up questions.

10         So we will begin with Mr. Smith.

11         PROSPECTIVE JUROR:  Good morning.  My name is Norman

12  Smith.  I work as a general maintenance mechanic in a carpenter

13  shop.  My wife works in real estate.  I have one son going to

14  San Diego State.  I had jury duty about two weeks ago in South

15  Bay, but I wasn't chosen for the court.  I had another one ten

16  years ago.  It was a criminal case.  A verdict was innocent --

17  I mean, well, there was a verdict reached.  And I was in the

18  military for about 32 years, Coast Guard.

19         THE COURT:  Thank you for your service.

20         Mr. Reyes.

21         PROSPECTIVE JUROR:  Good morning.  My name is Juan

22  Reyes.  I live in Poway.  I was in the automotive industry

23  since 1974 up until a couple years ago when I retired.  I still

24  work part-time in the same field.  My wife is a retail manager.

25  My adult daughter is in the educational system as a principal.

 1   I have not had any prior jury service, and I have not served in
 2   the military.
 3          THE COURT:  What did you do in the auto industry, sir?
 4          PROSPECTIVE JUROR:  Auto repair.
 5          THE COURT:  Did do you anything with computers on
 6   cars?
 7          PROSPECTIVE JUROR:  Just a scan.  Just a scan of the
 8   systems.
 9          THE COURT:  Okay.  Thank you.  Can you pass that to
10   Mr. Shaw.
11          PROSPECTIVE JUROR:  My name is Larry Shaw.  La Mesa,
12   California.  I was a professor at San Diego State University.
13   My wife is retired as a teacher of German in the Grossmont
14   district.  I have two children.  One is in technology with the
15   company of Chipotle, and my daughter is in wellness with Apple
16   Computers.  I have served once on a jury.  It was in the County
17   of San Diego in El Cajon, and it was a criminal case, and I
18   believe we received a yes verdict on that one.  And I have not
19   served in the military.
20          THE COURT:  All right.  Sir, what did you teach?
21          PROSPECTIVE JUROR:  I taught in the college of
22   education.
23          THE COURT:  And your daughter works at Apple, but
24   she's in wellness?
25          PROSPECTIVE JUROR:  It's a wellness center in

1    Cupertino at the Apple corporate headquarters.

2              THE COURT:  Helping keep everyone fit?

3              PROSPECTIVE JUROR:  Hopefully.

4              THE COURT:  And your other daughter works at Chipotle

5    but in technology?

6              PROSPECTIVE JUROR:  No.  That's the son.

7              THE COURT:  Oh, son. Sorry.

8              PROSPECTIVE JUROR:  He works in Columbus, Ohio for the

9    company of Chipotle in technology.  He deals with the

10   computers, this kind of stuff.

11             THE COURT:  And I'm gathering from "this kind of

12   stuff," you don't have a lot of detail about what he does?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  I always loved it when my kids were little

15   and their friends would come over and say, Oh, what do your

16   parents do?  Something with computers.  And that was about all

17   they could ever tell them.

18             PROSPECTIVE JUROR:  I know he's not a programmer.

19             THE COURT:  Great.  Thank you.  Can you pass that to

20   the next juror?

21             PROSPECTIVE JUROR:  My name is Paul Yurczyk.  I live

22   in San Diego, Rancho Bernardo area.  I am with a mortgage

23   investment company.  My wife is a barista at Starbucks,

24   part-time.  I have three adult children.  My oldest son was a

25   welder and he just started dive school yesterday, my second son

1    is a food server at a restaurant, and my daughter is a nurse in

2    Chicago.  I served on a jury in Vista in a criminal case, and

3    it was settled before we needed to deliberate.  And I have not

4    served in the military.

5          THE COURT:  Thank you, sir.

6          PROSPECTIVE JUROR:  Good morning.  My name is Toni

7    Shaw.  I live in Lemon Grove.  I am a site technician for

8    students at a middle school.  My husband is a high school

9    counselor.  I have three daughters.  Our oldest is a teacher,

10   our middle child is in dental school, and our youngest is a

11   paralegal.  I have served previously four times for jury duty,

12   once in Chula Vista, once in El Cajon, and twice in superior

13   court.  One was a civil trial, the other three were criminals,

14   and there were verdicts reached.

15         THE COURT:  Okay.  Hold on, hold on, hold on.  What

16   does a site technician do?

17         PROSPECTIVE JUROR:  I'm responsible for all the

18   students' data.

19         THE COURT:  Okay.

20         PROSPECTIVE JUROR:  All the data of the students.

21         THE COURT:  So do you do data entry?  Help me.

22         PROSPECTIVE JUROR:  I built the master schedule for

23   the school site for the teachers, for their classes.  I am

24   responsible for the students' academic grades, processing them.

25         THE COURT:  Okay.  And you understand if you're

1  selected to be on this jury, you can't consult with your
2  daughter who is a paralegal about legal issues in this matter?
3          PROSPECTIVE JUROR:  Right.  She doesn't talk to me
4  about anything.
5          THE COURT:  Okay.  Good.  Well, that's not good, but
6  that's fine.  Thank you.  Can you pass that?
7          PROSPECTIVE JUROR:  My name is Dung Tran. I'm from
8  San Diego, California.  I'm currently unemployed, but my
9  previous job was in retailing.  I have no husband nor any
10 children, I have no prior jury service, and I have not served
11 in the military.
12         PROSPECTIVE JUROR:  My name is Darlene Ecleonel.  I
13 live in the Rancho Bernardo area.  I'm a home health physical
14 therapist for Palomar Health.  My husband is a mechanical
15 engineer for a small startup company.  I have two young
16 children.  They are five and seven years old.  I have not
17 served on a jury, and I have not served in the military.
18         THE COURT:  All right.  Thank you very much.  Now we
19 need to pass it all the way down to Ms. Zurkowski.
20         PROSPECTIVE JUROR:  My name is Linda Zurkowski.  I am
21 in Point Loma, San Diego area.  My occupation is freelance
22 marketer.  My significant other is in real estate development.
23 We have no children.  I have served two times on prior jury
24 service, once a couple of weeks ago across the street, county.
25 That was a criminal case, and we reached a verdict.  The other

1   time was a criminal case in Connecticut, where I'm from.  That

2   was about a dozen years ago.  Also reached a verdict.  And I

3   have not served in the military.

4           THE COURT:  Thank you.

5           PROSPECTIVE JUROR:  My name is Joshua Stillman.  I

6   live in San Diego.  I am a border patrol agent specializing in

7   informations technology.  I do not have a spouse or children.

8   I have not previously served on a jury or in the military.

9           THE COURT:  What do you do with information

10  technology?

11          PROSPECTIVE JUROR:  A little bit of everything.

12  Primarily I construct programs to manage administrative

13  functions, enforcement data, biographical information, and

14  basically goes into 3D printing of landscape areas, models,

15  basically a little bit of everything.

16          THE COURT:  Okay.  Thank you.

17          PROSPECTIVE JUROR:  Good morning.  My name is Sara

18  Norris.  I live in San Marcos.  I was a registered nurse, but I

19  retired a year ago.  My husband is an associate engineer.  I

20  have two adult children.  My daughter is a certified nursing

21  assistant and my son is a legal consultant.  Now, what that

22  means -- you may want an explanation.  He's not a lawyer, but

23  he helps put together class action lawsuits and connects those

24  with lawyers.  He kind of connects groups of lawyers with class

25  action lawsuits.  I've never really understood exactly what he

1    does.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR:  So I was on a jury in Vista court

4    on a criminal case about 20 years ago, and it was a hung jury.

5    And I have never been in the military.

6          THE COURT:  Thank you.

7          PROSPECTIVE JUROR:  You're welcome.

8          PROSPECTIVE JUROR:  My name is Deborah Sollohub.  I

9    live in Poway.  I am retired.  My background is economics and

10   finance, and I wrote economic periodicals, business plans,

11   annual reports.  I am single.  I have no children -- oh, I was

12   on a federal court jury one time with a hung jury, and a civil

13   court trial that was settled out of court.  And I have never

14   been in the military.

15         THE COURT:  All right.  Thank you.

16         PROSPECTIVE JUROR:  My name is Rebecca Hamilton.  I

17   live in El Cajon.  I'm a grade school English tutor.  My

18   husband is active duty Navy.  We have one little boy.  He's

19   under a year old.  I have never served on a jury before.  And I

20   am not in the military.

21         THE COURT:  Thank you.

22         PROSPECTIVE JUROR:  I'm Vincent Albini.  I live in

23   Escondido.  I'm retired, a deputy sheriff at the lieutenant

24   level, 33 years.  My spouse was a corrections deputy, 16 years.

25   We have five children.  One a Carlsbad police officer, a son.

 1   I have a daughter who is a San Diego Police Department, an

 2   officer.  I've got a son who is a special needs teacher in

 3   Escondido.  And then, a daughter who is an administrator of

 4   education outside of Atlanta.  And then the youngest is the

 5   moneymaker.  She's a waitress at Rancho Santa Fe.  So never had

 6   prior jury service, and I did a four-year hitch in the Navy,

 7   '75 to '79.

 8           THE COURT:  Thank you for your military service, sir,

 9   and for your police service as well.

10           PROSPECTIVE JUROR:  Yeah.

11           PROSPECTIVE JUROR:  My name is Dallas Hardy.  I live

12   in El Cajon, California.  I'm retired.  I was a golf course

13   superintendent.  I'm married.  She's retired.  She was a social

14   worker for the County of San Diego.  I have two children.  One

15   is a safety manager at a local casino and the other is

16   unemployed.  I have served two years ago on the superior court

17   in El Cajon, a criminal case, and a verdict was reached.  And I

18   was in the United States Navy for 25 years.

19           THE COURT:  All right.  Thank you, sir, for your

20   service.  Would you pass that down to Ms. Castro, please?

21           PROSPECTIVE JUROR:  My name is Ana Castro.  I live in

22   Chula Vista.  I'm a retired elementary school principal, and my

23   husband is a retired electronics engineer.  I have a daughter

24   who is a marketing director.  I have a son who is a property

25   manager.  I have done jury service in South Bay, and we did

```
 1   reach a verdict in the case.  And I have never been in the
 2   service.
 3           THE COURT:  Thank you.
 4           PROSPECTIVE JUROR:  My name is Kathryn Robinson.  I
 5   live in Ocean Beach.  I am an intellectual property paralegal.
 6   My husband works in sales for Inventus.  We don't have any
 7   children.  I served on a jury about three or four years ago in
 8   superior court.  It was a civil case.  I was an alternate, so I
 9   was not involved in the deliberations.  And I have not served
10   in the military.
11           THE COURT:  Do you work with a firm?
12           PROSPECTIVE JUROR:  I do.  I work with Wilson Sonsini
13   Goodrich & Rosati.
14           THE COURT:  Okay.  And you do intellectual property
15   specialty as a paralegal?
16           PROSPECTIVE JUROR:  Yes.
17           THE COURT:  Do you think you could sit in this case
18   and be neutral and not go back to work and talk to people about
19   it?
20           PROSPECTIVE JUROR:  Honestly, I primarily work in the
21   area of Hatch-Waxman.  I have actually been in front of Your
22   Honor with a couple of other cases.  My only concern would be
23   if it would cause an ethical wall with anything that I might be
24   assigned to at my current company.
25           THE COURT:  Interesting.  I haven't ever really
```

 1   thought about that.  Thank you for letting us know that.

 2             PROSPECTIVE JUROR:  Thank you, Your Honor.

 3             PROSPECTIVE JUROR:  My name is Lynnette Wong. I live

 4   in Carlsbad.  I just recently started working at Carlsbad

 5   Unified School District as an account tech.  And my husband is

 6   in sales and marketing for a pharmaceutical company.  We have

 7   three children, one over 18.  He is a sophomore at the

 8   University of Arizona.  I have never served in the jury

 9   service, nor the military.

10             THE COURT:  Thank you.

11             PROSPECTIVE JUROR:  Your Honor, I'm Jim Woods.  I live

12   in Encinitas.  Please don't hold it against me, I am a

13   self-employed Delaware attorney.  My girlfriend works for Early

14   Warning Services.  I have three children.  One, an author; one,

15   a reporter; and one, who is looking for a job.  No prior jury

16   service and no prior military service.

17             THE COURT:  Are you practicing?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  What area do you practice in?

20             PROSPECTIVE JUROR:  Civil.

21             THE COURT:  Civil litigation?  Civil transactional?

22             PROSPECTIVE JUROR:  Both.

23             THE COURT:  And I know you have timing issues, but

24   assuming if you were selected to be on this jury, would you be

25   able to sit as a juror and not bring legal expertise into the

```
 1   jury room?

 2           PROSPECTIVE JUROR:  The attorney I mainly work with

 3   back in Delaware is waiting for a decision on motions that were

 4   briefed, and as soon as the decision comes down, discovery is

 5   going to start fast and furious, so I could be getting a call

 6   any day, "How soon can you be here?"

 7           THE COURT:  So that's another issue you might have

 8   with being able to continue to serve on this jury?

 9           PROSPECTIVE JUROR:  That's correct.

10           THE COURT:  Thank you, sir.

11           PROSPECTIVE JUROR:  Good morning.  My name is Lauralee

12   Burks.  I live in San Diego.  My occupation is I'm an

13   occupational therapist in the physical rehab of adults.  My

14   husband is in underground pipeline construction work.  I have

15   three children.  My oldest is disabled and is unable to work.

16   I have a son in the Army and a daughter in college still.  I do

17   not have prior jury service, and I have not served in the

18   military.

19           THE COURT: All right.  Thank you.

20           PROSPECTIVE JUROR:  My name is Brianna Moya.  I live

21   in La Mesa.  I work in retail as an inventory processor.  I do

22   not have a spouse, I do not have children, I do not have prior

23   jury service, and I have never served in the military.

24           THE COURT:  All right.  Thank you.

25           PROSPECTIVE JUROR:  My name is Jean Claude Chamaa.
```

1    I'm from the City of San Diego.  I am an architect.  My spouse
2    is an independent writer.  I have no children.  My prior
3    service in jury was a civil court where we did come up with a
4    verdict; and prior to that, several years before, was criminal
5    court, and it was a hung jury.  And I have not served in the
6    military.
7              THE COURT:  All right.  Thank you.
8              PROSPECTIVE JUROR:  My name is Fakhri Thomas.  I'm
9    from San Diego.  I currently work in a pharmacy.  My wife is a
10   nurse.  We have one daughter, 14 years old.  I have not served
11   in the jury.  And I'm retired Army National Guard.
12             THE COURT:  Thank you for your service.  And the
13   pharmacy, you work in sales there?  Are you a pharmacist?
14             PROSPECTIVE JUROR:  Pharmacy assistant.
15             THE COURT:  All right.  Thank you.
16             PROSPECTIVE JUROR:  Juan Rodriguez.  I'm from
17   Lakeside.  I work as a project assistant for the City of
18   San Diego.  My wife works for the State of California as a
19   driver's license examiner.  I have one child.  He's a -- he
20   works for -- he's a parts driver for Honda in San Diego.  I
21   have been in jury service twice, one civil, one criminal.  One
22   about 15 years ago, that was the criminal case, and there was a
23   verdict reached.  And the other one was about five years ago,
24   was a civil case here in downtown San Diego, and there was also
25   a verdict reached.  And I have never served in the military.

```
 1              THE COURT:  What do you do as a project assistant?
 2              PROSPECTIVE JUROR:  I do CAD design for all of the
 3    civil -- streets as far as like roadways and anything that's in
 4    the right of way for the City of San Diego.
 5              THE COURT:  So you work on computers?
 6              PROSPECTIVE JUROR:  Yeah.  Microstation and GIS
 7    programs.
 8              THE COURT:  Okay.  Do you do any downloading of
 9    materials in the process of doing that from the internet, for
10    example?
11              PROSPECTIVE JUROR:  Probably mostly with GIS
12    informations.  But most is already in the system so we don't
13    really have to download anything.
14              THE COURT:  Okay.  Thank you.
15              PROSPECTIVE JUROR:  My name is Chris Stark.  I live in
16    San Diego.  I actually am -- I work for Kaiser Permanente in
17    IT.  No children, no spouse, never been selected for a jury,
18    and no military service.
19              THE COURT:  Okay.  So you work in IT.  So are you --
20    you're the person everybody calls when their computer won't
21    work?
22              PROSPECTIVE JUROR:  Actually, I don't deal with end
23    users.  I'm on a red team.  So I'm in cyber security.
24              THE COURT:  Okay.  Are you familiar at all with any
25    of--
```

 1          PROSPECTIVE JUROR:  Neither the plaintiff or defendant

 2   I've never heard of before.

 3          THE COURT:  But you work with programs that are

 4   designed to set up firewalls?

 5          PROSPECTIVE JUROR:  Yes.

 6          THE COURT:  And protect information and all of that?

 7          PROSPECTIVE JUROR:  Absolutely.

 8          THE COURT:  Great.  Thank you.

 9          PROSPECTIVE JUROR:  My name is John Weinold.  I live

10   in Ramona.  I am retired deputy probation officer for San Diego

11   County.  My wife is also retired.  She used to work for a small

12   printing company.  I have one child, he's 37 years old, and

13   he's a federal inspector in Kentucky, and he's also a boatswain

14   mate chief in the Coast Guard -- Coast Guard Reserves.  And I

15   haven't served on a jury in probably 35, 40 years, and that was

16   a DUI case.  And oh, by the way, he was guilty.

17          THE COURT:  You're not supposed to tell us that, but

18   that's okay.

19          PROSPECTIVE JUROR:  I'm sorry.  And, yes, I did serve

20   in the military from -- Navy, 1971 to '75, and I am currently

21   in the Coast Guard Auxiliary.

22          THE COURT:  Thank you for your service, sir.  Could

23   you pass that to Mr. Peacock?

24          PROSPECTIVE JUROR:  Michael Peacock.  I live in

25   San Diego, retired CPA, single, no children, no prior jury

1    service, Navy for six years.

2              THE COURT:  All right.  Thank you for your service.

3              PROSPECTIVE JUROR:  My name is Emily Walker.  I live

4    in Escondido.  I work in retail.  I'm going through a divorce.

5    I have three children, two 19 year olds, one 17.  None of them

6    work.  No prior jury service, and I have not served in the

7    military.

8              THE COURT:  Thank you.

9              PROSPECTIVE JUROR:  Alexa Flynn.  I live in Point

10   loma, San Diego.  I'm a loan specialist at a bank.  My husband

11   works in workforce staffing for Amazon.  I have three children,

12   2, 5 and 10.  And no prior jury service and never served in the

13   military.

14             THE COURT:  Thank you.

15             PROSPECTIVE JUROR:  My name is Andrew Monti.  I live

16   in Chula Vista.  I'm a retired sheriff's detective, Riverside

17   County Sheriff after nine years; retired supervisor San Diego

18   County Probation Department after 18 years; retired high school

19   teacher, Hilltop High School, U.S. history, after ten years.  I

20   currently teach part-time at Southwestern College as an adjunct

21   professor teaching in the criminal justice department.  My wife

22   is a court operations manager for Superior Court, State of

23   California across the street.  I have a daughter who is a nurse

24   for Kaiser in Riverside.  I have a stepson who lives in

25   Minneapolis, and he's a service adviser for MINI Cooper

```
 1   automobiles.  I have never served on a jury.  I was in the
 2   Marine Corps from 1970 to '73.
 3           THE COURT:  Thank you for all those services, sir.
 4           And our final juror, Mr. Arneson.
 5           PROSPECTIVE JUROR:  My name is Tom Arneson.  I live in
 6   San Diego.  Education administration.  I'm not married, no
 7   children.  I did serve on a jury several years ago, criminal,
 8   not guilty.  And never served in the military.
 9           THE COURT:  All right.  Thank you, sir.  I'm going to
10   ask some questions now to all of you as a group, so you all
11   need to be playing along.  If you need to respond, please hold
12   up your number so that we can see you.  And this is when Lori
13   gets a workout because she's going to bounce back and forth.
14           So first question:  Has any member of the panel ever
15   been involved in the civil lawsuit as a witness or a party?
16           Number 16.
17           PROSPECTIVE JUROR:  Juror 16.  I am currently named
18   plaintiff in class action in front of Judge Sammartino.
19           THE COURT:  Thank you.
20           And number 4.
21           PROSPECTIVE JUROR:  I was a defendant in two lawsuits,
22   civil; one related to a pension fund, Great American, in the
23   late '80s, and a couple years ago regarding a real estate
24   transaction.
25           THE COURT:  Anything about those experiences that you
```

```
 1   think would influence your ability to serve as a juror in a

 2   civil case and be neutral?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  Thank you.  And I believe number 29 had

 5   his --

 6              THE CLERK:  Yes.

 7              THE COURT:  Sir.

 8              PROSPECTIVE JUROR:  You want to know what lawsuits

 9   I've been involved in?

10              THE COURT:  Yes.

11              PROSPECTIVE JUROR:  I was sued when I was a detective

12   in the sheriff's department.  I recently completed a lawsuit

13   where I was the victim of a hit and run and sued the insured

14   and the driver.  And a couple more in there.  There's -- let's

15   see.  Sheriff's department.

16              THE COURT:  Were they work related, mostly?

17              PROSPECTIVE JUROR:  I'm sorry?

18              THE COURT:  Were they work related?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  Anything about those experiences you had

21   either as a plaintiff or a defendant in those lawsuits that you

22   think would impact your ability to be neutral?

23              PROSPECTIVE JUROR:  Not really.  I just think in terms

24   of some of the questions that are asked -- oh, I was involved

25   also in another lawsuit, a fatal traffic accident that I
```

1   investigated when I was a patrol deputy.  Just some of the

2   questions the attorneys ask sometimes I think are out there.

3   Beyond that, I'm fine, I think.

4          THE COURT:  All right.  Okay.  Thank you.  Anyone else

5   think of anything?  Okay.  Good.

6          Now it may appear that one or more of the parties,

7   attorneys or witnesses, comes from a particular national,

8   racial, or religious group or may have a lifestyle different

9   from your own.  Would this in any way affect your judgment or

10  the weight or credibility you would give their testimony?

11         For example, if someone had a heavy accent or their

12  appearance was different than what you normally see every day,

13  does anyone think that would cause you any sense of bias that

14  you would consider them less credible because they may have an

15  accent?  The Court sees no hands.

16         PROSPECTIVE JUROR:  Your Honor.

17         THE COURT:  Number 29.

18         PROSPECTIVE JUROR:  There is one thing I overlooked.

19  I'm also a private investigator and I'm involved in a lot of

20  investigations for attorneys, criminal and civil, and I'm

21  working a couple of civil cases right now.  They don't involve

22  computers or anything like that, but I do that as well.

23         THE COURT:  Thank you for letting us know that.  If

24  anyone does think of anything you want to add, just raise your

25  hand and we'll add that.

```
 1              All right.  Has anyone here or member of their
 2   immediate family ever been employed by the United States Patent
 3   and Trademark Office?  The Court sees no hands.
 4              Has anyone here or member of their immediate family
 5   ever applied for or obtained a United States or a foreign
 6   patent?  Number 21.
 7              THE CLERK:  Number 11.
 8              PROSPECTIVE JUROR:  I can speak loudly.
 9              THE CLERK:  There's a bit of an echo in here though,
10   even though you speak loudly.
11              PROSPECTIVE JUROR:  My father had --
12              THE COURT:  You need to use it though.
13              PROSPECTIVE JUROR:  What a concept.  Thank you.  My
14   father had several patents which he bragged about incessantly.
15              THE COURT:  Were you involved at all during the
16   process?
17              PROSPECTIVE JUROR:  No.  Just --
18              THE COURT:  He was just very proud?
19              PROSPECTIVE JUROR:  Very proud.
20              THE COURT:  And number 21 had his hand up.
21              PROSPECTIVE JUROR:  It's not specifically applied or
22   got a patent, but my spouse did invent something and was
23   investigating into getting a patent.
24              THE COURT:  Okay.
25              PROSPECTIVE JUROR:  I don't know if that really
```

1    answers your question.

2         THE COURT:  No, that's fine.  So she did some of the

3    preliminary work --

4         PROSPECTIVE JUROR:  Yeah.

5         THE COURT:  -- contacted to see about whether it was

6    patentable and what steps she might take?

7         PROSPECTIVE JUROR:  Correct.  And I was helping her in

8    terms of looking for people who helped in getting that

9    information and following up.  But we never followed up with

10   it.

11        THE COURT:  There was no follow up.  All right.  Thank

12   you.

13        Does anybody here -- as part of your employment, have

14   you ever been involved in the protection of a company's

15   intellectual property, including things like preparing for the

16   filing of patents, copyrights or trademarks, or been subject to

17   a trade secret nondisclosure agreement as part of your work?

18        The paralegal.  Okay.

19        THE CLERK:  21, Your Honor.

20        THE COURT:  That was number 16.

21        And number 21 again.

22        PROSPECTIVE JUROR:  As an architect, all our products

23   are copyrights, anything that we've done with the company.  The

24   company has been kind of sued over copyrights of designs, but I

25   have not been involved.  But that's the extent.

```
 1              THE COURT:  Okay.  I didn't ask you when you said you
 2    were an architect, and I should have thought of it because my
 3    daughter is an interior designer and she does a lot of work on
 4    computers.  I assume you use computers somewhat?
 5              PROSPECTIVE JUROR:  Yes, that is correct.
 6              THE COURT:  So those -- are those programs that you
 7    license and then you use them on your computer?
 8              PROSPECTIVE JUROR:  Yeah.  Typically CAD files, CAD
 9    programs that you just design.
10              THE COURT:  Do you do any downloading of things from
11    the internet?
12              PROSPECTIVE JUROR:  Yes.  Mostly product details,
13    stuff that is industry standard.
14              THE COURT:  Okay.  Anyone else, in the course of your
15    work, ever had to deal with any intellectual property issues
16    with your employer?  Trade secrets?  Copyrights?  Trademarks?
17    Okay.
18              Has anyone ever been involved with the enforcement
19    through licensing or other negotiations or litigation of
20    intellectual property patents or copyrights other than for
21    yourself or for your employer, except for the paralegal?
22    Number 18.
23              PROSPECTIVE JUROR:  In my former law firm, I didn't do
24    patent work, but when they needed an extra hand, I did some
25    research from time to time on a patent issue.
```

```
 1              THE COURT:  All right.  Thank you.

 2              Anyone else do any licensing work for your company or

 3    yourself involving any kind of intellectual property?

 4              No hands.  Thank you.

 5              Does anyone have an opinion about patents, patent

 6    rights, or the United States Patent & Trademark Office that you

 7    think would impact your ability to be neutral in this case?  Do

 8    you think we shouldn't have patents?  We should have more

 9    patents?  Has anybody ever thought about it?  All right.

10    Nobody.  Thank you.

11              Have any of you or a member of your family or a close

12    friend had any experience or special training in computer

13    technology, computer security, computer antivirus products,

14    data communications, telecommunications, information

15    technology, or patent prosecution or patent litigation?  And I

16    know some of you have already told us that, but why don't we

17    start over here with number 3.

18              PROSPECTIVE JUROR:  I think I have said everything

19    already about my son's work.  I'm very limited in the

20    knowledge, though I do know it's in information technology and

21    primarily with hardware.

22              THE COURT:  And you do know if you were selected to be

23    on this jury, you couldn't consult with him if you didn't

24    understand something that you heard in Court that day?

25              PROSPECTIVE JUROR:  Yes.
```

```
1              THE COURT:  Okay.  Thank you.

2              And number 9 right behind you, sir.

3              PROSPECTIVE JUROR:  As I've previously said, I

4    currently work in information technology for the Border Patrol,

5    and I have experience with all of the things that you mentioned

6    on a daily basis.  Also, I am currently working toward a

7    bachelor's degree in computer science.

8              THE COURT:  Great.  Thank you.

9              Is there anyone else in the box?  Okay.  Then back

10   down to number 18 again.

11             PROSPECTIVE JUROR:  Back in the dark ages of mammoth

12   mainframes and IBM cards, I got a computer science minor.

13             THE COURT:  Yes.  When I took computer science in

14   college, we were using punch cards.  Your worst day was when

15   you dropped your punch card.

16             Go ahead, sir.

17             PROSPECTIVE JUROR:  I have a bachelor's in computer

18   science.  And in the military, I worked with signal systems.

19             THE COURT:  That was number 22.

20             Did do you any kind of programming or anything like

21   that?

22             PROSPECTIVE JUROR:  Programming in college.

23             THE COURT:  Okay.  Good.  And, obviously, number 24.

24             PROSPECTIVE JUROR:  I work in cyber security, so I do

25   Python programming.  That's about it.
```

1          THE COURT:  Thank you.  And I think there was number

2     30.

3          PROSPECTIVE JUROR:  Before changing careers 13 years

4     ago, I was a systems administrator for Northrop Grumman for

5     several years.  There was a lot of background in various

6     computer programming, security, et cetera.

7          THE COURT:  Thank you.  Anyone else?  All right.

8          Does anyone here -- you or your family member or a

9     close friend ever sell computer security or antivirus products.

10    If you haven't already told us --

11         PROSPECTIVE JUROR 26:  I worked at McAfee for a number

12    of years.

13         THE COURT:  Okay.  And then you probably should all

14    know the answer to this, but you might not:  Have any of you

15    ever used computer security or antivirus products?

16         The IT guy is going to be interested to see.  Okay.

17    Generally, pretty much everybody.  If you're using a computer,

18    there should be some sort of antivirus software on your

19    computer.

20         Has anyone ever had any real problems with it?  Had to

21    contact the company and ask questions about how your -- we are

22    talking about computer viruses here.  How your virus software

23    was working?  Number 29.

24         PROSPECTIVE JUROR:  Yes.  I have had problems.  I

25    think it's terrible.  A lot of things that are sold on the

1    market, they don't work.  They cause more problems then they

2    solve.

3            THE COURT:  Do you remember any of the companies in

4    particular?

5            PROSPECTIVE JUROR:  McAfee is one of them.

6            THE COURT:  He doesn't work there anymore.  It's okay.

7            PROSPECTIVE JUROR:  There's a couple.  I can't

8    remember, but most recently, McAfee.

9            THE COURT:  Okay.  Does anybody else have problems

10   with your computer security?  Number 18.

11           PROSPECTIVE JUROR:  I just had to contact Hewlett

12   Packard last fall because one morning my computer was

13   completely black.  Couldn't even turn it on.

14           THE COURT:  All right.  Anybody else?  Okay.  Good.

15           Now the plaintiff will make a claim for compensation

16   for the alleged unauthorized use of its patents.  I will

17   instruct you on the law of damages in patent cases.  But does

18   anyone have strong feelings about monetary damage awards that

19   would cause you not to be able to follow the law regarding an

20   award of compensation, even if you find the evidence supports a

21   finding of infringement of a valid patent?

22           You just don't want to move money around?  Does

23   anybody have a problem with compensation in this sort of

24   setting?  Number 10.

25           PROSPECTIVE JUROR:  It's more in like things I've read

1    in the paper and medical things, but I think sometimes the

2    punitive damages can be really over the top.

3              THE COURT:  All right.  Distinguishing an award for,

4    say, a royalty for using someone's system where you compensate

5    them because you would have had a license and you didn't have

6    one so you need to reimburse them, as opposed to punitive

7    damages; do have you an issue with that?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Anybody else, any issue with monetary

10   awards?  Good.

11             Now, the Court will instruct you on the law, and you

12   will be expected to apply the law to the facts in this case as

13   I give it to you, even if you disagree with the law.

14             Does anyone think you have a problem with following

15   that instruction?  The Court sees no hands.

16             The Court will also instruct you that you must decide

17   this case based on the evidence presented at trial.  That means

18   you cannot do any research on your own or consult with people

19   about the case.

20             Does anyone feel like that would just be hard?  If you

21   walk out of here at the end of a trial day and you just didn't

22   quite understand something, can you refrain from Googling it

23   when you get home, or doing your own research?  Anybody think

24   that that is just going to be too tough for them?  Okay.  The

25   Court sees no hands.

1          You will be instructed you must decide the case based

2     on the evidence and the law without regard to any prejudices,

3     sympathies, personal likes, or dislikes.

4          Does anyone feel you'll have a problem with setting

5     aside any personal concerns you might have, feeling sorry for

6     somebody or not, in the case?  No hands.

7          Now, the ultimate role of a juror is to make a

8     decision based on the information provided in the courtroom.

9     Some people may have a problem with that.  Just making a

10    decision, reaching a judgment is really hard for you.  And I've

11    had jurors tell me in their home/work environment, they are not

12    decision-makers.  They do not like to make big decisions.  They

13    let their spouse or their coworkers make all the tough calls.

14    And when you get into the jury room, you need to be able to

15    express yourself.  If you disagree, you want to able to feel

16    strongly that you can voice your thoughts.

17         Does anyone just feel like that role would be so

18    overpowering for you, so stressful that if you didn't agree

19    with anyone else in a unanimous verdict, you would just go

20    along because you hate confrontation and you just can't hold

21    your own?  Anybody?

22         And it's okay.  This isn't like -- people are like

23    that and it's fine.  Does anybody feel that way?  We would

24    rather know now.  Okay.  No hands.  Great.

25         And some people are uncomfortable with the idea of

1    determining responsibility.  Whether it's philosophical, moral,

2    religious, or other reasons, they just feel it's not their role

3    to assess fault, and they just don't think that they would be a

4    good juror because they don't like to have to determine someone

5    else's liability.  Does anyone feel that way?  Okay.  Great.

6           I am now going to turn it over to counsel for Finjan

7    to do follow-up.  They have a limited amount of time, so if

8    they ask you a question, don't feel picked on.  If you don't

9    get asked a question, don't feel left out.  He's going to do

10   follow up as he best sees fit to get to issues.

11   BY MR. ANDRE:

12   Q   Can everyone hear me okay?  I'm going to ask some very

13   specific questions from some of you who we talked to already

14   today, and then, I'm going to ask some general questions.  I'm

15   not going to try to get any personal information from you.  I'm

16   just trying to get a little bit more information. I'm going to

17   try to do this in some order so we can pass the mic back and

18   forth.

19       Mr. Smith?

20   A   Yes, sir.

21   Q   You stated that you were on a -- two juries previously,

22   correct?

23   A   Yes, sir.

24   Q   And what were the verdicts?

25   A   One was a hung jury.  The other was innocent.

1   Q   And when you're on the hung jury, did that give you -- make

2   you feel unsatisfied in the jury process?

3   A   It was the first one.  Yeah.  And it was, yeah.

4   Q   And you said you reported for jury duty just a couple weeks

5   ago?

6   A   Yes.

7   Q   And you were not selected for the jury?

8   A   I was not selected.  I was number 49.

9   Q   Well, you're number 1 today, which is good or bad,

10  depending how you look at it.

11      Now the fact that you reported to jury duty two weeks ago

12  and you're back here again, do you have any reservation about

13  coming back a second time?

14  A   No.  Everything is fine.

15  Q   Okay.  Great.

16  A   A little bit of irony, but it's fine.

17  Q   The irony being state court and federal court within two

18  weeks?

19  A   Yes.

20  Q   That is funny.  Go ahead and hand the microphone behind

21  you.

22      Ms. Zurkowski?

23  A   Yes.

24  Q   I noticed that you also served on jury a couple weeks ago?

25  A   Yes.

```
 1   Q    I'm going to ask you the same question:  Do you feel like

 2   you have already served your time and you don't want to do this

 3   anymore, or are you okay serving on another jury?

 4   A    This one pays me and I have free parking.

 5        THE COURT:  We also will feed you and bring you

 6   doughnuts.

 7   BY MR. ANDRE:

 8   Q    So you're okay with serving on the jury?

 9   A    Yes.

10   Q    That's fantastic.  Will you hand it over to Mr. Stillman?

11   A    Yes.

12   Q    You're an IT guy?

13   A    Yes.

14   Q    What type of IT work are you doing specifically?

15   A    Currently what I'm doing mostly is -- well, a little bit of

16   everything, but my primary goal is creating new programs to

17   manage informational processes, administrative processes,

18   enforcement technology, and information systems, GPS

19   coordinates for the United States Border Patrol.  I also work

20   in 3D modeling and report generation.  I do limited programming

21   in Python, Java, et cetera.

22   Q    You said you're getting your bachelor's degree in computer

23   science currently?

24   A    Correct.

25   Q    How far are you?
```

1   A   I have about a year and a half in.

2   Q   Thank you.

3       Mr. Shaw?

4   A   Um-hmm.

5   Q   So you're a professor at SDSU -- or were a professor.

6   You're retired?

7   A   Yes.

8   Q   Did you teach online courses?

9   A   Yes.

10  Q   And when you taught online courses, did you work a lot at a

11  computer?

12  A   Well, primarily, yes.

13  Q   Did you personally do it, or did you have like a course

14  administrator who did all the computer work?

15  A   No.  It was a canned computer program that we used --

16  Q   Okay.

17  A   -- for instruction.

18  Q   Did you use video uplinks, like Facetime, that kind of

19  stuff as well?

20  A   Yes.  It was all Facetime.

21  Q   Okay.  And did you ever have any problems on -- with the

22  online course part of your profession that caused you

23  aggravation about computers or anything?

24  A   No.  It didn't have any real hangups.

25  Q   My sister works in that, and sometimes professors get upset

1    about it.  Okay.  Great.  If we can pass the microphone down to
2    Ms. Shaw.
3        You said you had a child who works as a paralegal?
4    A    Yes.
5    Q    What kind of paralegal?
6    A    She works with the juvenile division.
7    Q    Is it more civil or criminal; do you know?
8    A    I don't know.  All I know is juvenile.  I don't know.
9    Q    And does she ever talk to you about shop, the legal aspects
10   of her job?
11   A    No.
12   Q    Okay.
13   A    I want her to because I want to know.
14   Q    You have kids.  When they get a certain age, you know how
15   it is.  You know, if you got selected as a juror, you couldn't
16   talk to her about this case and ask her about the law.  You
17   have no problem doing that?
18   A    No.
19   Q    Okay.  Very good.  Would you pass the microphone back to
20   Mr. Albino.
21   A    Albini.
22   Q    Albini.  I'm sorry.
23   A    No problem.
24   Q    Mr. Albini, you were in law enforcement, it sounds like,
25   most of your life?

```
 1    A    Yes.

 2    Q    And your kids are as well, it sounds like?

 3    A    Two of them.

 4    Q    All right.  Now, have you -- were you ever a witness in

 5    court against -- as a law enforcement officer, a lot of times,

 6    you take the stand in criminal cases?

 7    A    Yes.

 8    Q    So were you a witness in court often?

 9    A    I wouldn't say "often," but I have been a witness in court,

10    yes.

11    Q    How many times, approximately?

12    A    Less than a dozen.

13    Q    Okay.  Anything about that experience being a witness in

14    trial that gives you any opinion about litigation or court

15    proceedings?

16    A    No.  Not more than, you know, good reports and good

17    follow-up and things like that.

18    Q    And is there anything about you being a witness at trial

19    affect your opinion of lawyers?

20    A    No.

21    Q    Okay.

22    A    No.

23    Q    Very good.  Will you pass the microphone in front of you to

24    Ms. Tran?

25    A    Yeah.
```

```
 1   Q    Do you work with computers at all?

 2   A    No.

 3   Q    Are you active in social media or anything along that line?

 4   A    I have Facebook, but I rarely log onto it.

 5   Q    Okay.  That's probably very healthy for you.  You have no

 6   personal experience working with computers other than daily

 7   use?

 8   A    Yeah.

 9   Q    Okay.  Thank you.  Ms. Ecleonel?

10   A    Ecleonel.

11   Q    Sorry.  You said you had kids that were -- you had to take

12   to school each morning?

13   A    Yes.

14   Q    And you have no one else to take them to school?

15   A    No, I don't.  My husband works full time, and he doesn't

16   get paid for the time that he had to take off this morning to

17   take them to school.

18   Q    Okay.  Thank you.  If you will pass the microphone over to

19   Ms -- I believe it's Ms. Robinson.  Thank you.

20        Ms. Robinson, you're a paralegal for Wilson Sonsini?

21   A    I am.

22   Q    And you said you do Hatch-Waxman work.  Do you do it for

23   brand or generic?

24   A    I've done it for both.

25   Q    What do you primarily work on?
```

1    A    Primarily generic.

2    Q    Do you do anything else outside the Hatch-Waxman work?

3    A    I do.  I have done other cases.  I recently worked on an

4    arbitration for a patent more technology based as opposed to

5    chemistry, not a Hatch-Waxman case.

6    Q    And do you have technical training as an undergraduate, or

7    a graduate degree?

8    A    No.  My background is in political science.  I do have a

9    law degree.

10   Q    You have a law degree.  Okay.

11   A    Yes.

12   Q    And have you practiced law --

13   A    No.

14   Q    -- outside of what do you for Wilson Sonsini?

15   A    No.

16   Q    Are you familiar with the law firms Kramer Levin or the

17   defendants' firm?

18   A    Can you -- I didn't hear your names when you were giving

19   your appearances.

20   Q    We're Kramer Levin.

21   A    I've heard of you.  I don't know that we've worked with you

22   or that I've worked with you or that I've worked with opposing

23   counsel.  I'm not aware of -- I don't know what the defendant--

24        MR. ANDRE:  What's your firm name again?

25        MR. PISANO:  Eversheds Sutherland, LLP.

```
 1              PROSPECTIVE JUROR:  Again, the name is not familiar.

 2              MR. ANDRE:  Okay.  Thank you.  I'm almost out of time

 3   here, so let me --

 4              THE COURT:  You have some time still.

 5              MR. ANDRE:  Okay.  I feel like I'm on the clock here.

 6              THE COURT:  You are, but you still have time.  I'll

 7   give you a two-minute warning.

 8              MR. ANDRE:  Thank you.  I appreciate it, Your Honor.

 9   BY MR. ANDRE:

10   Q    Mr -- don't tell me.  Is it Moya?

11   A    No.  That's me.

12   Q    Okay.  What's your name?

13   A    Chamaa.

14   Q    Oh, okay.  Mr. Chamaa, you said you're an architect,

15   correct?

16   A    Yes.

17   Q    Do have you copyrights?

18   A    On the designs.

19   Q    On the designs?

20   A    Well, not currently anymore.  So for -- you're talking --

21        (Court reporter interruption)

22              PROSPECTIVE JUROR:  On designs that I've worked before

23   in the private sector, I do have copyrights on property.

24   BY MR. ANDRE:

25   Q    And maybe I misheard you.  Have there been litigation
```

1   involving copyrights that you're involved with?

2   A   Not on my copyrights, but the firm that I work with, there

3   was.

4   Q   Was there anything about that experience that gave you a

5   negative feeling about intellectual property?

6   A   No.

7   Q   Would you hand the microphone Mr. Thompson?

8       You said you have a degree in computer science?

9   A   Yes.

10  Q   What kind of work have you done with respect to that

11  degree?

12  A   I've done help desks in the military, set up field

13  networks, and set up vehicles for the communication.

14  Q   And did you do any programming?

15  A   Just in college, I did programming.

16  Q   And did you have any specific knowledge with regard to

17  antivirus software or any kind of anti-malware software?

18  A   Just installing it on the computers themselves, but not

19  programming or anything, coding within those, software.

20  Q   Okay.  Thank you.  You know I'm going to talk to you.  So,

21  Mr. Stark.

22  A   Yes.

23  Q   You say you work in IT?

24  A   Correct.

25  Q   And you have a lot of experience with cyber security?

1   A    Right.

2   Q    Other than McAfee, who else have you worked with?

3   A    I worked for IBM for a while, I've worked for Intel.  I was

4   a professional service consultant for a number of years.

5   Q    And what type of work have you done with cyber security?

6   A    Well, right now, I'm on a red team, and I'm an offensive

7   security specialist, so I'm basically hacking Kaiser Permanente

8   systems.

9   Q    So a red team, you act like a hacker, try to penetrate the

10  system to find vulnerabilities?

11  A    Yeah.  My title is a penetration tester.

12  Q    Okay.  And that's probably pretty fun actually, trying to

13  hack into some systems here legally?

14  A    Right.

15  Q    Do have you any particular software company you work with

16  when you test the security right now?

17  A    We have a number of vendors.  We're a very large

18  corporation, so we have a number of security products.  Rev

19  Assailants (phonetic), that's our primary V vendor.

20  Q    And do you try to penetrate at the gateway structures or at

21  the client?  Both?

22  A    We're focused primarily internal.  But we do have a lot of

23  DMZ systems.  We have a lot of internet facing exposure as well

24  that we're focused on.

25          MR. ANDRE:  Okay.  Thank you.  That's all I have.

```
 1              THE COURT:  Hand that over to Mr. Pisano, please.
 2     BY MR. PISANO:
 3     Q   Okay, folks.  Thank you.  I just have a couple of general
 4     questions for everyone.  First of all, these are just sort of
 5     raise-your-hand questions.
 6         Do you think patents are important to progress?  Anybody
 7     who thinks that's the case, put your hand up.  Are patents
 8     important to progress?  That looks like just about everybody,
 9     not everyone.
10         But let me ask the next question then:  Do you think
11     companies should use patents to stop the progress of other
12     companies?  How many think they should be able to do that, use
13     patents to stop the progress of other companies?  Okay.  A lot
14     of you do.
15         How many of you think -- well, let me back up.  How many of
16     you think -- let's drop that question.
17         How many of you think that because a plaintiff has filed a
18     lawsuit, he or she is entitled to get some money just because
19     they brought a lawsuit?  Anybody think that?  Nobody.  Okay.
20     Great.
21         Do any of you have negative impressions about Israeli or
22     Slovakian companies or business people?  Anybody?  Raise your
23     hands.
24         Number 21.  Thank you, sir.  Tell me what you think.
25     A   I don't particularly have any problems, but I grew up in an
```

```
 1   environment where I'm being told that I should have a problem,

 2   if that makes any sense.  I grew up my whole life saying, you

 3   know, don't trust Israelis, black market conduct, boycott

 4   Israeli companies, so.  But I don't have a problem personally

 5   with it.

 6            THE COURT:  So you would say it's a bias that you're

 7   aware of from the way you were brought up --

 8            PROSPECTIVE JUROR:  Correct.

 9            THE COURT:  -- but you would be able to set anything

10   like that aside?

11            PROSPECTIVE JUROR:  Correct.

12   BY MR. PISANO:

13   Q   Okay.  Thank you, sir.

14       How many of you have heard the phrase before "it's not

15   personal, it's only business"?  Anybody ever hear that one?

16   Now, I'm going to ask you, how many of you ever said that to

17   someone else?  Anybody?

18       Okay.  Ms. Robinson.  Can you tell me what the context was?

19   A   I don't --

20   Q   Without getting into too many details.

21   A   I won't give you too much.  It's having to do with my

22   husband who works in eDiscovery.  He actually works with our

23   particular firm.  They have had issues with some billing, and

24   so there was a this-is-business-it's-not-personal kind of

25   discussion between all of us involved.
```

1    Q    Okay.  And anyone else?

2            THE COURT:  Right next to you.

3    BY MR. PISANO:

4    Q    Yes, ma'am.

5    A    My husband deals with contracting with insurance companies,

6    so that phrase comes up fairly often in our family.

7        (The Court and court reporter discussion off the record)

8            THE COURT:  Just because she has to make a record of

9    this conversation, when you do speak, please try to speak

10   clearly so that the court reporter can hear.

11           Go ahead.

12   BY MR. PISANO:

13   Q    Anyone else?  That was Ms. Wong.  Anyone else use that

14   phrase before?

15       So some of you are going to come quite a distance to be

16   here downtown.  Will that travel from home to the courthouse

17   pose a problem for you?  Anybody think that's going to be the

18   case?  Yes, ma'am, Ms. Ecleonel?

19   A    Yes.  I live in Rancho Bernardo.

20   Q    Okay.  Anyone else?  All righty.

21           MR. PISANO:  Thank you, Your Honor.  Nothing further.

22           THE COURT:  Ladies and gentlemen, here's how we're

23   going to proceed -- this is where I feel like a flight

24   attendant.  The seatbelt sign has not gone off, so don't get

25   out of your seats.  I'm going to ask you to leave your

1    questionnaire and the witness list on your seat.  Take all your

2    personal possessions with you and go out -- don't go yet.  Go

3    out to the hallway.  Do not leave this floor.  You may use your

4    phones out there.  There are restrooms in the hallway.  We will

5    call you back in probably about 15, not more than 20 minutes.

6    So just take everything with you.

7          Please do not discuss anything about the case with

8    anyone while you're waiting, and you are all excused out to the

9    hallway.  Thank you.

10       (Prospective jurors in morning recess)

11       (Pause in the proceedings)

12       THE COURT:  All right.  The jurors have recessed.  I

13   will give counsel a few minutes to collect your thoughts and

14   then I'll come back and we'll do cause challenges and

15   peremptories.

16       MR. PATINO:  Juror Number 16.  I'm really -- I'm

17   pretty sure that we know each other, although it's been a long

18   time.  I think we worked -- her married name is Robinson.  I

19   think we worked together either at MoFo or Jones Day.  And

20   Scotty Robinson, her husband, we've worked together a lot as

21   well.  It's been a very long time since we've seen each other,

22   so I just wanted to make sure I alerted the Court.

23       THE COURT:  I have a feeling she isn't going to make

24   the cut anyway.  Just saying.  And actually, the Court would

25   even consider cause for her based on her recognition, that I

1   haven't thought about, she could create a conflict of interest

2   for her own firm by sitting on this case.  Is everyone willing

3   to excuse her for cause at this time?

4          MR. ANDRE:  We are.

5          MR. PISANO:  Yes.

6          THE COURT:  You don't need to waste time talking about

7   her.  Okay.  I'll be back in three minutes.

8       (Pause in the proceedings)

9          MR. PISANO:  Are we going to -- will we get a bio

10  break?

11         THE COURT:  No.  I'm going to pre-instruct.  But if

12  you want to have a break?

13         MR. PISANO:  Two minutes.

14         THE COURT:  Yes.  In fact, if you want to use the jury

15  room for now before we start, because we're not ready yet

16  anyway.  You guys can use the restroom in the jury room.

17         MR. ANDRE:  Your Honor, what are we thinking about

18  opening statements?  After lunch?

19         THE COURT:  Yes.  It's already after 11:00 and the --

20  pre-instruct is a little long in this case.  I'll give an early

21  lunch break.  We'll start back up at 1:00.  And today I would

22  like to be able to rap up around 4:15 at the latest to let them

23  get ahead of the traffic, especially with the weather.  And

24  then tomorrow, we'll start our other schedule.

25         MR. ANDRE:  Your Honor, one of our early experts, he

```
 1   is -- we will have him on the stand on Wednesday.  We will try
 2   to get him off on Wednesday.  We dropped some claims to get him
 3   off because he has another trial he has to fly out for in some
 4   kind -- it's not a patent case.  It's a different type of a
 5   case.  Is there any chance that we can extend like 10 or 20
 6   minutes to get him off the stand?  How flexible can we be if
 7   it's almost done with the witness?
 8            THE COURT:  Oh, yes.  I'll let them know.  I mean, I
 9   told them 2:30, but if we go to 3:00 to make sure we finish a
10   witness and not to have to call somebody back.
11            MR. ANDRE:  We'll make sure he gets out of here
12   because --
13            THE COURT:  The best way for us to stay on that
14   schedule is for me not to get 27 bench memos in the morning so
15   that we can't start at 8:30.  Just saying.
16            MR. PENNER:  That was actually one of the questions.
17   Do you want nightly bench memos like we have provided?
18            THE COURT:  Do I want them?  No.  Are you going to
19   file them?
20            MR. PENNER:  That was the question.  Would you prefer
21   they be filed, lodged, or come in and argue them in the
22   morning?  Is there a preference for Your Honor?
23            THE COURT:  Clearly, I'll have a better record if you
24   give me something in writing than just trying to do it on the
25   fly.  But if you are going to file something, please try to get
```

 1   it filed -- one of the reasons we're going to end early is so
 2   that you can get things filed by 5:00 so that I can read them
 3   overnight to be prepared to deal with it first thing quickly.
 4          MR. PENNER:  That was the party's plan, if that works
 5   for Your Honor.
 6          THE COURT:  That's fine.
 7          MR. PENNER:  Thank you.
 8          THE COURT:  The Court will first take challenges for
 9   cause.  Plaintiff.
10          MR. ANDRE:  Your Honor, we would like to challenge
11   juror number 7, Ms. Eselont --
12          THE COURT:  Ecleonel.
13          MR. ANDRE:  Ecleonel.  I'm sorry.  She has an issue
14   with the kids in the morning.  I think that's something we
15   should excuse her for cause on that.
16          THE COURT:  Any objection to excusing her for cause?
17          MR. PISANO:  No, Your Honor.
18          THE COURT:  Number 7 is excused for cause.  The Court
19   agrees.
20          MR. ANDRE:  We have already handled 16, the paralegal.
21          I think juror number 18, the attorney with the
22   girlfriend who is flat on her back with the incontinent dog,
23   I'm inclined to let him off as well.
24          THE COURT:  He has timing issues also.
25          Any issues?

1         MR. PISANO:  No, Your Honor.

2         THE COURT:  18 is also excused for cause.

3         MR. ANDRE:  We would also like to move for cause juror

4    number 19, Ms. Burks.  She says she's not getting paid, and I

5    think that's -- she needs the money, so we would excuse her as

6    well.

7         THE COURT:  Any objection with that?  She has economic

8    hardship.

9         MR. PISANO:  No, Your Honor.

10        THE COURT:  Number 19 is also excused for cause.  I

11   don't know if it's necessary, juror number 30 also had the same

12   issue.  We're not going to get that far down the road.

13        MR. PISANO:  We agree with that, Your Honor, as well.

14        THE COURT:  All right.  Yes.  Number 30 is also

15   excused for cause.

16        MR. ANDRE:  That's all we have, Your Honor.

17        THE COURT:  Thank you.  Anyone from the defendants

18   that wasn't covered?

19        MR. PISANO:  No, Your Honor, not for cause.

20        THE COURT:  Okay.  Then we'll start with peremptories.

21    We'll take the first one from plaintiff.  Remember now, you're

22   looking at the first nine people, so it would be jurors 1

23   through 10 because 7 was excused.

24        MR. ANDRE:  Your Honor, at this time, we would like to

25   exercise our first peremptory challenge on juror number 9,

1   Mr. Stillman.

2           THE COURT:  Mr. Stillman is excused, juror number 9.

3   Thank you.

4           Defense.

5           MR. PISANO:  Your Honor, we would like to excuse

6   Mr. Reyes.

7           THE COURT:  Number 2, Mr. Reyes.  All right.  Thank

8   you.  Mr. Reyes is excused.

9           Second challenge for the plaintiff.

10          MR. ANDRE:  Plaintiffs peremptory challenge juror

11  number 4, Mr. Yurczyk.

12          THE COURT:  Mr. Yurczyk is excused.  Thank you.

13  Second challenge for defendant, whenever you're ready.

14          MR. PISANO:  Ms. Tran, number 6.

15          THE COURT:  All right.  And last challenge for

16  plaintiff?

17          MR. ANDRE:  May I have one second, Your Honor?

18          THE COURT:  Yes, you may.

19          MR. ANDRE:  Thank you.

20      (Plaintiff attorney discussion off the record)

21          MR. ANDRE:  Our final challenge, number 11.

22          THE COURT:  Thank you.  Juror number 11 is excused.

23          MR. PISANO:  Our final peremptory, Ms. Morris, number

24  10.

25          THE COURT:  All right.  So the panel would be number

```
 1   1, Mr. Smith; number 3, Mr. Shaw; number 5, Ms. Shaw; number 8,

 2   Ms. Zurkowski; number 12, Ms. Hamilton, number 13, Mr. Albini;

 3   number 14, Mr. Hardy; number 15, Ms. Castro; and number 17,

 4   Ms. Wong.  Agreed?

 5            MR. ANDRE:  That's what we have, Your Honor.

 6            MR. PISANO:  Yes, Your Honor.  Thank you.

 7            THE COURT:  Then we'll call the jury in.

 8        (Prospective jurors returning at 11:05 a.m.)

 9            THE COURT:  I'm now going to call the selected jurors,

10   so the first four people I call will take the first four seats

11   in the front row.  Juror number 1, Mr. Norman Smith; juror

12   number 2, Mr. Larry Shaw; juror number 3, Ms. Toni Shaw; and

13   juror number 4, Linda Zurkowski.

14            Now starting in the back row, juror number 5, Rebecca

15   Hamilton; juror number 6, Vincent Albini; juror number 7,

16   Dallas Hardy; juror number 8, Anna Castro; and juror number 9,

17   Lynnette Wong.

18            Okay.  Ladies and gentlemen, for the rest you, thank

19   you very much for your time this morning.  I appreciate you

20   coming down and responding, particularly given what the length

21   of this trial is going to be.  It was much appreciated that you

22   were all willing to give us that time.  And on this rainy day,

23   drive very carefully.  I think you need to go back to jury

24   assembly before you're excused, right?

25            THE CLERK:  Yes.
```

1         THE COURT:  Thank you again, and you are all excused.

2     (Prospective jurors excused at 11:08 a.m.)

3     (Jurors given an oath)

4         THE COURT:  Ladies and gentlemen, I'm now going to

5     give you some preliminary instructions.  I know you saw the

6     patent video -- I believe you saw the patent video before you

7     came.  Some of this may be redundant.  I want to go over some

8     patent basics with you, as well as some fundamental issues

9     about jury service.

10        You are now the jury in this case.  I want to take a

11    few minutes to tell you something about your duties as jurors

12    and give you some preliminary instructions to help you

13    understand the principles that apply to civil trials and help

14    you follow the evidence as you listen to it.  At the end the

15    trial, I will give you more detailed instructions that will

16    control your deliberations.

17        It is your duty to find the facts from all the

18    evidence in the case.  To those facts, you will apply the law

19    as I give it to you.  You must follow the law whether you agree

20    with the law or not.

21        You must not be influenced by any personal likes, or

22    dislikes, opinions, prejudices, or sympathy.  That means you

23    must decide the case solely on the evidence before you.  You

24    just took an oath to do so.

25        You must not infer from these instructions or from

 1   anything I may say or do during the trial that I have an

 2   opinion regarding evidence or what your verdict should be.

 3   That is entirely up to you.

 4           This case involves a dispute related to five United

 5   States patents.  Before summarizing the positions of the

 6   parties and the legal issues involved in the dispute, let me

 7   take a moment to explain what a patent is and how one is

 8   obtained.  Patents are granted by the United States Patent &

 9   Trademark Office, sometimes called the USPTO.  A valid United

10   States patent gives the patent holder the right to prevent

11   others from making, using, offering to sell, or selling the

12   patented invention within the United States, or from importing

13   it into the United States during the term of the patent without

14   the patent holder's permission.

15           A violation of the patent holder's rights is called

16   infringement.  The patent holder may try to enforce a patent

17   against persons believed to infringers by means of a lawsuit

18   filed in federal court.

19           To obtain a patent, one must file an application with

20   the PTO.  The process of obtaining a patent is called patent

21   prosecution.  The PTO is an agency of the federal government

22   and employees are trained patent examiners who review

23   applications for patents.

24           The application includes what is called a

25   specification, which must contain a written description of the

1   claimed invention telling what the invention is, how it works,

2   how to make it, how to use it so others skilled in the field

3   will know how to make and use it.  The specification concludes

4   with one or more numbered sentences; these are the patent

5   claims.  When the patent is granted by the PTO, the claims

6   define the boundaries of its protection and gives notice to the

7   public of those boundaries.

8           After the applicant files the application, a PTO

9   examiner reviews the patent application to determine whether

10  the claims are patentable and whether the certification

11  adequately describes the invention claimed.  In examining a

12  patent application, the patent examiner reviews information

13  about the state of the technology at the time the application

14  was filed.  As part of that effort, the patent examiner

15  searches for and reviews information that is publicly

16  available, submitted by the applicant or both.  That

17  informations is called prior art.

18          Prior art is defined by law.  However, in general,

19  prior art includes things that existed before the claimed

20  invention that were publicly known or used in a publicly

21  accessible way in this country, or that were patented or

22  described in a publication in any country.  The patent examiner

23  considers, among other things, whether each claim defines an

24  invention that is new, useful, and not obvious in view of the

25  prior art.  A patent lists the prior art that the examiner

1    considered.  This list is called the cited references.

2         After the prior art search and examination of the

3    application, the patent examiner then informs the applicant in

4    writing what the examiner has found and whether any claim is

5    patentable.  And, thus, will be quote "allowed" unquote.  This

6    writing from the patent examiner is called an office action. If

7    the examiner rejects the claims, the applicant has an

8    opportunity to respond and sometimes changes the claims or

9    submits new claims.

10        This process, which takes place only between the

11   examiner and the patent applicant, may go back and forth for

12   some time until the examiner is satisfied that the application

13   and the claims meet the requirements for a patent.  Sometimes

14   patents are issued after appeals with the PTO or to a court.

15        The papers generated during this communication between

16   the patent examiner and the applicant make up what is called

17   the prosecution history.  All of this material becomes

18   available to the public no later than the date when the patent

19   issues.

20        The fact that the patent examiner grants a patent does

21   not necessarily mean that an invention claimed in the patent,

22   in fact, deserves the protection of a patent.  For example, the

23   PTO may not have had available to it all the information that

24   will be presented to you.  A person accused of infringement has

25   the right to argue here in federal court that a claimed

1    invention in the patent is invalid because it does not meet the

2    requirements for a patent.

3            There are five patents at issue in this case:

4            United States Patent Number 6/154,844, United States

5    Patent Number 6/804,780, United States Patent Number 8/079,086,

6    United States Patent Number 9/189,621, and United States Patent

7    Number 9/219,755.

8            The patents generally relate to the field of cyber

9    security and, more specifically, defending against cyber

10   security attacks.

11           Patents are often referred to by their last three

12   numbers, so in this case, the patents will sometimes be

13   referred as the '844, the '780, the '086, the '621, and the

14   '755 patents.

15           Plaintiff, Finjan, Inc., is the owner of the patents.

16   Finjan alleges that the product of defendants, ESET, LLC and

17   ESET SPOL, collectively ESET, infringe various claims of the

18   five patents asserted in this case.  Finjan has the burden of

19   proving by a preponderance of the evidence that the accused

20   patents infringe one or more of the asserted claims and a

21   reasonable amount of compensation it should receive due to the

22   alleged infringement.

23           ESET denies that their products infringe the Finjan

24   patents.  Defendants also allege that the asserted claims do

25   not meet the requirements for patent protection and are

1   invalid.  Defendants have the burden of proving invalidity by

2   clear and convincing evidence.

3       When a party has the burden of proof by a

4   preponderance of the evidence, that means the party must

5   present evidence that persuades you the allegation is more

6   probably true than not.

7       When a party has the burden of proof by clear and

8   convincing evidence, it means the party must present evidence

9   that leaves you with a firm belief or conviction that it is

10  highly probable that the factual contentions are true.  This is

11  a higher standard of proof than proof by a preponderance of the

12  evidence, but does not require proof beyond a reasonable doubt.

13      You should base your decision on all of the evidence

14  regardless of which party presented it.

15      The evidence you are to consider in deciding what the

16  facts are consists of:

17          The sworn testimony of any witness;

18          The exhibits which are received into evidence;

19          Any facts to which the parties have agreed; and

20          Any facts that I may instruct you to accept as true.

21      In reaching your verdict, you may consider only the

22  testimony and exhibits received into evidence.  The following

23  things are not evidence, and you must not consider them as

24  evidence in deciding the facts of the case:

25          The statements and arguments of the attorneys;

1          The questions and objections of the attorneys;

2          Any testimony I may instruct you to disregard; and

3          Anything you may see or hear when the Court is not in

4     session, even if what you see or hear is done or said -- that

5     should be "by" -- by one of the parties or by one of the

6     witnesses.

7          Evidence may be direct or circumstantial.  Direct

8     evidence is direct proof of a fact such as testimony by a

9     witness about what that witness personally saw or heard or did.

10         Circumstantial evidence is proof of one or more facts

11    from which you could find another.

12         You should consider both kinds of evidence.  The law

13    makes no distinction between the weight to be given either

14    direct or circumstantial evidence.

15         It is for you to decide how much weight to give any

16    evidence.

17         In deciding the facts in this case, you may have to

18    decide which testimony to believe and which testimony not to

19    believe.  You may believe everything a witness says or part of

20    it or none of it.  Proof of a fact does not necessarily depend

21    on the number of witnesses who testify about it.

22         In considering the testimony of any witness, you may

23    take into account:

24         The opportunity and ability of the witness to see or

25    hear or know the things testified to;

1          The witness's memory;

2          The witness's manner while testifying;

3          The witness's interest in the outcome of the case or

4     any bias or prejudice, if any;

5          Whether other evidence contradicted the witness's

6     testimony;

7          The reasonableness of the witness's testimony in light

8     of all the evidence; and

9          Any other factors that bear on believability.

10         A deposition is sworn testimony of a witness taken

11    before trial.  The witness is placed under oath to tell the

12    truth, and lawyers for each party may ask questions.  The

13    questions and answers are recorded.  Insofar as possible, you

14    should consider deposition testimony if presented to you in

15    court in lieu of live testimony in the same way as if the

16    witness had been presented to testify.

17         There are rules that control what can be received into

18    evidence.  When a lawyer asks a question or offers an exhibit

19    into evidence and a lawyer on the other side thinks that is not

20    permitted by the rules of evidence, that lawyer may object.  If

21    I overrule the objection, the question may be answered or the

22    exhibit received.  If I sustain the objection, the question

23    will not be answered or the exhibit will not be received.

24    Whether I sustain an objection to a question, you must ignore

25    the question and you must not guess or speculate what the

1   answer might have been.

2        I may order the evidence be stricken from the record

3   and direct you to disregard or ignore the evidence.  That means

4   that when you are deciding the case, you must not consider any

5   evidence I told you to disregard.

6        From time to time during the trial, it may be

7   necessary for me to talk with the attorneys out of the hearing

8   of the jury by having a conference at the bench or while you're

9   out of the courtroom on a break.  Please consider that while

10  you're waiting, we are working.  The purpose of these

11  conferences is not to keep relevant information from you but to

12  decide how certain evidence is to be treated under the rules of

13  evidence to avoid confusion and error.

14       I'll keep the number and length of these conferences

15  to a minimum.  If an attorney asks for a bench conference and I

16  do not permit it, please do not consider that as an indication

17  of my opinion of the case or what your verdict should be.

18       During deliberations, you will have to make your

19  decision based on what you recall of the evidence.  You will

20  not be given a transcript of the trial.  I urge you to pay

21  close attention to the testimony as it is given.  If at any

22  time you cannot hear or see the testimony, evidence, questions,

23  or arguments, let me know so I can correct the problem.

24       Occasionally, those screens will go out for some

25  inexplicable reason.  Generally, just turning it on or off

1   again will bring the screen back up.  But at any time your

2   screens go dark when we're looking at exhibits, raise your hand

3   and let me know.

4         If you wish, you may take notes to help you remember

5   the evidence.  If you do take notes, please keep them to

6   yourself until you and your fellow jurors go to the jury room

7   to decide the case.  Do not let note taking distract you.  When

8   you leave, your notes should be left in the courtroom.  No one

9   will read your notes.  They will be destroyed at the conclusion

10   of the case.

11         Whether or not you take notes, you should rely on your

12   own memory of the evidence.  Notes are only to assist your

13   memory.  You should not be overly influenced by your notes or

14   those of your fellow jurors.

15         Now, I'll say a few words about your conduct as

16   jurors.  First, keep an open mind throughout the trial.  Do not

17   decide what the verdict should be until you and your fellow

18   jurors have completed your deliberations at the end of the

19   case.

20         Second, because you must decide this case based only

21   on the evidence received in the case and my instructions as to

22   the law that applies, you must not be exposed to any other

23   information about the case or to the issues it involves during

24   the course of your jury duty.  Thus, until the end of the case,

25   or unless I tell you otherwise, do not communicate with anyone

1    in any way and do not let anyone else communicate with you in

2    any way about the merits of the case or anything to do with it.

3          This means discussing the case in person, in writing,

4    by phone, or electronic means via email, text messaging, or any

5    internet chat room, blog, website, or application including,

6    but not limited to, Facebook, YouTube, Twitter, Snapchat, or

7    any other forms of social media.  This applies to communicating

8    with your fellow jurors until I give you the case for

9    deliberation, and it also applies to communicating with

10   everyone else, including your family members, employer, media,

11   or press, and the people involved in the trial; although you

12   may notify your family and employer that you have been seated

13   as a juror in this case and how long you expect the trial will

14   last.  But if you're asked or approached in any way about your

15   jury service or anything about the case, you must respond you

16   have been ordered not to discuss the matter and to report the

17   contact to the Court.

18         Because you will receive all the evidence and legal

19   instruction you may properly consider to return a verdict, do

20   not read, watch, or listen to any news or media accounts or

21   commentary about the case or anything to do with it.  Do not do

22   any research, such as consulting dictionaries, searching the

23   internet, or using other reference materials.  Do not make any

24   investigation or in any other way try learn about the case on

25   your own, and also do not do any research about the case, the

law, or the people involved, including the parties, the

witnesses, or the lawyers until you have been excused as

jurors.  If you happen to read or hear anything touching on

this case in the media, turn away and report it to me as soon

as possible.

These rules protect each party's right to have this

case decided only on the evidence that has been presented here

at court.  Witnesses here in court take an oath to tell the

truth, and the accuracy of their testimony is tested through

the trial process.  If do you any research or investigation

outside the courtroom or gain any information through improper

communications, then your verdict may be influenced by

inaccurate, incomplete, or misleading information that has not

been tested by the trial process.  Each of the parties is

entitled to a fair trial by an impartial jury, and if you

decide the case based on information not presented in court,

you'll have denied the parties a fair trial.

Remember, you have taken an oath to follow the rules,

and it's very important you follow these rules.  A juror who

violates these restrictions jeopardizes the fairness of the

proceedings.  A mistrial could result that would require the

entire trial process to start over.  If any juror is exposed to

any outside information, please notify the Court immediately.

Trial will proceed in the following manner:

Each side may make an opening statement.  An opening

1    statement is not evidence.  It is simply to help you understand

2    what that party expects the evidence will show.

3          The presentation of evidence will then begin.

4    Witnesses will take the witness stand, and documents will be

5    offered and admitted into evidence.

6          As I outlined earlier, there are two standards of

7    proof that you will apply to the evidence, depending on the

8    issue you're deciding.  On the question of whether there is

9    infringement of the patent claim, you'll decide if it is true

10   by a preponderance of the evidence, that is, if it is more

11   likely true than not.  On the question of whether a patent

12   claim is valid, you use higher standard whether there was proof

13   by clear and convincing evidence, that is, whether the proof

14   leaves you with a conviction that it is highly probable that it

15   is true.

16         Finjan will present its evidence on its contentions

17   that the claims of the asserted patents are infringed by ESET's

18   products and the damages Finjan claims to reasonably compensate

19   it for the alleged infringement.  ESET will have an opportunity

20   to cross-examine Finjan's witnesses.

21         After Finjan has presented evidence, ESET will present

22   evidence responding to or rebutting Finjan's infringement and

23   damages contentions.  ESET will also present evidence on its

24   contentions that the asserted claims do not meet the

25   requirements of the patent and are invalid.  Finjan will then

1   have an opportunity to cross-examine ESET's witnesses.  Finjan

2   will then have an opportunity to call witnesses to respond to

3   or rebut the evidence presented by ESET on the invalidity

4   contentions.

5           After the evidence has been presented, I will give you

6   final instructions on the law that applies to the case, and the

7   attorneys will make closing arguments.  After closing

8   arguments, you will retire to deliberate and decide the case.

9           Now, that outline is generally what we'll follow.

10  Because some of these witnesses are traveling from a distance,

11  we may take some people out of order or allow for the complete

12  examination of a witness so that they don't have to be called

13  back, but the Court or the attorneys will signal to you when

14  they're shifting gears and addressing something that is a

15  little out of sequence.  But trials don't always flow very

16  literally.  Sometimes things jump around.

17          You will also, at some point, receive a notebook that

18  has copies of the patents and what's called the Court's claim

19  construction.  Certain terms of the patents, the Court has

20  given definitions to the parties as to what those terms are

21  understood to mean, and you'll have to apply the Court's

22  construction at some point.

23          Again, you're welcome to take notes, and I am sure the

24  attorneys toward the end of the case will give you good recaps

25  of who all these witnesses were because it's a long period of

1    time to remember.

2         More housekeeping.  The parties are instructed not to

3    talk to you.  Just because there should be no improper

4    communications ever between the jury or the attorneys or the

5    witnesses in the case, I have instructed them to not even say

6    good morning to you.  They're not going to be rude.  It's just

7    if someone sees you talking to one of the attorneys in the

8    hallway, they won't know that you are just commenting on the

9    weather or current events.  And I don't want any

10   misinterpretations.  So they'll not be having any conversations

11   with you.

12        And the attorneys are also instructed when their

13   witnesses are waiting in the hallway if the jury is recessing

14   out there to make sure witnesses keep a discreet distance from

15   the jurors, don't travel up and down the elevator with them, to

16   avoid any conversations that might be overheard.

17        We are going to take an early recess because I don't

18   want to interrupt their openings.  So I'm going to let you go

19   to lunch now, and we'll return at 1:00 to start with opening

20   statements.  Today is the only day we're going to go longer

21   because we did jury selection this morning.  So I expect to

22   excuse you for the day at about 4:15, certainly no later than

23   4:30 so you can get a jump on traffic getting out of town.  I

24   think the weather remains inclement.

25        You are welcome, when you return to the jury box after

1   lunch, to bring a beverage with you as long as it is in a

2   covered container.  No food in the jury box.  And do not

3   discuss the case or anything about it with anyone.  And you are

4   all excused.  Please be at the door at 1:00, and we'll get

5   started.  Thank you.

6        (Jury in lunch recess at 11:30 a.m.)

7            THE COURT:  The jury has recessed.  We are excluding

8   witnesses during testimony, but I don't have a problem with

9   them sitting through openings, unless the parties have any

10  objections.

11           MR. ANDRE:  That's fine with us, Your Honor.

12           THE COURT:  All right.  So after opening statements

13  are completed, anyone who is here who is an expected witness

14  other than an expert will have to wait outside until they're

15  called.

16           MR. PENNER:  Your Honor, we have our corporate

17  representative, Mr. Marko here, who is also potentially a

18  witness.

19           THE COURT:  Yes.  A party representative can sit.

20  Now, again, regarding confidential information, if a witness is

21  going to testify -- and I'm hoping we won't have that today,

22  but I know it's going to come up -- and there's any

23  anticipation that witnesses or party representative need to be

24  excused, let me know and we'll excuse them.  I'm not going to

25  lock the courtroom doors, but we'll have everybody wait outside

 1   during that testimony.  Then when the transcripts -- they will

 2   be available for you to review.  I gather you're getting

 3   dailies, and then before they get posted to the docket, you'll

 4   have a chance to give her the specific portions that you want

 5   sealed on a showing of good cause and having heard the

 6   testimony, it should be fairly easy for me to make those

 7   rulings.  Anything else?

 8          MR. ANDRE:  Just one thing, Your Honor.  We had

 9   some -- on the letter briefing last night regarding the

10   deposition designations.  There's probably a realistic chance

11   that only one of them will get played today, and that's

12   Mr. Touboul, the founder of Finjan.  I don't know if you want

13   to address that now or after.  The order of witnesses is, our

14   first witness is our current CEO, then Mr. Touboul's video

15   after that.  So we think we'll get to it this afternoon.

16          THE COURT:  All right.  I looked at that.  And so the

17   objection on this first 15 seconds is just the answer to a

18   question?

19          MR. PENNER:  Those are not seconds.  Those are line

20   numbers in the deposition.  In the future -- that's how we've

21   done it.  If you like it time coded, we can do that.

22          THE COURT:  That's okay.  It's one page, 15 lines, so

23   it's probably not even 15 seconds.  So what's --

24          MR. PENNER:  So the question, Your Honor -- and is it

25   easier for you if Your Honor has it available?

 1                THE COURT:  Yes.  You all can sit down.

 2                MR. ANDRE:  Here are the two sections.  I kind of

 3     highlighted one of the two.

 4                MR. PENNER:  So, Your Honor, in that first section,

 5     37/1 through 37/16, the answer that Mr. Touboul started to give

 6     was nonresponse to the question.  And I'm not sure if counsel

 7     included the follow up there, but there was an objection made

 8     by Mr. Hannah at the time saying the answer was incomplete

 9     because I had then followed up with another question, and

10     immediately thereafter, after Mr. Hannah had objected to it

11     being incomplete, I withdrew the question because he was not

12     answering the question I asked him.  So the answer is not only

13     incomplete, but it was nonresponsive to the question being

14     asked.

15                THE COURT:  I just have the highlighted section.  Do

16     you have --

17                MR. ANDRE:  Your Honor, here is the full transcript.

18                THE COURT:  Thank you.  Well, you can't just withdraw

19     it after he answered it because you didn't like it.  There is

20     no objection of nonresponsive and moving to strike.  You asked

21     him a question and he answered it, and while the answer is

22     perhaps a tad rambling, it seems to be addressing what he

23     understood what the question was.  The Court is going to allow

24     it.  All right.

25                MR. ANDRE:  The second portion, Your Honor, is the

1    highlighted portion marked number 2.  This is the examination

2    by Mr. Hannah of Mr. Touboul.  And I think I'll let them make

3    the basis for the objection because I'm not sure I understand

4    it.

5           THE COURT:  Your objection here was it was outside the

6    scope?

7           MR. PENNER:  So, first of all, Your Honor, the

8    objection was narrative the way the questions were formed,

9    basically "tell me about Finjan," and on top of that, they

10   didn't relate to the questions that were asked during

11   deposition.

12          THE COURT:  This gentleman is not local, right?

13          MR. ANDRE:  He is in Israel, Your Honor.  And at this

14   point, he has no association with Finjan, so.

15          THE COURT:  Given that it was probably anticipated

16   that this deposition would be used in lieu of testimony,

17   they're not limited in their examination of a witness by your

18   examination because it's for trial testimony.  So I won't

19   exclude it for that.

20          It is fairly narrative, but you know what?  There's

21   not much you can do about that.  The objections are overruled.

22          MR. ANDRE:  Thank you, Your Honor.

23          THE COURT:  All right.  Is that the only one for

24   today?

25          MR. ANDRE:  I imagine the other ones will go tomorrow.

1   If you want to address them today, we can.  They're pretty --

2   one is fairly straightforward.

3            THE COURT:  These are the only two that I have, right,

4   that you have filed for Mr. Krizan?

5            MR. ANDRE:  Krizan, yeah.  This is the full

6   transcript.  You can see the issue we're having.  The first

7   section highlighted is what we designated as the transcript.

8   There's a portion that is not designated.  It just kind of has

9   ink pen mark on it --

10           THE COURT:  Okay.

11           MR. ANDRE:  -- where there's follow-up questions, and

12  then he answers those follow-up questions.  Counsel for ESET

13  has designated the follow-up questions, the second portion of

14  the highlighting.  It makes it sound like he's talking about

15  the chart, not the follow-on flows.

16           THE COURT:  Okay.  Hold on.

17      (Court reviewing transcript)

18           THE COURT:  So you just want to bridge this with this

19  in-between question?

20           MR. PENNER:  Well, the in-between question relates

21  actually to designated testimony that they had earlier on in

22  their designation where they were asking him about the flow of

23  the day and they said so step one is X, step two is X, step

24  three is X, and those are the additions the parties agreed to

25  play, then they asked that question and then they skipped the

1   flows, which given that they didn't use the word "flows" in

2   prior questioning, we didn't feel it was necessary for the jury

3   to hear that, but then simply follow on with this commentary

4   about whether or not it was accurate or not with what he had

5   previously testified to.

6        THE COURT:  Is there a designation earlier that is

7   going to make this clear as to what we're talking about here?

8        MR. ANDRE:  There's not, Your Honor.

9        MR. PENNER:  Yes, there is.

10       MR. ANDRE:  The way they tried to counter-designate

11   that second part where we say it's not accurate, the flow is

12   not accurate, it makes it sound like the previous testimony.

13   But he's talking about something earlier in the day that's not

14   being played.  It's improper counter-designation is our

15   objection to that.  When he says he's not referring to the

16   portion of the chart and the exhibit that he was talking about,

17   the follow-up question was:  We talked about flows earlier

18   today.  Would this chart apply to those?  And he says no, it

19   wouldn't apply to those.  But if you look at their

20   counter-designation, it makes it sound like the chart is

21   incorrect.

22       MR. PENNER:  Your Honor, it does apply to the earlier

23   designated testimony where I believe it's just a couple pages

24   earlier in the transcript where Mr. Lee asks him:  Can I just

25   try to get the flow correct here?  Is it step one, step two,

 1    step three, step four?  And the answers are:  Yes, yes, yes.

 2    That's the earlier flows that they were discussing.  Then he

 3    pulls out the flow chart and then asks about that, and then

 4    later says:  Is that about what we were just talking about?

 5    And so that's where he says:  The chart does not represent the

 6    flows that I was previously talking about.

 7         THE COURT:  When you play his deposition, you're going

 8    to play all the evidence you want from it, or are you breaking

 9    this up?  Because this seems -- I don't know that anyone would

10    understand what was going on here if you just played this

11    column you gave me when you say what we talked about earlier.

12    Will they have heard the earlier part?

13         MR. PENNER:  The step one, step two, step three is

14    designated in part of the depositions they plan to play for the

15    jury, yes.

16         MR. ANDRE:  If they bridge the gap, we would probably

17    throw in the objection.  They didn't want to bridge that gap,

18    which we had talked about earlier.  They wanted to make this

19    sound like the chart was not correct.

20         THE COURT:  You may be reading it that way.  But I'm

21    just seeing that the question, if you if go from whatever this

22    exhibit is that is in front of him that shows the integration

23    of our product into customer's networking infrastructure.  And

24    do you recall the flows we went through earlier today?

25         "What do you mean?"

1       "We went through several flows about how ESET gateway

2   security receives inbound and outbound content and scans the

3   content; do you recall that?"

4       "Yes."

5       "Would this diagram be accurate?"

6       "I don't think so."

7       So why would that not be clear?

8       MR. ANDRE:  It would be if you put that all in.  The

9   part that is not highlighted, they don't want to play that

10  part.

11      THE COURT:  Oh.  No.  The objection should come out

12  but the question:  Do you recall looking at these flows when

13  you said what they were, and he said yes, that sets some

14  context.

15      MR. ANDRE:  Right.

16      THE COURT:  You have to have that context.  Otherwise,

17  it's just this diagram an accurate depiction of the

18  architecture, it's not referring back to giving -- framing a

19  question in his answer.

20      MR. PENNER:  We're okay playing those other parts as

21  well, Your Honor.

22      THE COURT:  Yes.  Just take the objections out.  The

23  objections are overruled.  But the content here, the questions

24  and answers of the witness through this whole section starting

25  at 185/4 through 187/5 should be played.

 1          MR. ANDRE:  That's fine, Your Honor.

 2          THE COURT:  Okay.  And how do you pronounce this?

 3   There's like three witnesses who have the same name.

 4          MR. PENNER:  Juraj.

 5          THE COURT:  What's the issue there?

 6          MR. PENNER:  In this one, Your Honor, the witness

 7   basically says I don't know, and so he gives his kind of best

 8   guess at something, but he is being played as a corporate

 9   representative here.  He's available, but they're trying to

10   play his testimony, 30(b)(1) testimony as a corporate because

11   he is a controlling officer.  But he says: I don't know.

12   They're going to try to play to the jury something there's

13   speculating on.

14          MR. ANDRE:  Pass it up, Your Honor?

15          THE COURT:  The objection is overruled.  Overruled.

16   You can play it.

17          MR. ANDRE:  Your Honor, that's all we have for today.

18          THE COURT:  All right.  I will see you all at 1:00.

19      (Court in lunch recess at 11:43 a.m.)

20      (Call to order of the court at 1:00 p.m.)

21          THE COURT:  All right.  Before we call the jury in and

22   start, I understand there's an issue.

23          MR. PISANO:  Your Honor, it's not an issue, it's just

24   with respect to Finjan's experts, because pretrial you said

25   they will not be relying on each other.  We were wondering if

1   it's necessary for them to be sitting in the courtroom during

2   each other's testimony.

3         THE COURT:  I don't care.  They can sit in the

4   courtroom because they can't go outside their expert reports,

5   so what they hear shouldn't make any difference.

6         MR. PISANO:  Very good.  Okay.

7         THE COURT:  All right.  Let's get the jury in.

8      (Jury entering at 1:02 p.m.)

9         THE COURT:  All right.  Ladies and gentlemen, we're

10  going to begin now with opening statement from Finjan.  And I

11  remind you that opening statements are not evidence.  It's just

12  an opportunity for them to give you a preview of what you're

13  going to hear in the course of the case.

14        MR. ANDRE:  May it please the Court?  Your Honor, may

15  I have your permission to address the jury from the well?

16        THE COURT:  Yes, you may.

17        MR. ANDRE:  Thank you.

18        Good afternoon, ladies and gentlemen.

19        THE JURY:  Good afternoon.

20        MR. ANDRE:  I introduced myself earlier today.  My

21  name is Paul Andre.  I am the lead trial counsel for Finjan.

22  With me today and throughout the next three weeks, you'll meet

23  Lisa Kobialka, she's another attorney; James Hannah; Kris

24  Kaskins is sitting back there; and behind him is Cristina

25  Martinez.  We're all the attorneys representing Finjan.  And

 1    next to Cristina is Gladys Tong and Steve Dennison.  They're
 2    our paralegals who will be running the show for us the next
 3    three weeks.
 4           I have the honor of coming to the court like this and
 5    representing a really great client in Finjan.  Finjan has been
 6    around for many, many years.  They're a publicly-traded company
 7    on Nasdaq.  They are a company that believes in innovation.
 8    That's their core being, innovation, today in two lines of
 9    business include licensing their innovations, their patents,
10    their technology, and also selling a mobile app to help you
11    protect your cell phones from being hacked and getting a virus.
12           I'm happy today to have many of our company
13    representatives here.  Phil Hartstein is the CEO of Finjan.
14    He's going to be the first witness you hear today.  He's going
15    to get up and talk about Finjan as soon as we finish our
16    statements.  Next to him is Julie Mar-Spinola, who is the chief
17    intellectual property manager of Finjan.  Ms. Ann Taylor works
18    in our legal group.  John Garland, director of licensing, and
19    Jevan Anderson, the chief financial officer.
20           We come here because Finjan is an innovator in cyber
21    security.  And cyber security is more important today than it
22    ever has been.  It affects every one of us in this courtroom.
23    If you have a social media account, it affects you, if you have
24    a bank account.  Anything you do in today's world is connected
25    through data.  Cyber security has become one of the most

1  important components in our country, national security,

2  financial wellbeing, and individuals are at risk just like

3  companies and governments are.

4          It wasn't always that way.  Back in the pre-internet

5  days, you guys probably remember these computers had floppy

6  disks.  You guys remember floppy disks?  Remember those?  Some

7  of you are probably too young for it, maybe.  But in the days

8  of pre-internet, computers weren't really at risk.  A virus

9  would be on a disk and some prankster would go break into like

10  a Best Buy and sneak a disk into one of those packages and

11  that's how they started a virus.  The virus spread very slowly.

12  It wasn't much of a real issue for society, only those

13  individuals who got hit.

14          Now, back in those days, the first antivirus company

15  that was formed in 1970, McAfee, it was pretty simple to

16  control.  They had what was called antivirus programs.

17  Antivirus programs were literally someone would get a virus, a

18  human being would sit at a computer and they would write a

19  piece of code.  They'd say every time you see this code come in

20  on one of those floppy disks or through a network, that's a

21  virus.  Those are called virus signatures or fingerprints, and

22  those are what we call reactive technology.  In other words, it

23  was reactive because you couldn't write that code, that

24  signature, until the virus had already infected somebody.

25          When I first started working with Finjan 15 years ago,

1  my first trial was 10 years ago, I talked about reactive

2  technology versus proactive technology and used the example of

3  my young son at the time.  Now he's a teenager and doesn't

4  quite fit the mold anymore.  But I talked about for a parent,

5  you can be reactive in nature, which means, you walk in, you

6  see your kid and he's got the cookies, you now, the Girl Scout

7  cookies, he's eaten half the pack, you get upset and take them

8  away from him and you hide them from him going forward.  That's

9  a reactive nature.  Proactive is when you buy the Girl Scout

10  cookies, you hide them to begin with.  You don't ever let that

11  happen.  That's the difference between reactive and proactive

12  technology.

13       Well, back in the day, the pre-internet, reactive

14  technology was fine.  There just wasn't that much activity

15  going on.  But then comes the internet.  The mid-1990s, the

16  government released all controls and commercial internet began.

17  Also at the same time, computer languages began changing.  And

18  that's very important.  We'll talk about why that's important

19  in a few minutes.

20       But with internet, you can actually sit down at your

21  computer and reach out to the world.  You can be talking to a

22  million people, and I know it, because all the interconnections

23  that go on.  A million chances to get infected.  The older

24  reactive technology of signature-based technology of that

25  certain code you knew was not going to work anymore.  That's

1   where Finjan comes in.

2          At this time period, Finjan came up with something,

3   what is behavior-based technology.  It's proactive.  They

4   invented behavior technology.  What Finjan came up with was an

5   idea instead of just looking at a piece of code, when something

6   would come into your computer, we tried to figure out what the

7   code is going to do.  It looks at the behavior and when it

8   looks at the behavior, it creates a profile and it says this

9   might do some bad things.  So you look at the behavior of the

10  code before it can cause problems, and then you can make an

11  informed decision what you want to do with it.

12         Finjan got a lot of recognition for being the

13  inventors, the pioneers, the innovators of behavior technology.

14  That was a turning point.  A turning point in how we've

15  attacked the cyber security industry and how we've attacked

16  viruses.

17         I think it helps to go back and look at how Finjan

18  began to give you the full story.  The summer of 1995, a man by

19  the name of Shlomo Touboul in Israel had just sold his company

20  to Intel.  He's looking for a new project.

21         Sun Microsystems in Silicon Valley just released Java.

22  You guys remember Java?  Java is still as popular today as it

23  was back then.  But it was a craze.  It was a new computer

24  language that was going to change the way computing is done.

25  What was new about it was Java had a component about it that

1   when you clicked on the website, code would automatically run

2   on your machine.  It didn't get installed or anything, it just

3   started running.

4          Now, people in the industry at the time, 1995, they

5   thought this was the greatest thing ever.  Mr. Touboul saw

6   problems.  Mr. Touboul says you can have code running on your

7   machine and not even know it.  So he taught himself the Java

8   programming language from the summer of '95 to the beginning of

9   '96, and he formed a company called Finjan.

10         Now, one of the things I love about Finjan is the

11  name.  Finjan is Arabic.  And what it means is a pot that holds

12  it coffee.  It's a small coffee pot.  Mr. Touboul thought it

13  would be really great because what he was trying to do was

14  contain Java.  That was the genesis of this name, containing

15  that computer language that's going to cause problems.

16         So he formed the company January 1st, 1996.  And one

17  thing Mr. Touboul knew because he had sold companies before, he

18  sold his company to Intel, he understood you had to protect

19  your intellectual property.  Once he started developing

20  products, he got his first product on the market and he started

21  filing patents, and these patents, what I'm talking about, are

22  what people describe as pioneer.  The inventor of

23  behavior-based technology.  It was a paradigm shift in how we

24  were going to attack computer security.

25         Most people laughed at him.  For years, they laughed

1   at him and said we don't need it.  The typical startup company,

2   they got funded, people said we don't need it.  But then around

3   early 2000s, people said we need it.

4          Finjan's first patent application was filed

5   November 1996.  And one of the things that's a little bit

6   interesting about this case is a lot of the patents that you're

7   going to look at in the next three weeks, they're filed around

8   the same time period.  And as you saw in the video, patents get

9   a 20-year life period.  And Finjan's patents have run their

10  life.

11         So we're in this court today about those last few

12  years of life of the patents.  That's what we're looking at.

13  The infringement was the last couple of years.  The patents all

14  expired in 2017, but we filed this case much earlier than that.

15  It just takes a long time to get where we are today.

16         As innovators, one of the things that kind of gives

17  you a good idea about innovation is who takes licenses, who

18  looks at your technology and says we need your technology.  If

19  you look at the slide in front of you now, you can see it's a

20  who's who of people taking licenses of Finjan technology.  You

21  see McAfee, Symantec, Trend, FireEye, IBM, Webroot, Microsoft.

22  Microsoft was the first license in 2005.  It's literally the

23  who's who of cyber security in computer networking.  They take

24  licenses to Finjan's innovative technology.

25         Sometimes we have to come to court, like this.

1    Sometimes you have to file a lawsuit, because believe it or

2    not-- it's hard to believe, some companies don't like paying

3    money for someone else's technology.  They would just rather

4    take the technology.  But many times we have gone to court,

5    most times we don't.  Most of those licensees were just

6    negotiations between the parties and they worked it out.

7         Now Finjan's business started back in '96, started

8    doing products in '97 and went public in 2014.  A lot happened

9    in between that.  There are multiple products sold, they had

10   employees up to 150 down to zero.  Typical startup company, ups

11   and downs of a company.  One thing that remained consistent

12   with Finjan was innovation.  They were an innovative company.

13   They put value in patents.  They respected IP.  So when you see

14   the patents in this case, you'll see five patents that were

15   granted over a period, from 2010 up to 2016.

16        You'll also see that Finjan began licensing its

17   technology and patents back in 1996 and 1997.  Its very first

18   technology license was in early 1997.  They believed in sharing

19   their technology.

20        Now, one of the things that comes up in these types of

21   cases is, why are there five patents involved in this case?

22   Why five patents?  Because Finjan also believed in a layered

23   security approach.  It's not enough just to have it on your

24   home computer or not enough to have it on the server in your

25   company.  There has to be a lot of different security aspects

1   to be successful.

2          So Finjan came up with a layered security approach.

3   And you see layers of protection.  And you see on the slide in

4   front of you, there's a user endpoint.  That's someone at their

5   computer.  You have to have security on the user endpoint.  You

6   see the gateway.  That's usually a server that sits between the

7   user and the internet.  And more recently, there's the cloud.

8   The cloud is this -- just a bunch of servers offsite.  People

9   are now using the cloud for all types of information.  You go

10  offsite, you put security there.  Finjan has patents that cover

11  all three of those aspects.  Those layered security approaches.

12         Let's discuss the five patents in this case.  First is

13  the '844 patent.  Now, the '844 patent is like the inspector.

14  You have an inspector at the gateway of the cloud, and what

15  that inspector is going to do, it's going to say no web server

16  is going to be able to serve the content to my client, the end

17  user without me inspecting it first.  They're not going to make

18  that content available.  That is the essence of what this is

19  about.

20         So on the gateway, you'll see content will come in

21  from the internet, it will review it.  The inspector will

22  review the content.  He'll create a security profile.  He'll

23  link that profile to representations of the web.  So then an

24  administrator, who works in your company, whatever, can look at

25  it and say is this something we want to let through or not, is

1    this something we want in our network.  So by doing that

2    security profile and linking it to the actual web page, that

3    gives that type of security that you need at that level.

4         You can also do this in the cloud.  You have an

5    inspector in the cloud.  Very similar, but here, because the

6    cloud is so big and so powerful, you have multiple computers

7    doing it.  You can run something, what they call a sand box.

8    You see the depiction of the sand box.  They call it a sand box

9    in computer science because it's like where kids can play and

10   be safe, they have a safe environment where you can detonate

11   the malware.  So you get a chance to actually bring the malware

12   into the sand box, detonate it, and see what happens.  It's

13   safe.  When they do that, they create a profile, they link it

14   before it ever gets to the end user.

15        The next patent that we're going to discuss is the

16   '086 patent.  This is just a little bit different.  You have an

17   inspector that looks at the malware and says, you know what, I

18   want to look at it a little deeper.  So it sends it to a

19   destination computer.  It says I'm going to send it somewhere

20   else and I'm going to give it a deeper dive.  That's what the

21   '086 patent is about.  You give it a first inspection, maybe it

22   needs additional inspection and send it off somewhere else just

23   to make it safe.

24        The '780 patent is the third patent we're going to

25   talk about.  The '780 is about hashing.  You're going to hear

1   about hashing all over the place.  Hashing is a way of taking a

2   web page and giving it a unique ID.  Now, why would you ever do

3   that?  Well, because if you've seen the web page once and

4   you've already scanned it and you said it's okay or it's bad,

5   either way, why scan it again?  So hashing is a way of giving a

6   web page or a file, some malware a unique ID, so you don't have

7   to continually rehash all over again.  This helps the

8   computer's speed and also helps to catch the bad guys.

9        The final two patents are very close in nature, so

10  we're going to handle those together, the '621 and '755 this

11  actually operates on the client side.  What this does is it

12  brings in a file.  Let's say you have a bad file, and it goes

13  down into the operating system and it actually sends a delete

14  message to the register:  That's not good.

15       So what these patents do is they put probes in.

16  They're going to let the file come into the system and see what

17  it's going to do.  If it starts doing something they don't

18  like-- this is like a police officer seeing someone acting

19  suspicious -- they're going to say let's go look at this, let's

20  go check this out.  So they do a further inspection, and that's

21  at the client side.

22       Now, all five of these patents together create this

23  shield of security.  The shield is important, as I've

24  mentioned, because it gives you multiple layers.

25       Now, the technology we're talking about over the next

1    three weeks is really complex.  And I asked some questions in

2    the voir dire if you guys had technical understandings, and

3    most of you did not.  You're not trained in that area, so it's

4    our job to explain it to you.

5            And the way I think about this type of security is

6    something you can probably all relate to.  I think of it as

7    like, you know, when I was a little kid and we would take my

8    aunt, who was in the Air Force, we would go to Columbus, Ohio

9    and we would take her to the airport, and I would go to the

10   gate with her.  I don't remember going through a metal

11   detector.  Then they put some metal detectors in because they

12   had some hijackings, and then, of course, 9/11 caused TSA; you

13   have the full body scan; if you don't have a ticket, you can't

14   get to the gate anymore.

15           Security beefed up because threats beefed up.  And

16   cyber security has done the same thing.  Threats have gotten

17   much, much more intense, so they had to beef up security.  So I

18   equate it to an airport.

19           Today's modern airport is like these five patents.  If

20   you look at the first layer of defense, security.  That's the

21   machine you go in and you raise your hands -- everyone has done

22   that -- and you get the body scan.  You put your bag through

23   the X-ray, that's the inspector.  That's the '844 patent.  You

24   go in, that's the first line defense.

25           If they see something in your bag or something comes

1    up on the screen, they do a second screening.  That's the '086

2    patent.  They saw something they didn't like.  They said hey,

3    there's something going on here, we should have further

4    inspection.  If you go through the airport, they see something

5    in your bag, you walk over to a little stand and give it to a

6    person, they wipe your hands and run it through the computer to

7    make sure there's no bomb-making material or whatever it is.

8    That's just another security scan.

9         If you're a known traveler and you have TSA precheck,

10   that means you had the interview with TSA, they took your

11   fingerprints, they trust you a little bit more, so the check is

12   not quite as intense.  You have a known ID, just like the '780

13   hash.  You don't have to do the full body scan and all that.

14   You may have to go through the X-ray machine.  You don't have

15   to take your shoes off or take your computer out of your bag.

16   It's just an easier way of getting through.  So the '780 patent

17   is like that hashing and TSA.

18        And, finally, the last two patents that operate after

19   you get past the initial security screening, these are like

20   security in the airport.  Sometimes you might even have air

21   marshals on the airplane.  They want to see what you're doing

22   when you're on the home computer.  They want to know what's

23   happening.  These two patents are going to say, we see you

24   doing something suspicious, we're going to look at you deeper.

25        So the layers of security in cyber security is very

1    much like the layers of security at modern airports.  You have

2    the inspector, you have a secondary screening, you have known

3    ID, known travelers, and then you have security once you get

4    in -- when you go on the airplane.

5          Now, we're here today because 2013, 2014, Finjan

6    noticed a company called ESET.  It wasn't very familiar with

7    ESET.  They noticed ESET was moving to the behavioral space,

8    moving to behavior detection.  ESET as a company was around

9    before Finjan was found.  It was one of the traditional

10   signature-based antivirus companies.

11         Around 2013, 2014, Finjan noticed that ESET was coming

12   into the behavior space.  And Finjan in the beginning of 2015

13   sends a letter to ESET and said hey, we saw your technology.

14   You should take a license to our patents.  And the parties

15   began to negotiate.  And they negotiated for a year and a half.

16   Couldn't get anywhere.  So that's the reason they filed the

17   lawsuit over 18 months later.

18         Finjan filed a lawsuit against ESET.  The same day,

19   ESET filed a lawsuit against Finjan.  They said we're going to

20   duke it out in court instead of taking a license.  And that's

21   the reason we're here today, three and a half years later,

22   trying to figure out who's right and who's wrong.

23         The ESET technology is being broken down into really

24   three components.  There's what we call the ESET gateway.  ESET

25   gateway products are products they call File Security or

1    Gateway Security or Mail Security.  And these are software

2    programs you buy and you put on your servers that act as a

3    gateway to an enterprise system.  So this is between what's out

4    there in the world and the user of the computer.  So you're

5    going to see those products in the gateway space.

6         In the Endpoint space, there are eight products.  The

7    user endpoint are the computers you see in the Courthouse.

8    You'll see eight different products.  And when we talk about

9    these eight different products, they all use the same

10   technology that infringes.  And we'll talk about what that

11   technology is.  It's called HIPS.

12        Same with the gateway.  They use the same technology.

13   They just use it for different purposes.  Like you'll see the

14   gateway security, email security.  You'll see different

15   components.  They're all using the same type of technology.  So

16   we're not going to go through it and show you eight different

17   infringements.  We're going to show you one technology used for

18   all eight different products.

19        And, finally, you're going to hear about ESET's cloud.

20   Now, I said cloud is out there in the ether.  Cloud can be

21   dispersed around the world.  They offer cloud services to

22   people who buy the Gateway products and people who buy their

23   user Endpoint products.  So if you buy an ESET product, you get

24   use of their cloud services.  They call their cloud services

25   LiveGrid with the computer and Cloud Malware Protection System,

 1   CMPS.

 2        Now, we have in this case, some of the very best

 3   experts in the world.  We've hired people from -- you'll see a

 4   lot of them sitting in the gallery right now.  We have

 5   professors from USC -- we have a full professor, by the way, of

 6   Harvard -- UC Irvine, Georgia Tech, Penn State.  We have the

 7   leading experts in academia who teach this stuff and research

 8   this area.  And Harvard.  We've got Harvard.  We have a Harvard

 9   professor as well.  I don't want to leave Dr. Mitzenmacher off

10   there.

11        We also have people who work in this space.  We have

12   people who started the CIA's cyber security unit back in the

13   early '90s, the person who has written the actual bible, the

14   cyber security bible, and who works for the government, has so

15   many top secret clearances, I can't even keep track of all of

16   them.  We have those type of experts.  We have people who work

17   in the industry.

18        And you will hear from all these experts, and their

19   job is going to be to explain this technology in a way that you

20   understand it.  They're going to look at it objectively.  They

21   don't have any stake in this case.  They don't get a piece of

22   it.  They're not employees.  These are people who look at the

23   evidence objectively and will give it straight to you.  And

24   they're going to explain some of this terminology I'm going to

25   show you on the screen now.

 1              So this is key terminology you're going to hear

 2      throughout the next two or three weeks.  You're going to hear

 3      ThreatSense Engine.  The ThreatSense Engine is that inspector,

 4      that scanning engine that's in all of the Endpoint products,

 5      the Endpoint and the Gateway products.  That's the first line.

 6      That's what scans every piece of code that comes in to see if

 7      it's safe.  The ThreatSense Engine creates a security profile

 8      they call it the DNA, signature DNA profile.  That's a behavior

 9      profile of what comes into the system.

10              A lot of the computer science -- as you probably are

11      familiar or know, anyone who works in computer science, they

12      have a weird sense of humor, so they call it DNA and genes and

13      all of that, but really it's computer code.  It's not DNA.

14              And then you see something called a Hash.  Hashing,

15      you'll hear a lot of about.  Hashing is just a way of taking

16      code and breaking it down in pieces and gives you some kind of

17      ID from it.

18              The Cloud Malware Protection System, that's the sand

19      box.  That's up there in the cloud, and that's going to be

20      generating profiles.

21              LiveGrid is the entire cloud.  That's how things get

22      to the cloud, how they come back.  They call it the feedback

23      system and the reputation system.  That's the link to all the

24      end users.

25              The sand box, I explained.  That's where things are

1    detonated.

2         The Malware Analyzer Engine is the engine that is in

3    the sand box.  That's what generates the profile.  You'll

4    notice they use the word "engine" also.  They're not really

5    little engines.  These are software modules that create -- do

6    things.  But, once again, it's pure scientist language:

7    Engine, DNA, and whatnot.

8         Finally, you'll see the Host Intrusion Prevention

9    System, HIPS.  A very common term in the cyber security

10   industry.  HIPS is what we look at on the Endpoint.

11        Now, to put this in context, if we go back to the '844

12   patent, you'll see that inspector.  The inspector would be the

13   ThreatSense Engine.  That's the first thing we talked about.

14   That's the inspector.  The DNA profile it's generating, that's

15   the security profile.

16        If you go to the cloud version of the '844, you'll see

17   the inspector there.  That's the Cloud Malware Protection

18   System.  And when you see detonator, that's the sand box.  And

19   what is actually operating on the cloud is Malware Analyzer

20   Engine.  Our experts will explain all this to you.  This is

21   just a little bit of a preview so when you hear these terms,

22   you'll understand what we're talking about.

23        Now, you heard the judge say what our burden is.  We

24   have the preponderance of the evidence to prove infringement

25   and damages.  And you saw the video.  Preponderance of the

1    evidence puts the weight on a scale, it's slightly tipped one
2    way.  Remember that?  That's what we have to prove.
3          So how are we going to do it?  Well, we're going to
4    look at public documents.  ESET documents.  We'll look at our
5    patents, what the claims cover, and we'll look at the public
6    documents, the things they tell the users, the public.  We're
7    going to look at their confidential documents.  This is stuff,
8    internal documents to the company that they keep very
9    protected.  We're going to look at those documents.
10         We're going to look at results of our testing.  We
11   have bought their products.  Our experts tested them.  So we're
12   going to look at the results of actual testing.
13         We're going to look at source code.  I don't know if
14   you are familiar with source code or not.  Source code is kind
15   of the code that programmers write that causes computers to do
16   what they do, that get compiled into machine language.  The
17   source code is the programmers' language to say what they want
18   their products to do.  We're going to look at source code.
19         We're also going to look at the testimony of several
20   of the ESET engineers.  I think the best evidence you will hear
21   is when their engineers were in the deposition under
22   cross-examination by our lawyers and what they admitted to.
23   And they'll bring their engineers on the stand.  They may
24   change that testimony, but the testimony on cross-examination,
25   what they admitted to is very clear.

1          And, finally, you're going to hear from the expert

2   testimony that I was discussing.  The expert testimony of the

3   Finjan team will be something you'll have to weigh the

4   credibility of.  You will weigh that against the credibility of

5   ESET's expert.  And that's not an easy thing for a jury to do.

6   It's something that -- you know, you have a bunch of doctors

7   and professors and they have a professor, and they'll want to

8   say apple and the other will say orange, one will say X, one

9   will say Y.  You'll say who do I believe?  They're all credible

10  people, they're all nice people, but one is telling the truth

11  and one is not.  Look at the evidence.  What evidence do they

12  have to support the positions they have?  When you look at the

13  evidence, that will give you the right answer.

14         Now, we're here in court because they disagree with

15  us.  So how are they going to defend against this mountain of

16  evidence we're going to be presenting to you?  The first thing

17  they're going to do -- I hope they don't do it, but I think

18  they will -- is they're going to try to disparage Finjan.  It's

19  an old axiom in patent law or any kind of law really that if

20  you don't have the facts on your side, you throw the dirt.

21  They're going to say Finjan is not an honorable company.  We're

22  out suing people and trying to get money for our patents, and

23  our technology was no good, we didn't invent anything, despite

24  the fact that we got all the recognition from the industry of

25  being the inventors of behavior technology in all of our

1   patents.  In order to find for noninfringement, you're going to

2   have to ignore their documents, you'll have to ignore the

3   engineers' testimony, you'll have to ignore our experts.

4        The evidence we're going to present to you in the next

5   week and a half when we put our case on is going to be

6   overwhelming.  Overwhelming evidence.  It's going to be way

7   past preponderance of the evidence.  We're going to give you

8   chapter and verse.  The best experts, the best evidence.

9        Now, they're also going to say that they don't

10  infringe because these patents are invalid.  They're going to

11  try to convince you that the Patent Office didn't get it wrong

12  once, they didn't get it wrong twice or three times or four

13  times, they got it wrong five times.  The Patent Office just

14  got it wrong five times.  These patents should have never been

15  granted.

16       They have to try to give you that information by clear

17  and convincing evidence.  That's a much heavier burden.  When

18  you see the evidence, you're going to see what they're

19  presenting was already before the Patent Office, and there is

20  no evidence of invalidity of these patents.

21       Probably some of the best evidence of validity is why

22  would so many people, the Intels of the world, the IBMs,

23  McAfees, Mantechs, Microsoft, why would they license Finjan

24  patents if they were no good, if they were invalid?  They're

25  giant companies.  We're a small company.  They could have

1    bought us.  They all took licenses.  Some of the best evidence

2    of the validity of those patents are those licenses.

3            Finally, we're going to talk about damages.  This is

4    not one of those hundred, two hundred million dollar cases.  I

5    wish it was, but it's not.  As I said, we didn't notice they

6    were infringing until January '15.  That's when the damages

7    began.  It's our obligation to put them on notice hey, we think

8    you're stepping on our territory.  The patents expired in '17,

9    so it was a very short window of damages.  And you're going see

10   that what we're going to ask for is no less than a reasonable

11   royalty.

12           Our expert will take the stand and give you a number,

13   give you his opinion.  You're not bound by that opinion.

14   You're bound by the facts of the case.  It could be more, it

15   could be less.  You base your opinion -- base your judgment on

16   the facts.  When you hear the facts of the case, you find

17   infringement of valid patents, look at the facts for damages.

18   We're asking for no less than a reasonable royalty.

19           Now, in two and a half weeks from now when I'm doing

20   my closing argument here, I want you to do me a favor.  Hold me

21   to what I said today.  Everything I said, hold me to it.  I

22   don't want you to say well, he may have made a misstatement

23   there.  Hold me to it.  Because we're going to give you the

24   evidence.  I want you to hold them to their statements as well.

25           Now, they're going to get up here and tell you what

1    they're going to try to prove in the next two and a half weeks.

2    If you hold me to what I said and look at the evidence that

3    we're going to present, that's what we want you to have an open

4    mind about.  Look at the evidence, listen to the witnesses, and

5    make a decision.  We think you're going to show that they've

6    infringed valid patents for money you think is reasonable for a

7    reasonable royalty.

8         With that being said, I'm going to sit down -- I'm

9    sure you're tired of hearing me talk -- and say thank you very

10   much.  Jury duty is something that's very important.  We

11   appreciate your time.  Thank you.

12        THE COURT:  Thank you, Counsel.  If you would take the

13   mic off and hand it over to whoever is opening for ESET.  Thank

14   you.

15        MR. PISANO:  Your Honor, may I speak from the well?

16        THE COURT:  Yes, you may.

17        MR. PISANO:  So, ladies and gentlemen of the jury,

18   thank you.  My name is Nic Pisano.  With me today at counsel

19   table is -- you'll see there's a reason for this.  With me

20   today is Scott Penner, at counsel table, and also Regis Worley.

21   And today in the audience, we have Richard Marko, who is the

22   CEO of ESET Slovakia, we have Michael Kristufek, who is the

23   chief legal officer, and then we have the vice president of

24   legal at ESET, LLC, Alexandra Albo.  Thank you.

25        So, ladies and gentlemen of the jury, you may have

1    seen on television where lawyers who can get up, like Mr. Andre

2    did, and give you a presentation for 35 minutes without looking

3    at notes.  That's great.  But I'm not that guy, so I apologize.

4         Please indulge me while I look at my notes because,

5    unlike Mr. Andre, I want to get into a little bit about what

6    these patents talk about.  And it's not too soon for you to

7    start learning what the evidence is you're going to be seeing.

8    As Mr. Andre said, it's complicated.  It's very complicated.

9    It's very complex.  But by bringing all of ESET's engineers --

10   not all of them, a whole bunch of them in from Slovakia, we're

11   going to explain the technology to you, and we think that ESET

12   engineers know this technology better than a bunch of

13   professional witness experts.

14        So with that, let me say, I am honored to represent

15   ESET S.R.O., that's ESET Slovakia, and ESET, LLC in this

16   litigation, and to enlist your assistance in correcting what is

17   actually an abuse of that system.

18        Earlier today, you saw a video describing the

19   constitutional foundations of our patent system, and they

20   probably threw out Article I, Section 8 of the Constitution, of

21   our founding document that enshrines the abilities of inventors

22   to obtain patents to promote science and the useful arts.  The

23   U.S. patent system is the envy of the free world, and it has

24   driven technological advancements for more than 200 years.

25        As discussed in that video you saw, the patent lets a

1   patent holder exclude others from making, using, or selling the

2   patented invention.  The invention is described in words by

3   claims that appear at the end of the patent, and the claims are

4   property boundaries in real property meaning.  They define what

5   the patent holder can exclude others from doing.

6          Now, our founders did not envision that unscrupulous

7   businessmen would subvert the very purpose of patents and try

8   to exclude others from making, using, and selling technology

9   that patent holder did not invent.  And that's what you're

10  going to find this case is about.

11         There are two ways patent holders attempt to

12  circumvent the patent system.  One way is to get patents on

13  things the inventor did not invent.  The patent holder can do

14  this by painting claims that have no support in the text of the

15  patent specification or with claims that are so ill-defined, no

16  one can understand what infringes and what doesn't.

17         Another way is for the patent holder to tell the jury

18  that the technology is so complicated, the jury should just

19  trust their patent holders -- the patent holders' experts.  The

20  experts then point to features in the accused products that do

21  not actually correspond with the claims.  In this way, the

22  patent holder improperly expands his claims far beyond the

23  scope to cover what he did not invent.

24         During this trial, ESET's evidence will show that

25  Finjan's entire case is built on those two strategies that I

1    just mentioned.  So let me give you a brief sketch of the

2    parties and what you'll be hearing over the next three weeks.

3    Nothing Mr. Andre said is evidence.  Nothing I'm saying is

4    evidence.  But what I'm doing is giving you a preview of what

5    you'll be hearing in the next three weeks.

6          Now, Mr. Andre showed you some slides during his

7    opening that depict Finjan's idealized perspective of who and

8    what Finjan is.  That's important because the facts tell a

9    different story.  The evidence will show that Finjan, Inc. is a

10   patent holding company.  And by the way, Finjan, Inc. is the

11   plaintiff here.  Mr. Andre mentioned another company that makes

12   products called Finjan Mobile.  That's not a plaintiff.  Those

13   products aren't covered by the patents here.  They have nothing

14   to do with this case.

15         Anyway, Finjan started as an Israeli company that

16   filed a provisional patent application on what were obvious

17   technical improvements in 1996.  As he said, patents have a

18   term of 20 years.  All five of Finjan's patents here expired in

19   2017.

20         So Mr. Andre showed you this slide.  There you go.

21   I'm going to have to walk back and forth too.  The evidence

22   will show that Finjan made and sold products that were not

23   commercially viable until it ran out of money in 2008.  So

24   that's a dozen years ago.

25         So let me just click through those.  The first one.

1    This is just not working.  There we go.  So I think in 2004,

2    that should be they lost $7.7 million with their fabulous

3    products.  In 2006, they lost $7.2 million.  2007, they lost

4    $17.8 million.  This is for their award-winning products.

5         And so by 2008, they had to sell the company.  They

6    sold the assets of the company.  They stopped making products.

7    They sold the products to a company called M86, and they

8    continued on as a patent assertion entity.  That's just an

9    entity that has patents and they go out and they try to license

10   them, as Mr. Andre mentioned.  So sold all its assets.

11        But then, Finjan became a public company in 2012 when

12   they bought a publicly-traded company, which they did what's

13   called a reverse merger with a publicly traded company that

14   made fertilizer out of food scraps.  That's how they got to be

15   Nasdaq listed.

16        In the three years before it stopped operating and

17   sold its assets, Finjan lost more than $30 million.  You may

18   hear testimony from ESET's witness, Mr. Thompson, that Finjan

19   products were not very good at stopping malware, kind of shown

20   by their history.  The company's demise came to no surprise,

21   and it hasn't made a product since 2008; not the plaintiff,

22   Finjan, Inc.

23        You will hear testimony from Mr. Hartstein, Finjan,

24   Inc.'s CEO that today the company has three employees, himself,

25   the chief financial officer, and the general counsel.  Finjan

1   Inc.'s only business is licensing and litigation.  So when they

2   said their interest is in sharing their technology, basically

3   that's how they're doing it, by litigating.

4        So let's have the slide on Finjan licenses.  Okay.

5   Mr. Andre showed you this slide, but there's a little more to

6   it.  So the only I would consider harmless license is the one

7   with Microsoft in 2005.  And then they ran out of the money,

8   sold the assets to a company called M86.  And then earlier, but

9   pretty much after 2012, they began their enforcement business.

10       And so you see everybody else there, with the

11  exception of IBM, all those licenses resulted as a result of

12  threatened litigation or actual litigation.  You'll hear

13  Mr. Hartstein testify in response to the question:

14       Did anybody come to Finjan to license your technology

15  voluntarily?

16       Answer:  No.  Didn't happen.

17       So you will hear that for the most part for most of

18  these licenses, taking a license was a more business-friendly

19  and less-costly option than litigating in this court.  But ESET

20  believes because it doesn't infringe Finjan's patents, it

21  shouldn't have to pay tribute to something it's not using and

22  didn't use.

23       And because many of Finjan's patents have expired,

24  Finjan is now in the business of buying third-party patents to

25  fuel its business.  And so that's the connection to IBM.  They

1    bought a bunch of patents from IBM to continue their business.

2          So let me say a little bit about my clients ESET

3    S.R.O., also known as ESET Slovakia, and ESET, LLC, known as

4    ESET North America.  I've already introduced some of the folks

5    from the company.  Let me put up this comparison of the

6    companies.  So this is -- looking at the monitor, there's a

7    general comparison of the companies.

8          ESET sells more than 30 different anti-malware

9    products worldwide for home and business use.  ESET employs

10   1,700 people worldwide, including 200 malware analysts in a

11   virus laboratory in Europe and 200 sales and marketing people

12   here in the U.S.  Those 200 people in the antivirus laboratory

13   are there 24/7 looking at new viruses as they come in.  They're

14   generating all sorts of analysis of that and they're protecting

15   your products and their end user products.

16         So let's go back to the slide on Finjan's beginnings.

17   So as Mr. Andre said, that was his slide.  Now let's talk about

18   what ESET was doing at the same time.  ESET Slovakia was

19   founded in Czechoslovakia in 1992 after it shook communist rule

20   in 1989.  On January 1st, 1993, that country peacefully split

21   into Czech Republic and Slovak Republic, now known as Slovakia.

22   Bratislava became the capital of Slovakia.  That's 35 miles

23   from Vienna.  That's where ESET's global headquarters is

24   located.

25         You'll hear testimony from Richard Marko, ESET's CEO,

1    that ESET's antivirus product called NOD ICE was released in

2    about 1994.  There we go.  Now, NOD ICE is Slovak for hostile

3    at the edge of the disk, back in the climate when we had little

4    floppy disks.  That code included some behavioral analysis,

5    even before Mr. Marko joined the company in 1944, and that's

6    years before Finjan was founded.

7            When he joined ESET, Mr. Marko worked on developing

8    ESET's heuristic analysis and emulation technology.  So what

9    does that mean?  Well, that's the proactive stuff that

10   Mr. Andre was saying his company invented.  They didn't.

11   You'll hear Mr. Marko's code was released by July 1995, before

12   Finjan was born.  Before they were born.  Yet Finjan may even

13   allege in this case that ESET's heuristic technology that's

14   still carried on in its product somehow infringes, even though

15   it existed before they were founded.

16           So ESET, LLC, ESET North America, readily recognized

17   by its building in downtown San Diego.  The iconic ESET

18   building is four blocks from here, employees 200 people.

19   ESET's green and android advertisements were a fixture in the

20   San Diego airport.  You don't see them around too much, but

21   they used to be everywhere in the airport.

22           Now, let me explain why the evidence will show that

23   Finjan should not have brought this case.  Although Finjan's

24   products were a flop, it continued to file patent applications.

25   Using something called "continuation practice," Finjan filed

1   patent applications decades after its original application.

2   But Finjan told the Patent Office, those applications were

3   entitled to a 1996 invention date.

4          As a result, companies like ESET, who have continued

5   to advance anti-malware technology, are prejudiced.  And that's

6   something we're going to ask you to look at.  A patent whose

7   issuance is intentionally delayed by the patent holder for a

8   very long period of time enables the patent holder to seek

9   damages from manufacturers, even though the patent holder did

10  nothing to advance their technology.

11         For example, Finjan's '621 and '755 patents asserted

12  here were filed in 2015.  They claim a 1996 invention date.

13  The new claim submitted in those applications were filed more

14  than 18 years after the original application date.  When the

15  patents issued, they just had over a year of life before

16  expiring.

17         So why did Finjan get such short-lived patents?  So it

18  could sue everyone in the anti-malware business, to reap what

19  it had not sown.  You'll hear Finjan has sued more than 23

20  companies in the last ten years and has, I believe, right now,

21  five other pending litigations.  Is this illegal?  No.  Sadly,

22  it's not.  But does it promote science and useful arts as

23  envisioned in the Constitution?  Absolutely not.  Finjan's

24  conduct just adds to the expense of litigation and increases

25  costs to consumers with no benefit.

1          So this is going to be -- these are going to be

2     Finjan's experts.  They're going to put up two fact witnesses.

3     They're going to put up Mr. Hartstein, who joined the company

4     in 2012, and a Finjan marketing person named David Kroll.  He

5     left Finjan back in 2002.  That's it for fact witnesses.  The

6     rest of them are going to be this panel of expert witnesses.

7          So let me go to ESET's witnesses.  We have brought

8     people who actually know how ESET's code works, and we're going

9     to try and we think we'll succeed in explaining to you how that

10    code works, because these people work with it every day.

11    They're responsible for that code.  They know what it does.

12    They know it doesn't infringe these patents.

13         So understanding the operations of ESET's products is

14    key to your finding ESET's products do not infringe.  So we've

15    brought engineers from Europe to explain to you how products

16    work.  ESET will also present testimony from two technical

17    experts, one on technical issues and one on damages.  And we

18    may present an expert to discuss Finjan's long dead products,

19    if that comes into play in this case.

20         As mentioned in the patent video you saw earlier, the

21    claims at the end of the patent define the invention.  The

22    Court has defined what certain disputed claim terms mean.

23    You're required to apply those definitions when deciding

24    whether or not Finjan has proved infringement.

25         So patent claims are like the boundaries in a property

1  deed.  The boundaries tell you where your property ends, where

2  your neighbor's begins.  So you all know if you went out in the

3  backyard and you saw your neighbor moved his fence five feet on

4  your property, you would be able to tell really quick.

5         But Mr. Andre told you, this technology is very

6  complex, so complex you have to trust his experts.  That is why

7  we expect Finjan's experts to speak, using a term of art,

8  "technobabble" and to point to features in ESET's products that

9  do not correspond to the asserted claim elements.  Instead of

10 observing the property boundaries, Finjan's experts are going

11 to pull up the property boundary stakes and move them.

12        So when they're done testifying, this is what they're

13 going to testify to.  Now they're not going to be able to tell

14 you they're observing the Court's claim construction, but the

15 things they're pointing to don't actually correspond to what

16 the claims require.  So Finjan, of course, they're going to

17 deny that, right?  But evidence will show that Finjan's expert

18 will testify that ESET's products cannot do or did not do what

19 they cannot or did not do before the patents expired.  And,

20 unfortunately, Finjan hopes you can't tell the difference.

21        So how can Finjan get away with that, you're sitting

22 there saying?  Well, whether the features in ESET's products

23 that Finjan's experts identify as corresponding to the claims

24 is a question for you, the jury, to decide.

25        So let me give you concrete examples.  Please don't

1   worry if you don't pick all of this up right now.  I've been on

2   this case for a long time.  It took a long time for me to

3   figure out.  There will be plenty of time for our witnesses to

4   explain this, so I'm going to hit some of the highlights for

5   you.

6          The Court has provided some definition for the terms

7   of the asserted patents.  I'm going to put some of the terms

8   up, and I am going to tell you, I have italicized certain

9   language in these because that's what I want to draw your

10  attention to.  So in the '780 patent, you'll see the language

11  in the Court's construction, there's the word "together."  You

12  have to perform a hashing function on the download together

13  with its fetched software components.

14         For the '844 patent, again, my italics:  Before the

15  Downloadable is available on a web server can be called up or

16  forwarded to a web client.

17         And then for Downloadable, the Court has defined that

18  as:  A small executable or interpretable application program.

19  And you can read the rest.

20         Now, let me explain what we expect Finjan's experts

21  will point to in ESET's products as corresponding to these

22  claims.  But before I do that, let me give you a really brief

23  introduction to the '780 patent.

24         So let's bring up, Mr. Jay, figure 7 of the '780

25  patent.

1        Here's what the evidence will show.  You heard

2   Mr. Andre's interpretations of the patent.  What the evidence

3   will show is the '780 patent was directed to a problem of

4   hiding a piece of malware by cutting it into pieces.  So if you

5   had a piece of malware and it was known to the antivirus

6   manufacturer, he would create something called a signature, and

7   if you saw the file come in, your would match it to the

8   signature, and you'd say aha, this is a piece of virus.  This

9   is a virus.

10       But if the user downloaded the file -- first of all,

11  if the hacker cut the file into pieces and instead of giving

12  the whole file just included part of the file with a reference

13  to another component, if the downloader -- if the user

14  downloaded the file, it would include the references to the

15  missing components that would be retrieved in the executable

16  file.  Okay.  So instead of the whole thing, you get a part,

17  but this part matches that part and that gets that part and

18  that part matches another part, and it all comes in.

19       So the trick of that though is if you cut up the virus

20  into pieces, when a user downloads the first piece of the file,

21  it wouldn't match the software signature.  It wouldn't match

22  the antivirus software signature.  That's the reaction

23  signature that Mr. Andre was talking about.

24       So the alleged invention of the '780 patent was when

25  you downloaded the initial piece of the file, you would scan

 1   the file to see if there were references to other components,

 2   and if there were, then you would fetch the reference

 3   components, reassemble the whole file, and then you would look

 4   at that with respect to the signature.

 5          So I've put up -- okay.  So here's what we expect

 6   Finjan's experts will point to for the '780 patent.  Now what

 7   the claim requires -- that's not the Court's construction.

 8   That is what we believe our evidence will tell you is required

 9   by the -- well, at least for the second part.  But the first

10   part, that is the Court's construction.  But the second part,

11   the word "fetched."  So the word "fetched."  It says:  We

12   believe the evidence will show based on what's described in the

13   patent obtaining the reference software components from outside

14   the Downloadable.  What Finjan will point to is:  Containing

15   the reference components from inside the Downloadable.

16          So that's like telling your dog after he brings in the

17   Sunday newspaper, Fido, go fetch me the comics.  The dog is

18   going to look at you because he already brought you the paper,

19   and the comics are in there.  So if -- you know, if the dog

20   wouldn't understand that instruction, then Finjan's position

21   here doesn't make any more sense.

22          Let me put up figure 1 and figure 6 of the '844

23   patent.  So I think Mr. Andre will refer to this as the sample

24   submission patent or something.  But here's what the evidence

25   will show you on the '844 patent.  That patent wasn't even

1    directed to stopping malware.  Instead it was directed to

2    creating a profile called the Downloadable Security Profile, or

3    DSP, that can be linked to the profile.

4         The claimed inspector would receive a Downloadable

5    from a developer.  I'm a web developer, I receive something --

6    or rather, I create something, I send it to the inspector, the

7    inspector looks at that Downloadable, creates the DSP, links it

8    to the Downloadable before the web server makes the

9    Downloadable available for downloading by web clients.  That's

10   everybody who's getting it.  That way when a user downloaded

11   the file, he could check the DSP when he first gets it to see

12   if the file might do something that might be of concern.

13        As described in the '844 patent in the prosecution

14   history for that patent, the inspector had to perform all the

15   steps of receiving the Downloadable, generate the DSP,

16   identifying suspicious code, and linking.  And all that had to

17   occur before the Downloadable is first made available to a web

18   server or before the web server makes the Downloadable

19   available to web clients.

20        So what will the evidence show here from Finjan's

21   experts?  Again, what the claim requires is what we believe the

22   claim requires.  Next slide, please.  And this is what Finjan

23   will point to.  So the claim requires that before the

24   Downloadable -- or rather, before the web server makes the

25   Downloadable available to the web clients, the claim says:

1   Before the Downloadable is available on a web server being

2   called up or forwarded to a web client.

3          Now, what we understand Finjan is going to point to is

4   making the Downloadable available on another web server after

5   it was first called up and received by ESET's product meets the

6   before limitation.  So if you're confused, you're not going to

7   be the only one, okay?  So remember, "before," that's after.

8          Now, here's the other thing, under Finjan's

9   interpretations of the claim, we believe based on what we've

10  heard that their experts will testify the end user may not get

11  any benefit from their patent.  You can download the file, you

12  can still get infected, and according to them, ESET has still

13  infringed the patent in the way they're interpreting.

14         So let me go to the last -- what do we have next?  The

15  sources relied on.  Okay.  Now, you're all familiar with the

16  shell game.  And here's the trick of this shell game, when

17  they're done moving all those around and you open them all up,

18  there's no ball under any of them.

19         So why do I say that?  Because the documents that

20  Finjan is going to point to are things like in current projects

21  that were submitted by some interns who worked at ESET.  They

22  worked for a summer, they submitted a project, the company said

23  that's great, fine, thank you.  When they left, it went in the

24  circular file.  That's what they're going to point to.

25         They're going to point to things and features that

1   weren't released before the patents expired.  You're going to

2   hear about Enterprise Inspector.  I hope we won't, but we're

3   going to.  I think we will.  And that was a product that wasn't

4   even available.

5        You're going to hear about firewalls and network

6   probes.  None of that was in the code either, but that's what

7   they got.  So like I said, our three sources of information,

8   aborted development projects, and they'll show you something on

9   behavioral chains, hooks that we don't use; and then on the

10  other end, post-expiration developments, EDTD, ECMPS, EI, and a

11  bunch of other things.  None of those were released before the

12  patents expired, so they can't infringe.  And then in the

13  middle, it's all glued together with what they call

14  speculation.

15       So now, the Court did not provide any definitions for

16  the words in '086 patent other than for the term "Database."

17  Here too, Finjan's experts will point to features of ESET's

18  products that do not correspond to these certain claims.  For

19  example, Finjan's experts will not be able to identify the

20  Downloadable scanner coupled with a receiver for deriving a

21  DSP, which is this list of suspicious computer operations, and

22  a transmitter for transmitting a Downloadable representation

23  DSP.  A lot of stuff I'm giving you right now.  Please don't

24  worry.  You will have lots of time to absorb it.

25       We expect they may point a software module.  Mr. Andre

1    said yes, it did one thing, and then in an entirely different

2    unrelated software feature, that does something else which they

3    say is transmitting.  Those things don't do what the claim

4    requires.

5            So like the shell game, no ball. You're just going to

6    get a mishmash of ESET documents about aborted development

7    products, not implemented features that were added to ESET code

8    or products after the patents expired, and all the rest glued

9    together with speculation.  The only thing that will tell you

10   from which you can understand how ESET's products work is

11   ESET's source code.

12           And then for the other patents, Finjan's patents will

13   point to features of ESET's products, they don't do what they

14   say, or they do the opposite of what the claims require.

15           So let's talk about Downloadable.  Here's the

16   definition for Downloadable.  The term defined the term --

17   excuse me.  The Court defined the term "Downloadable" as used

18   in all the asserted patents to mean a quote "a small executable

19   or interpretable program."

20           Now, the problem is, none of Finjan's experts can

21   agree and tell you how big the small program is.  We asked them

22   all.  We expect the one Finjan expert to say small means

23   something less than 10 megabytes.  Another will tell you it's

24   not possible to define a specific limit to the word "small,"

25   where that small is relative and depends on the context, and

1   another will testify that you can tell that something is really

2   large -- you can tell if something is really small, but you

3   can't give an exact number.  So you need them to come in and

4   testify here in court to tell you what it means.

5        So with respect to the property boundary analogy what

6   I gave you before, this is what that is.  In fact, there are no

7   boundaries.  And when there are no boundaries, the claim is

8   indefinite.  It should be determined to to be invalid.

9        So, again, if you ever had a neighbor who went and

10  pulled up the property land markers, you know what this feels

11  like.  Like the public, a product manufacturer cannot tell what

12  falls within and without the scope of the patents.  That makes

13  them invalid for indefiniteness.

14       So if, like he said, you can conclude the evidence

15  shows that the patents do not provide clear guidance of what is

16  sufficiently small to tell the public what is permitted and

17  what is excluded, we will ask you at the end of this trial to

18  find the asserted claims invalid for indefiniteness.

19       Now, we expect Finjan's experts, professionals who

20  have testified many times on behalf of Finjan, to misidentify

21  features of ESET's products as corresponding to the asserted

22  claims as the basis for infringement.  Finjan's experts will

23  even point, as I said, to features added after expiration of

24  the patent.  If we do our job, that is, me, Mr.Penner, and

25  Mr. Worley, cross-examination of Finjan's experts will show

1    that their opinions are not true to the Court's claim

2    constructions.  That testimony will prove ESET products do not

3    infringe.

4           Like the property boundaries I mentioned earlier,

5    Finjan will be reaching across the boundaries to accuse ESET of

6    infringement for doing things that do not fall within Finjan's

7    patents.

8           So I tried to come up with a slide that captures the

9    essence of Finjan's position in this case but with more

10   relatable subject matter, because I appreciate, and we all do,

11   that this technology is not simple.  It's not horribly

12   complicated, and we're going to try to explain it to you.

13          But here is something I think we can all understand.

14   So here is our accused product.  There's the asserted claim.

15   Finjan's experts will get up there and will look at that lion

16   and they'll say well, it's a mammal, it has four legs, it's got

17   a head, two ears, a brown coat, a tail.  The end.  And they

18   skip that limitation says eats carrots.  You only have to be

19   missing one limitation to not infringe the claim.  So what are

20   they going to say?  They're going to say -- they're going to

21   interpret carrots or they're going argue -- they're going to

22   point to evidence that actually shows a gazelle and they're

23   going to tell you it's a carrot.

24          So as I said, we expect Finjan's experts are going to

25   walk through the infringement charts for each claim, put

1  checkmarks in their boxes, just as we expect they will do.

2  That the Finjan trick, again, is they're going to tell you

3  gazelles are actually carrots.  So while you're listening to

4  all of the testimony come in, and it will all be their side

5  first, here's what I would like you to keep in the back of your

6  mind when you're listening to Finjan's infringement expert

7  evidence.  That's their carrot.  Okay?

8       Now, let me talk a bit about what you're going to hear

9  from ESET's witnesses.  Again, you're not going to hear from

10  them until next week, so keep an open mind.  We'll try to cut

11  through the technobabble, Finjan's, so you can understand how

12  ESET's products work and why they do not infringe.

13       When ESET's engineers and Dr. Spafford finish, we

14  think you will know three things:  You will know how ESET's

15  products actually work.  You will know more about ESET's

16  products than all of Finjan's experts combined.  You'll know

17  why ESET's products do not infringe the patent.

18       Now, Dr. Spafford will also explain another reason why

19  ESET's products do not infringe.  ESET's products use -- most

20  of them use what is called a Windows operating system and are

21  licensed under Finjan's 2005 license with Microsoft.  You'll

22  recall that's the very first license that they got.  This

23  covers third parties whose products inter-operate with Windows.

24       You heard Mr. Andre say Finjan is entitled to a

25  reasonable royalty if you find there is infringement.  We

1   believe no damages should be awarded because ESET's products do

2   not infringe.  Mr. Griffin, ESET's damages expert, will

3   explain, even if you determine otherwise the appropriate

4   damages amount would be less than $200,000.

5        You will also hear from prior art witnesses who will

6   describe antivirus software that performed proactive behavioral

7   analysis, not just reactive, proactive, also provided a layered

8   defense years before Finjan was formed, completely debunking

9   Finjan's claim to inventing those concepts.

10       Finally, Dr. Spafford will return after those prior

11  art witnesses to sum up why by clear and convincing evidence

12  each of the asserted claims of Finjan's patents is invalid

13  based on what was previously known in the anti-malware

14  industry.  That will clear up many things for you, but

15  especially that Finjan did not invent what it says.  Finjan did

16  not invent proactive behavioral analysis, not in 1996, and not

17  ever.

18       Finjan did not invent layered defenses.  Finjan did

19  not invent scanning files downloaded from the internet.  That

20  was a natural evolution of the technology.  And you'll hear

21  about products that can do scans of files when they were

22  inserted on disks.

23       Finjan did not invent Java or scanning Java files for

24  malware.  Finjan did not invent hashing files.  Finjan did not

25  invent linking lists, identifying suspicious behavior to files.

1          ESET's products and those of other companies employed

2    proactive behavioral analysis and layered defense before Finjan

3    was ever formed.  And all the Finjan's asserted claims are

4    invalid.

5          Once the evidence is in, you will be asked to consider

6    whether Finjan has met its burden to prove infringement.  If

7    you're totally confused by their presentation, as sometimes we

8    are, that doesn't meet the preponderance of the evidence

9    standard.  You'll be asked to -- you'll also be asked to decide

10   whether Finjan's patents are valid, whether it acted

11   inappropriately in patenting the things it did not invent.

12         Folks, you have an important role to fulfill in our

13   constitutional scheme.  At the end of this case, we will ask

14   that you find those the product infringes, ESET's products, our

15   license, and that all the asserted patents are invalid.  By

16   doing so, you will preserve the purpose of patents to promote

17   science and useful arts while not discouraging innovation with

18   stale, invalid patents on trivial improvements.

19         My clients and I thank you for your participation in

20   this process.  We trust you will make the correct decision

21   based on the facts.  We will try to keep this interesting for

22   you, and we will not waste your time.  Thank you.

23         THE COURT:  Thank you, Counsel.

24         You can start with calling your first witness.

25         But would the jury like a five-minute break before we

1   do that, or are you ready to go?  Anybody need a break?  Yes,

2   we have one.  Why don't we just take five minutes.

3       (Pause in the proceedings)

4           THE COURT:  All right.  Thank you.  Ladies and

5   gentlemen, we'll now begin with the presentation of evidence.

6           Would Finjan please call your first witness.

7           MS. KOBIALKA:  Thank you, Your Honor.  Lisa Kobialka.

8   May it please the Court.  Finjan would like to call Phil

9   Hartstein of Finjan.

10    Philip Hartstein, called as a witness, testified as follows:

11      (Witness given an oath)

12          MR. ANDRE:  Your Honor, we have witness binders.  May

13   I approach?

14          THE COURT:  Yes.

15          THE CLERK:  Counsel, before we begin to do that, I

16   would like to have you please state your name, spelling your

17   last name for the record.

18          THE WITNESS:  Sure.  My name is Philip Hartstein,

19   P-h-i-l-i-p, Hartstein, H-a-r-t-s-t-e-i-n.

20                      **DIRECT EXAMINATION**

21   BY MS. KOBIALKA:

22   Q   Good afternoon, Mr. Hartstein.  Could you please tell the

23   jury what your position is?

24   A   Certainly.  I am the chief executive officer of the company

25   Finjan Inc. that is the plaintiff in this case, the patent

1   owner, and I'm also the president, chief executive officer of

2   Finjan Holdings, which is the public parent company.

3   Q   And can you tell us about Finjan and what it does today?

4   A   Sure.  Today Finjan does a couple of things.  We continue

5   to license the intellectual property patents that are contained

6   in our subsidiary Finjan Inc., and we develop new mobile

7   security products through another one of our subsidiaries

8   called Finjan Mobile.

9   Q   And when was Finjan originally founded?

10  A   The company was founded in 1996.  It was founded around the

11  idea that there was a new security risk that needed to be

12  solved in the industry, and it was founded by a gentleman named

13  Shlomo Touboul.

14  Q   We'll get into a little bit more of the details, but just

15  at a high level, where was Finjan headquartered back in 1996

16  and where is it headquartered today?

17  A   In 1996, Finjan actually started in Israel.  In about the

18  1998 time frame, it relocated its entire operation, moved its

19  headquarters to the United States, and we were located in the

20  Bay Area in the Silicon Valley, and today we are still

21  headquartered in the Silicon Valley.

22  Q   Let's talk a little bit about the corporate structure

23  because it might be confusing.  So how is Finjan Inc. or Finjan

24  Holdings structured?

25  A   So in our mind, we think about this as the Finjan

1    companies.  So we employ a fairly standard public company

2    structure which is out of the parent.  That's the public

3    company.  Underneath the umbrella of the public company, what

4    you have are your various operating subsidiaries.  So in our

5    case, that's Finjan Blue, which is where our relationship with

6    IBM is; Finjan, Inc., for example, in this case, the patent

7    owner and the plaintiff.  It also includes Finjan Mobile,

8    another one of our subsidiaries.  And also broadly under that

9    umbrella, it also includes investments that the company makes,

10   for example, we were venture investors in a fund with Jerusalem

11   Venture Partners, and co-invested alongside Cisco and Alibaba

12   and another company called T360.  But at the end of the day,

13   the important thing that you need to know is everything from

14   staffing to revenues, it all gets rolled up and reported to

15   shareholders from the parent public company itself.

16   Q    So how many people are currently employed at the Finjan

17   companies?

18   A    Today we have ten full-time employees and about another

19   dozen half-to-full-time contractors or consultants.

20   Q    And the offices for Finjan Mobile or Finjan, Inc., are they

21   in the same place in Palo Alto there in Silicon Valley?

22   A    They're all at the same office.  All of the businesses are

23   at the same locations.

24   Q    So you're working across the various Finjan companies,

25   right?

1  A    In fact, the roles and responsibilities for most of the

2  employees are with the parent company.  And for government's

3  purposes, just being a public company, what you often do is you

4  translate those responsibilities directly into the oversight

5  functions for the individual subsidiaries.  So as I mentioned

6  earlier, I'm the CEO of Finjan, Inc., which may or may not

7  actually need a CEO, but for government purposes, it's there.

8  My real role, my real title, and my real function is with the

9  parent, Finjan Holdings.

10  Q   So let's talk about your experience at Finjan.  How long

11  have you been there?

12  A   I joined the company in April of 2013.  So next month will

13  be seven years.

14  Q   And why did you join?

15  A    Finjan has a reputation for developing innovative

16  technologies in the cyber security sector, and that's backed up

17  by its patents.  My role is broader than that where I work with

18  the board and the shareholders to, one, continue licensing the

19  intellectual property; two is to identify new opportunities for

20  investments and to grow the business; and three, to continue to

21  develop new innovative technology products.  So for me, an

22  all-around great opportunity.

23  Q   So when you joined Finjan, since it was founded in 1996,

24  what did you do to learn about the history and why did do you

25  that?

1    A    So one of the things that I had to learn about being a CEO

2    of a public company -- this is my first public company role --

3    is that you're often accountable to make representations to

4    shareholders very regularly, at least quarterly if not more.

5    And that's always under the rules of the SEC.  And to be able

6    to do that, it requires you to be able to really research and

7    understand not just the current operations of the business and

8    go-forward plans but also, all of those historical aspects of

9    the business as well.

10        So for me, it started with a dozen Bankers Boxes and some

11   interviews of the original founders and inventors of the

12   company.  I began participating in industry conferences and

13   events, and all of those activities really continue to this

14   day.

15   Q    And did you review all of the old business records of

16   Finjan predating your time?

17   A    I did.  You know, everything that a company would have.

18   Those would be emails, those would be research reports and

19   public articles that were written about the company.  It would

20   have been internal documents about the operations, basically

21   everything that you would expect to find in a historical

22   context for an operating business.

23   Q    Now do you report to the board of directors for Finjan?

24   A    I do.  So we may be a small public company, but all CEOs do

25   have a boss.  So my boss -- my bosses are our board.  And we're

1    proud about our board.  We have some Silicon Valley legends on

2    that board.  So for example, Eric Benhamou.  I'm confident in

3    saying, I think you might recognize.  He was the CEO of Palm.

4    So we all had Palm Pilots before we had iPhones and iPads.  He

5    has been an investor and board member at Finjan since, I

6    believe, 2003.  We also have more recently, Gary Moore, who is

7    the recent president/chief operating officer of Cisco Systems,

8    who is also not just a board member but become a mentor for me.

9    Q    Just briefly, can you tell us about your background?

10   A    I grew up in Southern California, not in San Diego, but in

11   Orange County.  I went to school up the coast in San Luis

12   Obispo.  I went to Cal Poly.  I got a degree in industrial

13   technology, which is best described as a combination between

14   business and engineering.  I'm not a lawyer, although I have

15   spent the entirety of my career around intellectual property,

16   innovative companies, and new technologies.  But, again, my

17   role with Finjan is broader, right?  I spend my days really

18   dividing my time between managing shareholders, working to

19   diversify and grow the business, and basically overseeing all

20   of the operational functions, and in some instances, that

21   actually takes a great deal of time where we work on public

22   policy initiatives and things just really for the betterment of

23   how intellectual property is received and how it should be used

24   in the United States.

25   Q    Let's talk about Finjan's history.  Can you tell us how

1    Finjan got started?  And I believe we have a slide we can look

2    at.

3    A   So Finjan was founded in 1996 to solve, as I mentioned

4    earlier, a security problem that really wasn't aware or didn't

5    present itself in the market --

6           THE COURT:  I'm sorry.  We were putting the time line

7    up for the jurors.

8           THE WITNESS:  You see here in 1996, that's when Finjan

9    was founded.  The story starts a year or so earlier.  And the

10   reason for that is, you heard briefly in the openings, in 1995

11   the commercial internet didn't exist, certainly not how you use

12   it today.  And what our founder recognized is that there was a

13   company called Sun Microsystems, again, a Bay Area company,

14   that had created language called Java.  Java later became the

15   language that connected everything on the internet.  But what's

16   important for you to know is that this is really the first time

17   that computers could be connected directly from one to the

18   other and that information would free flow from one computer to

19   the next really unchecked.  So the realization by Mr. Touboul,

20   our founder, was that the existing security solutions out

21   there, these antivirus technologies, were just not robust

22   enough to identify the new risks that were going to present

23   themselves to the new age.

24   BY MS. KOBIALKA:

25   Q   So can you tell us a little bit about Mr. Touboul?  Was he

1  an inventor on the technologies here?

2  A    Yes.  So Mr. Touboul he is a serial entrepreneur.  He is

3  the inventor on Finjan's early patents and continues into many

4  of the other patents.  He's a visionary.  He's a smart guy who

5  has a lot of ideas.  So this was not his only company.  And

6  even though he still works with Finjan, he has many other

7  pursuits and is working on additional companies.

8  Q    So where did the Finjan name come from?

9  A    I actually really like this story.  So you're probably

10  going to hear us talk a lot about the name Finjan and Java

11  technology, but that Finjan that's over there on the counter,

12  it's a Middle Eastern word for a vessel or a container, and it

13  was used to make coffee over an open fire.  And the idea or the

14  play on words that Mr. Touboul came up with was if I could

15  somehow build a security container that could hold Java and

16  allow consumers the ability to safely consume that Java, then

17  you can do so without being subject to malicious content,

18  viruses contact and malware.

19  Q    What was your understanding of what kind of technology

20  Finjan was focused on in that 1996 time frame?

21  A    So the security that existed at the time was these

22  antivirus technologies, and the drawback to antivirus

23  technologies is you actually have to know what the virus is to

24  protect against it.  So if you think about that for a second,

25  it presents this conundrum:  How do I protect against it until

1    I know what it is, which means how would I be affected by it

2    before I could then solve for it.  So a lot of these older

3    technologies, it's why they're referred to as reactive.  It's

4    the point which someone knocks on your door and you let them

5    into that house, and then you say whoops, I probably should

6    have looked through the peephole and not let you into the

7    house.

8        So Finjan's technology was different in that it was

9    proactive.  It was the idea that you could observe the

10   behaviors of content and files instead of having to rely on a

11   signature or a preexisting definition of a virus or a content.

12   Q    Now did Finjan end up producing any kind of products?

13   Developing and selling products.

14   A    We did, yes.

15   Q    And just, very brief level, what was that?

16   A    So Finjan developed software security and hardware security

17   products.  We sold those for more than a decade through until

18   about 2009.  We were most known for our security appliances,

19   which are basically just boxes that sit in a server room.  And

20   the reason for that is it's the most logical point on a network

21   where you would want to intercept information that comes from

22   the internet and before it gets to the user, rather than the

23   old way which was I would have to install all of that

24   technology onto every individual user's computer.  So it really

25   was an advancement in the state of the art.

1    Q    How many employees did Finjan have at its peak?

2    A    At its peak, Finjan had approximately 150 employees.  They

3    were located in about ten offices around the world.

4    Q    And how much money did they spend on R&D?

5    A    So in terms of true venture capital, we raised about

6    $65 million in VC funding.  We continued to invest and redirect

7    income from the sales of our products to grow the business, and

8    to this day, we still spend more than a million dollars a year,

9    sometimes $2 million a year on research and development issues.

10   Q    So now turning to the patents.  Did Finjan apply for

11   patents?

12   A    We did.  I believe the first patent that Shlomo filed for

13   Finjan was in November of 1996.

14   Q    And how many issued patents does Finjan have?

15   A    Finjan has -- the way we describe it because it's

16   constantly influx, one of our subsidiaries had one issue last

17   week, so we describe them in a sort of bulk number.  We have

18   50-plus-or-minus patents issued around the world.

19   Q    Which patents are at issue in this particular case?  I

20   think you can see them on the time line here?

21   A    I can.  There are five patents in this case.  I think what

22   you'll hear is the way we think about that is we refer to them

23   in their short numbers.  So you can see that here.  The five

24   patents will be the '844, the '789, the '086, the '755, and the

25   '621 patents.

1   Q   And when did these patents expire, just generally?

2   A   I believe all of these patents expired roughly in the 2017

3   time frame.

4   Q   Okay.  So now looking at the green bar below here, can

5   you -- did Finjan start to sell products starting in 1996

6   through a certain period of time?

7   A   Yeah.  So I mentioned that Finjan started in 1996.  Our

8   first products really started to be developed and sold toward

9   the end of the 1996.  Our first license agreement was in an OEM

10  agreement that we signed, I believe it was in January of 1997.

11      And what an OEM agreement is, it's an agreement between

12  companies where Finjan would make its technology available to

13  other companies so they could use Finjan's new technology into

14  their products.  So our first technology license happened very

15  shortly after the company started selling its own products.

16  Q   I think we have a demonstrative.  Can we just pull up the

17  slide.

18      Can you just tell us what we're looking at?

19  A   This is an example of one of Finjan's products.  This would

20  be a product that would sit in the server room between internet

21  and the user.

22  Q   And were there awards that Finjan received?

23  A   Yes.  So I'm old enough to remember you used to have to

24  subscribe to these magazines.  But just like anything that you

25  have whether you're a computer hobbiest or a fisherman, there

1    are magazines that review new technologies, they write about

2    what improvements are being made in the state of the industry

3    and what needs to be fixed, and so these represent some of

4    those publications that are writing those type of articles

5    about Finjan's technology.

6    Q    Were there industry articles and research reports about

7    Finjan?

8    A    Yes.  There's another dynamic here, and there are research

9    reports.  So there are different types of reports where they're

10   a little bit more in depth in terms of their analysis and

11   information that they provide so, yes, there are those types of

12   firms that provide those types of reports.

13   Q    Can you name a couple of them?

14   A    Off the top my head, the two that would stand out to me

15   that we use are research firms called IDC and also Gartner.

16   Q    And were those research firms around back in the early

17   2000s through even today?

18   A    Yes.  They continued -- they started a long time ago, and

19   they do continue to actively monitor and provide regular if

20   not -- not quarterly, possibly quarterly is probably the

21   fastest they do it, but they do provide up-to-date information

22   about what the state of the market is.

23   Q    For companies like Finjan, how do you get access to these

24   third-party market reports?

25   A    Well, they're publicly available, although most of them

1   require costly subscriptions to access the databases where the

2   reports are held.

3   Q   So I'd like to show you, before I move and publish to the

4   jury, PTX-894 and see if you recognize this document.  It's

5   also in your binder if you would like to look at it.

6   A   Yes.  This is one of those IDC reports.  It's dated

7   October 2003.

8            MS. KOBIALKA:  Your Honor, at this time, I would like

9   to mark and move into evidence --

10           MR. PISANO:  Objection, Your Honor.  Hearsay.

11           THE COURT:  This is not the complete report.  It's

12  just certain pages from it?

13           MS. KOBIALKA:  This is the complete document.  I'm

14  only going to -- from Finjan's business records.

15           THE COURT:  The objection is overruled.  Go ahead.

16     (Exhibit PTX-894 Admitted)

17           MS. KOBIALKA:  So maybe we can -- can we publish it to

18  the jury?

19           THE COURT:  Yes.

20           MS. KOBIALKA:  Thank you.

21  BY MS. KOBIALKA:

22  Q   So on the front cover here, it's entitled Finjan Software:

23  Closing the Window of Vulnerability October 2003; is that

24  right?

25  A   It is, yes.

1    Q    IDC, is that one of the market research firms you just

2    mentioned?

3    A    Correct.  It's one of the two firms I just mentioned.

4    Q    If we can turn to the second page of that document, and

5    there's a paragraph talking about Finjan software.  Can you

6    read that first sentence there that we're going to highlight?

7    A    Yes.  This first paragraph says:  Finjan software, a

8    pioneer in proactive content-based inspection, founded in 1986.

9    Q    And this is among the documents you were reviewing at your

10   position?

11   A    That's correct.  When you go digging through the boxes, you

12   tend to find reports like this about the state of the industry.

13   Q    Did you see any other market reports similar to this?

14   A    I did.  There were other IDC reports as well as Gartner

15   reports.

16   Q    I would like to show you PTX-500.  Let me know if you

17   recognize this document as something you have reviewed from

18   Finjan's business records?

19   A    I do.  This is an IDC report from November of 2005.  And

20   it's a market analysis.

21          MS. KOBIALKA:  Your Honor, at this time, I would like

22   to move and mark PTX-500.

23          THE COURT:  Objection?

24          MR. PISANO:  Well, Your Honor, I think it's hearsay.

25          THE COURT:  All right.  Overruled.  Admitted.

1      (Exhibit PTX-500 admitted)

2    BY MS. KOBIALKA:

3    Q    Could you read the title and the date on the document?

4    A    The title is:  Worldwide Secure Content Management from

5    2005 to 2009.  Forecast update:  In 2004, vendor shares

6    spyware, spam, and malicious code continue to reak havoc.  And

7    I believe it's dated at the bottom November 2005.

8    Q    If you can turn to page 50 of that document.  And I just

9    wanted to highlight the paragraph that says:  Finjan Software

10   Overview.  That top paragraph.  Is that -- did this report do a

11   review of Finjan as well as others in the -- in this

12   marketplace?

13   A    Yes.  This report covers -- looks to be like a sizable

14   report.  It covers a lot of companies, and it does have several

15   pages on what Finjan was doing at the time.

16   Q    And do you recall anything from this report in terms of its

17   discussion of Finjan?

18   A    I do.  The standout comment in this report as well is --

19   mind you, this is a couple of years later -- is that it again

20   identifies Finjan was founded in 1996.  It gives some

21   information about the company, but more standout to me shows up

22   later on the next page.

23   Q    And what?

24   A    So, again, in 2003, we were described as, you know, the

25   pioneer of this type of new inspection.  And here again, you

1   hear Finjan software, the inventor of proactive content-based

2   inspection.  So here again, you see it two years later in a

3   similar report.

4   Q   So now I would like to show you PTX-903.  Can you identify

5   this document?

6   A   I can.  This is a Gartner report from June of 2007, and it

7   is what they call a magic quadrant for secure web gateways.

8           MS. KOBIALKA:  Your Honor, at this time, I would like

9   to move and publish PTX-903 in evidence.

10          MR. PISANO:  No objection.

11          THE COURT:  It's admitted.

12       (Exhibit PTX-903 admitted)

13   BY MS. KOBIALKA:

14   Q   It says Gartner June 4, 2007.  Is Gartner one of the

15   industry reports you referred to?

16   A   Yes.  That is the other research firm that we tend to look

17   at.

18   Q   And what is this reference to magic quadrant?

19   A   So one of the things that Gartner does that's different is

20   they create these magic quadrants.  And the idea is that they

21   will take some density of companies, all whom were working

22   around a specific technology area.  So in this case, this one

23   is around secure gateways.  And it tries to organize those

24   companies into one of four quadrants.  And the idea there is

25   that you can identify who the leaders are, who the niche

1    players are, the challengers, and the visionaries.

2    Q   I would like to turn to page 3 of this document.  Maybe we

3    can highlight the section in the figure magic quadrant.

4    Mr. Hartstein, do you see that?

5    A   I do see that, yes.

6    Q   Where is Finjan identified on this magic quadrant?

7    A   Finjan is listed in the visionaries quadrant.

8    Q   This is in 2007?

9    A   Correct, June of 2007.

10   Q   Do you recognize any of the other names in the different

11   boxes in the magic quadrant?

12   A   I sure do.  Many of these companies were around when Finjan

13   was.  Many were competitors.  There has been consolidation in

14   the industries so some of them have combined, others have gone

15   out of business, but I would also note that at least nine,

16   maybe ten of these companies are also licensees of Finjan's

17   patents.

18   Q   Well, we'll talk about some of the licensees in a minute.

19   Let's go back to the time line.  We talked about Finjan sold

20   products until I think it was about 2009 or so.  Can you

21   explain what happened to Finjan in 2009?

22   A   You heard a little bit about Finjan basically no longer

23   being an operating business in 2009.  But I have to back you up

24   to 2008, because I think everyone would remember the economic

25   crisis going on here in America.  So when something like that

1    happens, the players tend to look for opportunities to

2    consolidate and that's either through merger or some other form

3    of combination, and you do that so can you remain competitive.

4    So in this time frame, in the 2008 and 2009 time frame, that is

5    exactly what Finjan was doing.  So there were three companies.

6    There was one called Marshal Security, there was one called 8e6

7    Security, which is just a mathematical reference, and there was

8    Finjan.  Three of those businesses combined, and the ultimate

9    company was called M86 Security.

10   Q    So what happened as part of the deal with M86?

11   A    So in that transaction, Finjan basically agreed to

12   contribute its customers its products, its malicious code

13   research center, which we called our MCRC.  Our employees went

14   over to work at M86, and Finjan's CEO was also M86's CEO.  In

15   exchange for that, Finjan granted a license to M86 for

16   25-percent equity of that newly formed entity, but Finjan also

17   kept its patents rights, all of its patents and all of its

18   patent applications.

19   Q    So did Finjan sell all of its assets then, or is that not a

20   right description?

21   A    That is an incorrect statement.

22   Q    What happened to M86 thereafter?

23   A    So remember I mentioned this industry consolidation?  Well,

24   that continued.  Several years later, M86 was acquired by a

25   Chicago-based company called Trustwave, who paid a few hundred

1   million dollars for the business.  And it happened again,

2   because Trustwave was acquired by Singapore Telecom a few years

3   after that.  And at that time, the transaction was well over a

4   billion dollars for the business.

5   Q   Was there any kind of provisions that prevented Finjan from

6   developing products or selling products?

7   A   As part of our arrangement with M86, we had to agree to not

8   compete in the marketplace.  I think it's sort of an obvious

9   expectation.  Also there was a confidentiality provision.  We

10  really couldn't talk about that.  When Trustwave acquired M86,

11  that provision was also renewed and extended based on Trustwave

12  and their acquisition of M86.

13  Q   Is that noncompete still in place today?

14  A   No, it's not.  It expired in the first quarter, March of

15  2015.

16  Q   So what did Finjan do then between that 2009 through 2015

17  time frame?

18  A   So in that time frame, Finjan had a lot of cash, it had a

19  lot of equity, and third-party companies.  It put into motion

20  what was going to be the next generation of Finjan.  Through

21  that time period, it did continue to license its patents.  We

22  became a public company.  And I heard some dates sort of around

23  this, but let me give you the right dates.  Finjan became a

24  public company in June of 2013.  In that same year, we also

25  made our first venture investment into the JBP fund, Cyber

1    Strategic Partners.  It's a cyber security focus venture fund,

2    ultimately planning for what would happen in 2015, knowing that

3    that exclusion from the market would expire.

4    Q    So why did Finjan decide to develop technology and products

5    after the expiration of the noncompete?

6    A    I get this question a lot.  Nothing had changed about the

7    premise of investing in a cyber security company or putting

8    money behind an innovative company to develop new technologies.

9    In fact, today it's probably one of the most hotly watched

10   segments of the stock market.  So because that premise hadn't

11   changed, in fact, many of our original venture capital and

12   private equity investors actually to this day continue to own

13   shares of Finjan as a public company.  So nothing had changed.

14   Q    Let's talk about licensing.  What has Finjan licensed over

15   the years?

16   A    Two things:  We've licensed our technology and we've

17   licensed our patents.

18   Q    And how many licenses -- patent licenses does Finjan have?

19   A    Today, the company has approximately 25 licenses.  And as a

20   result of that, also has a number of partnerships that are in

21   there as well.

22   Q    We have a slide.  Can you tell us, is this all of your

23   licensees on this slide?

24   A    No.  This is a -- I think this is a good representation,

25   but it does not include all of your licensees, no.

1    Q    Who are some of Finjan's licensees and technology partners?

2    A    I would probably break this up into a few groups.  Probably

3    some of the most recognizable ones you would note would be, for

4    example, Microsoft and Intel.  These are much larger household

5    names.  They're more diversified companies that have some

6    interaction in the security sector.  Someone like myself might

7    also recognize other companies in this license list, like

8    Bluecoat, Proofpoint, FireEye, Symnatec as also being very

9    large companies, but primarily focused in security; and then

10   some mentioned smaller players as well are also in this list.

11   Q    I see a couple that say "confidential" on there.

12   A    Yeah.  Sometimes the terms of our license agreements, we

13   try to work with licensees.  If, for example, they want certain

14   terms or provisions protected as part of that license, we do

15   what we can.  But in most instances, because we're a public

16   company, at a minimum, we have to announce and release the

17   value of those transactions and really the pertinent material

18   terms of those agreements.

19   Q    And are all of these companies in the cyber security space?

20   A    In some form or another, yes.  You know, many were

21   competitors to Finjan when we were building those original

22   products, and most continue, I would say, to be competitors to

23   each other in the same space at the same time.

24   Q    Does this represent a significant portion of the industry?

25   A    We think so.  I think at a minimum, it represents

1   widespread use and adoption of Finjan's patents.

2   Q   Generally, does Finjan have an approach to licensing and

3   aspects of licensing that you have been involved in.

4   A   We do.  So in -- very early on my joining the business, we

5   developed and publicly released something called our best

6   practices and licensing.  And that was an effort to communicate

7   the standard by which Finjan intended to engage with

8   prospective licensees and how we desire to have open lines of

9   communication and really outline the ways in which we would

10  provide information in that negotiation process so that you

11  could basically have a framework for a constructive

12  negotiation.

13  Q   Can you provide an overview of this licensing process?

14  A   Certainly at a high level.  You know, some of the obvious

15  things, before you approach a prospective licensee, you need to

16  identify and look at products and services.  I mean, there's no

17  substitute for looking at a company and understanding what it

18  is they sell and how they're deploying it, how they're

19  marketing it.  You look, I would say, as deeply as you can into

20  the publicly available information to get a sense about how

21  their revenues are being generated, in that sometimes it

22  doesn't tell the whole story, so sometimes you have to look at

23  value instead of revenue.

24      An example I like to think of there is I think we

25  overlooked this, but when you go to Google and type in

1    something to search, they don't charge you to search, but they

2    charge those advertisers a lot to put ads into your search

3    results.  So that's sort of the tradeoff there that we have to

4    think about.  But at the end of the day, what you do is you

5    take all of that information that you learned about that

6    company and you prepare it and then you make that available and

7    you use that as an opportunity to engage with any prospective

8    licensee based on the information that you've identified.

9    Q    And how do you engage with the licensee?  What does that

10   mean?

11   A    So it's always the duty of the patent owner to tell someone

12   hey, we think you're using our patents.  And generally we find

13   the best way to do that is you prepare a letter.  And in our

14   letters, we introduce Finjan, we introduce our team.  I think

15   in this case in particular, we introduced our best practices as

16   well.  And in that letter, what you would do is you would tell

17   them what products and services you looked at.  You would

18   identify these categories of technology that you're concerned

19   might be using your patents, and you would then identify

20   specific patents that you think they should be aware of.  So

21   you would send this letter, and the hope is that that actually

22   is the spark that starts that negotiation process.

23   Q    Now, today, who is leading up or heading up Finjan's

24   licensing practices?

25   A    John Garland runs our licensing program.

1  Q   Is he an employee of Finjan?

2  A   John and I have had this conversation for years about him

3  joining and becoming a full-time employee.  No, he is not.  He

4  is still a consultant to the business.  But I've worked for

5  John previously before coming to Finjan to run it as a public

6  business, and I recognize his contributions and the value he

7  brings to the licensing negotiation.  So that is really why the

8  business would like to have him as a full-time employee.

9  Q   Has Finjan ever experienced granting a license where the

10  company doesn't have any revenue for products it wanted to

11  license?

12  A   Yeah.  So Microsoft, I think is probably the key example

13  there.  In that instance, Microsoft didn't have any impacted

14  products, they weren't generating any revenues around something

15  they released into the market.  Instead, they were looking at

16  what was it that we could do with that license.  And we learned

17  about some of that later.

18  Q   So was that Finjan's very first license?

19  A   That's correct.  In 2005, it was our first license.

20  Q   What were the various terms of that agreement?

21  A   So, you know, aside from not using the patents themselves,

22  they paid an $8 million licensing fee.  They also made a

23  $2 million capital investment into the business, and there were

24  other business terms that were valuable to the organization as

25  well.

1  Q   When you say "other business terms that were valuable" and

2  were important, what do you mean by that?

3  A   Certainly the cash is important, don't get me wrong, but

4  the business terms for Finjan were -- the value of that was

5  just enormous.  If you could imagine having Microsoft validate

6  Finjan's technology and do so on a global stage at a major

7  security conference like RSA, it's huge.  It really is a big

8  deal for a small company like Finjan.

9  Q   And that would have been true in that 2005 time frame?

10  A   Absolutely.

11  Q   And does Finjan have any other licenses that prioritize

12  business terms?

13  A   Sure.  So another one on this list would be Avira.  You

14  will see them in the 2017 time frame.  So Avira and Finjan are

15  jointly developing these mobile security products that we have,

16  but Avira is also a licensee to Finjan's patents.  I guess we

17  could go back to and maybe include M86 and also Trustwave.

18  Those deals were more focused on the combination of businesses,

19  but also resulted in a patent license.

20  Q   Now has Finjan had to litigate prior to achieving a

21  license?

22  A   We have.  It's not our preference, certainly.  But most of

23  our deals are negotiated and outside of litigation.

24  Q   I'm sorry?

25  A   Most of our deals are outside-of-litigation negotiated

1    transactions.

2    Q    Let's talk about what was the circumstances of the Sophos

3    license.  I think we see Sophos here in 2017 or so?

4    A    Sophos is a UK-based company.  They have a substantial U.S.

5    operation.  They also sell a cloud security product that I

6    believe they call Sophos Labs.  And our lawsuit with Sophos,

7    the same patent in that case, many of the same patents are

8    actually involved in this case.  And what we got there was a

9    finding that Finjan's patents were infringed, were valid, the

10   Court confirmed the jury's award of $15 million, and that

11   presented an opportunity for Finjan to grant a broader license

12   to Sophos for 17 and a half million dollars and also has

13   provisions in there that allow Finjan to get additional

14   royalties if certain milestones are met.

15   Q    Can you take a look at JTX-130 in your binder and identify

16   the document?

17   A    These are the agreements -- yeah, there's a couple.  These

18   are the agreements, our license agreements with Sophos.

19          MS. KOBIALKA:  Your Honor, at this time, I would like

20   to mark and move into evidence JTX-130.

21          THE COURT:  Any objection?

22          MR. PISANO:  No objection, Your Honor.

23          THE COURT:  Received and admitted.

24      (Exhibit JTX-130 admitted)

25

BY MS. KOBIALKA:

Q   If we could publish to the jury that first paragraph so you

can give the date and the description of the document?

A   Okay.  So this is a confidential master agreement, and the

reason for that is because we also received a cross-license to

our mobile security products because they have patents too and

they also have mobile security products.  So this is basically

the governing agreement of the license with Sophos, and it's

dated March 30, 2017.

Q   So I believe you mentioned that Finjan usually reaches out

to potential licensees to start negotiations; is that fair?

A   Yeah.  Generally that's the case, yes.

Q   Did you do that with ESET?

A   We did, in 2015.

Q   Okay.  So can you tell me briefly at a high level what

happened in 2015?

A   So really where this starts is in the 2013, 2014 time

frame.  And you have heard the phrase "layered security,"

you've heard the phrase "behavior security," that's when Finjan

first observed in the market research that ESET was moving into

that technology area, and that's where Finjan has patents so

that's really where we became aware.  And then we ran into that

licensing process that I described.  And so by, I think, the

middle to late, maybe even early of 2015, we had all that

information prepared, and we sent a letter to ESET.

1    Q   Okay.  I'd like to show you a slide here.  I think this is

2    what you described.  So you indicated after you saw ESET -- or

3    Finjan started to observe ESET in the marketplace, what did

4    Finjan do about it?

5    A   Well, we first saw it in the 2013, 2014 time frame.  We

6    continued to monitor it.  And, again, this would be the sort of

7    understanding what the products are, how they're being

8    marketed, who they're selling them to, tracking the marketing

9    research to see if they're generating revenue in those areas,

10   and by 2014, early 2015, Finjan had information that it needed,

11   in our mind, to make a credible representation to ESET that

12   they needed to discuss in negotiation for a license.  And

13   that's what triggered the preparation and sending of the

14   letter.

15   Q   And so did Finjan first reach out to ESET about licensing

16   in a letter?

17   A   We did, yes.

18   Q   If you could take a look at PTX228.  Is this the letter

19   that you're referencing?

20   A   Yes.  So this is a letter from Ivan Chaperot, who was

21   Finjan's VP of licensing, to Richard Marko, ESET's CEO, dated

22   January 22, 2015.

23          MS. KOBIALKA:  At this time, your Honor, I would like

24   to move into evidence and publish to the jury PTX-228.

25          MR. PISANO:  No objection, Your Honor.

1           THE COURT:  Received and admitted.

2      (Exhibit PTX-228 admitted)

3    BY MS. KOBIALKA:

4    Q    So if we could blow up the first couple paragraphs.  There

5    we go.  What was the purpose of this letter?

6    A    So, again, these letters, they have a couple of different

7    sections, but really it's to introduce who Finjan is.  It's to

8    say we're a company that holds patents, we have undertaken some

9    effort to analyze your company, your products.  We're going to

10   share with you some of that analysis.  In this letter, also we

11   introduced Finjan's best practices in licensing, and we

12   identified several of the specific patents that can you see

13   here that we thought ESET needed to look at so they could

14   research independently our initial claims.

15   Q    What was the result of Finjan's efforts to negotiate a

16   license with ESET?

17   A    Nothing.  We heard nothing.

18   Q    So what did you do next?

19   A    Well, we sent another letter.

20   Q    Okay.  So there were attempts to have further contact with

21   ESET, but then after that, what did you do next?

22   A    Well, it was not a very successful engagement in trying to

23   engage in the licensing discussion.  And Finjan grew concerned

24   that there was a potential problem if we're getting close to

25   the end of the life of the patents.  And these aren't decisions

1    that I get to decide on my own, so I had to take this to our

2    board.

3    Q    So what happened next?

4    A    Our board's view was that they agreed that there was not

5    really a path here to achieve a license; and, moreover, our

6    board was concerned, in fact, that ESET was going to sue

7    Finjan, that they were going to sue us.  And so as a result of

8    that board meeting, they authorized the filing of this case,

9    this lawsuit against ESET.  And, in fact, ESET filed a lawsuit

10   against Finjan the same day we filed this case, so it turned

11   out to be true.

12   Q    And was that -- that was filed in 2016; is that right?

13   A    That's correct, in the middle of 2016.

14          MS. KOBIALKA:  I have no further questions at this

15   time.

16          THE COURT:  Thank you.  Cross-examination.

17          MR. PISANO:  Yes, Your Honor.

18                    **CROSS-EXAMINATION**

19   BY MR. PISANO:

20   Q    Mr. Hartstein?

21   A    Hartstein.

22   Q    Thank you.  By now I certainly should have it down.  Who

23   else for Finjan Mobile works for Finjan, Inc.?

24   A    For Finjan Mobile?

25   Q    Yeah.  Who at Finjan Mobile works for Finjan, Inc.?

1    A    It would be the other way around -- oh, no.  There is no

2    person at Finjan, Inc. who works for Finjan Mobile.

3    Q    Right.  That's what I thought.

4    A    Correct.

5    Q    You said that Finjan spent a million dollars in R&D.  Was

6    that last year?

7    A    On our mobile security division, I think it's been between

8    a million to two million a year for the last several years,

9    yes.

10   Q    And that was spent by Finjan Mobile, right, not Finjan,

11   Inc.?

12   A    Well, I mean, the way we describe it is that the Finjan

13   companies spend that money on R&D.  That's the way it's

14   reported.

15   Q    Okay.  But Finjan Mobile is not a plaintiff in this suit,

16   is it?

17   A    No.  They are not a plaintiff in this suit, no.

18   Q    You testified you understand the historical aspects of the

19   company, right?

20   A    Yes.  To the best of my efforts and abilities, yes.

21   Q    Now is Finjan currently suing Cisco Systems?

22   A    Yes.

23            MS. KOBIALKA:  Objection, Your Honor.  This goes to

24   motion in limine.  Our motions in limine number 3.

25            MR. PISANO:  Your Honor, he opened the door when he

1   said he has a fellow board member from Cisco.  I was going to

2   ask him --

3          THE COURT:  I'll allow it.  Then move on.

4          MR. PISANO:  Thank you, Your Honor.

5          THE WITNESS:  Yes, we do.

6   BY MR. PISANO:

7   Q    So did he object?

8   A    I'm sorry?

9   Q    Did the board member you have from Cisco -- the Finjan

10  board member who came from Cisco, did he object to suing Cisco

11  Systems?

12  A    I don't recall the board's discussion about that.  I'm not

13  sure I can answer.

14  Q    Okay.  Now how much money did Finjan lose last quarter?

15  A    Ooh.  So fourth -- so we're a little behind the way public

16  reporting is.  So when I hear "last quarter," I think fourth

17  quarter of 2019.

18  Q    Um-hmm.

19  A    I think probably on the order of $2 to 3 million, if I had

20  to guess.

21  Q    Was that all for litigation expenses?

22  A    No.  That's basically -- all of our expenses are, you know,

23  everything from operations to office space to staff to

24  insurance, taxes, et cetera.  So all of that is bundled in

25  there.

1   Q   We'll look at that in a moment.  So you mentioned an IDC

2   award from 2003, or rather some awards from 2003, 2005, 2007,

3   right, on your direct testimony?

4   A   I believe those are the three we've talked about.

5   Q   Okay.  But the '086 patent issued in 2011?  Right?  I'll

6   represent that it did.  Are you aware that it did?

7   A   I'll take your representation.

8   Q   Are you aware that the '621 and '755 patent issued in 2015?

9   A   I don't have the information in front of me, but I would

10  take your representation for that.

11  Q   Okay.  So you would agree those awards don't have anything

12  to do with those patents, right?  Those awards prior to 2007

13  have nothing to do with the patents at issue in 2011 and 2015,

14  right?

15  A   I don't think I can agree with that.

16  Q   Okay.  Now you said you looked into -- earlier, you were

17  talking about the Finjan boxes.  Do you know if they were

18  rule-based boxes?  How did they work?

19  A   I'm sorry?

20  Q   How did the Finjan boxes that you talked about earlier --

21  were they rule based?  Did they have rules that controlled the

22  behavioral analysis?

23  A   Oh, I don't have a technical background sufficient to give

24  you any examples of how they may or may not have worked

25  specifically.

1  Q   Okay.  Now when you said that companies had adopted the

2  Finjan technology after the technology was sold to M86 and then

3  on to Trustwave.  When you say recently -- more recently,

4  companies have adopted the technology, you mean they have taken

5  licenses from Finjan, right?

6  A   That could be one way to describe it, but I would also

7  describe it another way, which is the same things that Finjan

8  patented are now showing up in the market so that would also be

9  the adoption.

10  Q   Okay.  But you can confirm here that the only litigant is

11  Finjan, Inc.?  That's the only plaintiff in this case, right?

12  A   That's correct.  That's who owns the patent.

13  Q   Prior to joining Finjan, Inc., your background emphasized

14  patent monetization, correct?

15  A   Yes.  I would say the majority of it has, yes.

16  Q   Okay.  So patent monetization is basically the licensing of

17  patents or suing the people who refuse to take a license,

18  right?

19  A   I think that's a very narrow description of what that realm

20  is.

21  Q   All right.  Prior to joining Finjan, Inc., you had no

22  experience working in the cyber security industry or with

23  malware detection technologies, correct?

24  A   I believe that's correct, yes.

25  Q   And you became the president of Finjan, Inc. on a

1   consulting basis in April of 2013; is that correct, sir?

2   A   Correct.

3   Q   A few months later in June of 2013, you oversaw a reverse

4   merger between Finjan, Inc. and Converted Organics Inc. that

5   resulted in Finjan Holdings; is that correct?

6   A   I did.  So the process was started before I got there.

7   Yes, I completed it through that.  The company's name was

8   Converted Organics, and, yes, we did rename that business to

9   Finjan Holdings.

10  Q   And the business of Converted Organics was creating

11  fertilizer from food scraps, correct?

12  A   Well, there's this complicated patented process about how

13  that all happened, so, yeah -- I mean, if you ask the guys who

14  are there doing the work, that's what they would tell you, but

15  there's more to it than that.

16  Q   After the reverse merger, the merged entity changed its

17  name from Converted Organics Inc. to Finjan Holdings, Inc.,

18  right?

19  A   Not entirely correct.  So we changed the name of the

20  parent, and then the existing fertilizer business became a

21  subsidiary we called, I believe it was Converted Organics of

22  California.  So it became a subsidiary.

23  Q   So after the closing of the reverse merger, you were

24  appointed Finjan, Inc.'s president, correct, sir?

25  A   No.  That's confusing.  Because I joined the original

1    Finjan as a consultant.  And the reason for that is because we

2    knew we were going become a new public company, but didn't know

3    what it was going to be called.  So once we acquired that

4    public business and changed its name to Finjan, we then knew

5    where I would go to work, so that's when my employment

6    agreement kicked in; that's when I became the president of

7    Finjan Holdings.

8    Q    Okay.  So after the merger, Finjan, Inc. and Converted

9    Organics were subsidiaries of Finjan Holdings, Inc.; is that

10   correct?

11   A    That is correct, yes.

12   Q    Okay.  Other than yourself, Finjan, Inc. only has -- only

13   has two other employees, Ms. Mar-Spinola, your general counsel,

14   and your chief financial officer?

15   A    It's like that in all of our subsidiaries, yes.

16   Q    So you review and sign the corporate disclosures to the

17   government such as the Security Exchange Commission or the SEC

18   for documents filed by Finjan Holdings, Inc.; is that correct,

19   sir?

20   A    Yes.  So we have to report quarterly and annually and also

21   on any material events that happened to the company as they

22   happen.

23   Q    So Mr. Hartstein, did you -- does Finjan report in its 2019

24   annual report that Finjan generates substantially all of its

25   revenue from license and settlement agreements related to our

1   patented technologies?

2   A    Yes, that's correct.  Greater than 90 percent.

3   Q    And Finjan, Inc., the plaintiff, does not now sell any

4   products, correct?

5   A    Correct.  Finjan, Inc. does not sell any products.

6   Q    And Finjan, Inc.'s only asset is its patent portfolio,

7   correct.

8   A    That is the only asset that is in that subsidiary, yes.

9   Q    So Finjan, Inc.'s only source of revenue is from licensing

10   and litigating its patent portfolio, correct?

11   A    The entirety of what Finjan, Inc.'s revenues are from

12   licensing, yes.

13   Q    Now is it true that Finjan's management dictates and

14   controls the overall litigation strategy for each case it

15   litigates or settles?

16       MS. KOBIALKA:  Objection, Your Honor.  I'm afraid

17   we're sure to go down a path with some of the previous motion

18   in limine rulings.

19       THE COURT:  Let me see you.

20     (Sidebar held outside the presence of the jury, reported as

21   follows)

22       THE COURT:  So where are we going with this?

23       MR. PISANO:  I don't know of any motions in limine.

24       MS. KOBIALKA:  So motions in limine number 3, pending

25   proceedings.  So any pending or relevant proceedings excluded,

```
 1   with the exception of the '962 for obviousness.
 2              MR. PISANO:  I'm not discussing --
 3              THE COURT:  He's not going to get into proceedings.
 4   He wants to know who's calling the shots.
 5              MR. PISANO:  That's right.
 6              MS. KOBIALKA:  He's asking about pending litigation.
 7              THE COURT:  You know he's not going to go very far
 8   with that, first of all, because I'm not going to let him; and
 9   second, because he's wasting his time.
10              MR. PISANO:  I am not going --
11              THE COURT:  That's fine.  Thank you.
12         (Open court, jury present)
13   BY MR. PISANO:
14   Q   So the question, Mr. Hartstein, was:  Finjan's management
15   dictates and controls the overall litigation strategy for each
16   case it litigates or settles; is that correct?
17   A   I don't think that's entirely accurate.  Our board has as
18   part of the government's construct for the business, it's their
19   decision to evaluate and authorize any lawsuits.  But in terms
20   of licensing, the company does manage its own operations, yes.
21   Q   Mr. Jay, can you bring up that excerpt from the 2019
22   report -- Your Honor, actually -- before you bring that up.
23   Mr. Hartstein, I would like you to look at tab 2 in your
24   witness binder.
25   A   I'm with you.
```

```
 1    Q    Okay.  That's Finjan Holdings, Inc. 2019 Form 10K, right?

 2    A    Yes, that's correct.

 3    Q    If you flip to the third from the back -- actually the

 4    second to the last page, it has a certification under

 5    Sarbanes-Oxley Act.  Is that your signature -- or is that your

 6    electronic signature there, sir?

 7    A    Yeah.  It's -- Your Honor, in the annual filings, our

 8    entire board is required to sign.

 9            THE COURT:  That's fine.  You can get comfortable with

10    the document before you answer the question.

11            THE WITNESS:  I do see my signature, but I will also

12    note for all annual filings, every individual board member

13    needs to sign off on the review before it's filed.

14    BY MR. PISANO:

15    Q    Mr. Hartstein, would you agree that this document, which we

16    can designate DTX-1039, is a business record of Finjan?

17    A    Yes.

18    Q    Okay.

19            MR. PISANO:  Your Honor, I would like to publish a

20    part of this document to the jury.

21            THE COURT:  Do you want to admit the whole thing?

22            MR. PISANO:  I don't want to admit the whole thing,

23    just publish one excerpt from it.

24            THE COURT:  That's fine.  Go ahead.

25
```

1    BY MR. PISANO:

2    Q    So with respect to that question, who dictates and controls

3    litigation strategy, Mr. Jay, could you bring up PDF page 14.

4    It is the 2019 annual report.

5         So you see the highlighted language there?

6    A    I do.

7    Q    Okay.  And it says:  Although management dictates and

8    controls our overall litigation strategy for each case,

9    litigated or settled, we use outside legal counsel to execute

10   certain aspects of our strategy.  Do you see that?

11   A    I see that, yes.

12   Q    Okay.  Do you still not agree with the concept that

13   management dictates and controls overall litigation strategy

14   for each case Finjan litigates?

15   A    I think my understanding of that statement is different.

16   That's implying that because Finjan has the expertise in-house

17   that we don't allow our outside counsel to independently

18   dictate the litigation strategy.  So that's just us saying we

19   haven't handed it off to our lawyers, we want to decide who,

20   when, how.  And I think it's explicit when it talks about

21   including certain aspects of our strategies, which would

22   include settlement authority.

23   Q    Now let me go to tab 1 in your exhibit binder,

24   Mr. Hartstein.  It is the 2014 Form 10K filed by Finjan

25   Holdings, Inc. with the Security Exchange Commission; is that

1  correct, sir?

2  A    It is correct, yes.

3  Q    And just for reference, your electronic signature appears

4  on the second to last page of that document, right?

5  A    Yes.  A number of spots, yes.  I have to sign a number

6  of different -- yes.

7  Q    So you would agree that this document too is a business

8  record of Finjan Holdings, Inc.; is that right?

9  A    I do.  This would have been filed with the SEC and made

10  available to shareholders.

11  Q    So do you recall that in this annual report, Finjan

12  Holdings restated its consolidated statements of operations

13  with the SEC to change the proceeds of patent infringement

14  settlements and licensing from "other income" to "revenue due

15  to a change in the company's business model"?

16  A    Could you point me to where in document that is.

17  Q    Sure.  Let's take a look at page 33.  Do you see the

18  highlighted language on your screen, sir:  So it's the case

19  that in 2013 --

20          THE COURT:  Okay.  Hold on.  You're talking and he's

21  trying to read and --

22          MR. PISANO:  Excuse me, Your Honor.

23          THE COURT:  He needs to figure out where you are.

24          MR. PISANO:  My apologies.

25          THE COURT:  He has kind of put this up to, let's say,

 1    refresh your recollection.  Does that help refresh your

 2    recollection?

 3              THE WITNESS:  I don't know if I have a question, Your

 4    Honor.

 5              THE COURT:  Okay.  Are you with us?

 6              THE WITNESS:  I have -- I think I understand where --

 7    I have my place now, yes.

 8              THE COURT:  Go ahead, Counsel.

 9    BY MR. PISANO:

10    Q   In 2013 when Finjan Holdings restated its consolidated

11    statements of operations with the SEC to change the proceeds of

12    patent settlements and licensing from "other income" to quote

13    "revenue due to a change in the company's business model"?

14    A   The background on this, which is very important, is that

15    what preceded this document was a super AK filing, and the

16    reason why it's complicated is because we're combining the

17    existing business with the new Finjan business, and we're

18    trying to explain to the SEC that we're no longer a petrol

19    chemical business and that the primary action is an

20    intellectual property business.

21        So in these restatements and realignments, you have to

22    bring together these two disparate organizations and explain

23    those together.  The reason why there's a change in the way

24    this outcome has happened is because as we're going through the

25    process to list on NASDAQ and you're communicating with the

1    SEC, they didn't like the fact that the vast majority of our

2    revenues were going to come from licensing.  And this request

3    was at the SEC's request so that it was more clear for

4    shareholders to understand what our business was and what it

5    would be going forward.

6    Q   So can you clarify, is the statement in this SEC filing

7    that's highlighted in front of you; is that accurate?

8    A   In the context that the SEC wanted us to be more

9    descriptive about how we were going to generate income from

10   licenses and settlements, sure, I could agree with you on that.

11   Q   Okay.  Also on that same page of the 2013 annual report,

12   Finjan recasts its legal costs of patent enforcement as

13   selling, general, and administrative expenses; is that correct,

14   sir?  Let me bring that up for you.

15   A   Yeah.  This might exceed my financial knowledge. I'm not

16   sure I understand what the difference between a cost of

17   revenues is and consolidated statements.  I just don't know.

18   I'm sorry.

19   Q   Let's move on.  Mr. Hartstein, as of December 31st,

20   Finjan's Holdings' authorized capital stock consisted of about

21   80 million shares of common stock and 10 million shares of

22   blank check preferred stock; is that correct?

23   A   I will take your representation for it.

24   Q   Okay.  And Finjan Holdings' common stock has been publicly

25   traded on the NASDAQ exchange since 2014, right?

1    A    I believe that's correct.  May of 2014.

2    Q    Is it true that between May of 2014 and December 31st of

3    2014, that Finjan -- there has never been any payment of cash

4    dividends on Finjan's common stock?

5    A    That's correct.  We do not have an active dividend policy,

6    but we did dividend out the vast majority of our cash before

7    becoming a public company.

8    Q    Okay.  And since the licensing revenue has come in since

9    you became a public company, none of that is distributed to the

10   common shareholders?

11   A    Correct.  There is no dividend policy active.

12   Q    In the 2013 annual report now, this is the same document,

13   Finjan Holdings says it expected significant competition from

14   those in the area of patent acquisitions and enforcement.  Do

15   you recall that?  If not, I can point you to PDF page 10.  It's

16   on your screen, sir.  I'm sorry.  Page --

17            THE COURT:  That's 7.

18   BY MR. PISANO:

19   Q    It's PDF page 7.

20   A    Okay.  Yes.  I see it.  And, yes, I see the statement, yes.

21   Q    Okay.  At that time, in 2013, Finjan identified its

22   competitors by name, just on the next line of this document, as

23   Acacia Research Corporation, Interdigital Corporation, RPX

24   Corporation, Rambus Inc., Tessera Technologies, Wi-Lan Inc. and

25   Pendrell Corporation; is that right, sir?

1   A    Yes.

2   Q    And those are all patent assertion entities, right?

3   A    Wow.  I don't think they would take kindly to that.  I know

4   Wi-Lan was the original telecommunications company.

5   Interdigital has been around for 25 or 30 years.  You could

6   attach that label to a couple of them, except RPX is obviously

7   an outlier as well.  That's a defensive aggregator.  This, just

8   to be clear, is what's called a peer group.  So you're required

9   by the SEC to define a group of peers for which when the SEC

10  evaluates you, they say hey, I just saw this release from

11  Finjan, I can go look at these six or seven other companies to

12  see if they do something similar.  So this is just the peer

13  group designation.

14  Q    Okay.  That's the peer group designation that you

15  identified for the significant competition in the area of

16  patent acquisitions in enforcement that Finjan Holdings was in

17  at that time, right?

18  A    I don't get to identify that.  You have to hire a

19  third-party research firm, so we used Compensia.  Compensia is

20  the one who identifies our peer group because they have to be

21  the defensive person who says no, we independently evaluated

22  for all of the purposes for Finjan, including compensation and

23  other matters.  So the peer group often is outside the realm of

24  what we get to decide.

25  Q    So Mr. Hartstein, is the statement in front of you from the

1   SEC statement inaccurate?

2   A    No.  I'm just -- I'm just answering that I think you're

3   misreading it or don't quite appreciate what those designated

4   companies are.

5   Q    Okay.  We can let the jury decide that.

6       Are any of those companies cyber security companies?  Those

7   companies being Acacia, RPX, Rambus, Tessera, Wi-Lan and

8   Pendrell?

9   A    No, they are not.

10  Q    So is it true that Finjan believed that infringement of its

11  patents began between approximately 2002 and 2006?

12  A    I'm sorry?

13  Q    Is it true that -- let me back up.  In its 2013 annual

14  report, the document you've been looking at --

15          THE COURT:  Counsel, the jury hasn't seen it.  You

16  haven't moved to admit it.  None of these pages have been in

17  front of them, so I'm just saying to help you out if you want

18  them to follow along, you might want to move some of this stuff

19  in.

20          MR. PISANO:  Thank you, Your Honor.  I thought I had

21  asked to publish it.  My apologies.

22          THE COURT:  No.

23          MR. PISANO:  I would ask that DTX-1039 and 1040 be

24  admitted into evidence as business records of Finjan Holdings,

25  Inc.

1        MS. KOBIALKA:  So I'll object just to the extent they

2  have never -- there is no DTX-1040. I don't mind the admission

3  of them.

4        THE COURT:  We'll admit them and talk about this

5  exhibit issue when the jury is gone for the day.  So now if you

6  want to use -- I don't know which one we're talking about at a

7  page.  You need to be more specific so we can find it and make

8  it part of the record.

9        MR. PISANO:  Thank you, Your Honor.

10    (Exhibits DTX-1039 and DTX-1040 admitted)

11  BY MR. PISANO:

12  Q  Let me go to the 2013 annual report, DTX-1040.  Tab 1 in

13  the exhibit binder.  And I would like to go back and I would

14  like to publish to the jury, Your Honor.

15        THE COURT:  That's fine.

16        MR. PISANO:  I think it -- I think it's page 7,

17  Mr. Jay.  The one where we're talking about the competitors

18  identified by name.

19        THE CLERK:  This is 1040?

20        MR. PISANO:  Yes, ma'am.  That would be the 2013

21  annual report.

22        THE COURT:  Can you put that up.

23  BY MR. PISANO:

24  Q  So Mr. Hartstein, you saw this paragraph before, right:  We

25  expect to encounter significant competition in the area of

1    patent acquisitions and enforcement.  That's what Finjan told

2    the world in 2013; is that right?

3    A    Yes.

4    Q    Okay.  And then Finjan included amongst those entities in

5    that field Acacia Research Corporation, Interdigital, RPX,

6    Rambus, Teserra, Wi-Lan and Pendrel; is that correct sir?

7    A    It's correct, yes.

8    Q    Is it correct, sir, that none of those companies are cyber

9    security companies?

10   A    To the best of my knowledge, yes.

11   Q    So let me in this exhibit turn to page -- PDF page 5, which

12   is page 2 in your document.  And in your 2013 annual report,

13   Exhibit DTX-1040, Finjan stated that it believed infringement

14   of the patents began approximately between 2002 to 2006.  Do

15   you see that language, sir?

16   A    Right.  And I think it's referring to our first patent

17   lawsuit which was in, I think, 2006.

18   Q    Okay.  Now as part of your patent monetization background,

19   isn't it generally the preferred enforcement strategy to wait

20   to enforce patents until a technology is adopted and thereby

21   maximize potential damages awarded -- awards?

22   A    I don't think I would agree with that.

23   Q    No?

24   A    No.

25   Q    Okay.  So in your view, in your -- from your patent

1  monetization background, it's most effective to immediately

2  contact the potential infringers; is that right, sir?

3  A   It would go back to my answer previously:  You need to

4  evaluate products and services, you need to understand what

5  those are and how you might implicate those with your patents,

6  you need to evaluate whether there's revenues, and you need to

7  analyze that, put that information together.

8  Q   So on the slide that Ms. Kobialka showed you before, there

9  are a number of licenses spanning from 2005 forward, correct?

10 A   I think that's correct, yes.

11 Q   Okay.  So why did that take until 2015 for Finjan to

12 approach ESET -- or strike that.  Let me withdraw that

13 question.

14     It's true, sir, that Finjan did not approach ESET until

15 2015, right?

16 A   That's correct.  As I indicated, it would have been the

17 date that we sent that first letter.

18 Q   Okay.  So let me ask you to turn to document number 3, tab

19 number 3 in your witness binder.  This is a document marked

20 DTX799.  Do you see that, sir?

21 A   I do.

22 Q   Okay.  And at the bottom in small type it says this is a

23 board meeting for November 29, 2016.  Do you see that?

24 A   Yes.

25 Q   Was this document kept in the ordinary course of the

1   business of the Finjan, Inc.?

2   A   I believe so.  I've seen it before.

3          MR. PISANO:  Your Honor, Id like to admit Exhibit

4   DTX-799 and publish it to the jury.

5          MS. KOBIALKA:  No objection.

6          THE COURT:  It's admitted, and you can publish it.

7      (Exhibit DTX-799 admitted)

8   BY MR. PISANO:

9   Q   Mr. Hartstein, can you turn to page 3 of Exhibit DTX799.

10  A   So it starts with 46, 47, 48.  Is that what you want?

11  Q   Well, let me ask you to go to the Bates number page 125.

12  Finjan-ESET 035125.

13  A   Okay.  I'm with you.

14  Q   Okay.  And you see the -- there's a net operating loss for

15  the year ending December 31st, 2004 of $7,749; is that right,

16  sir?

17  A   I do see the operating loss row, yes.  That number seems

18  correct.

19  Q   Okay.  Then let me ask you to turn to tab 4 in your exhibit

20  book.  This is document DTX-800.

21  A   Okay.  I'm with you.

22  Q   And this is -- also this document is a Finjan board of

23  director meeting for April 28, 2000, correct, sir?

24  A   It looks to be correct, yes.

25  Q   And this document was also kept in the ordinary course of

1    Finjan, Inc., correct?

2    A   I imagine so.

3        MR. PISANO:  Your Honor, I would like to publish and

4    admit DTX-800.

5        MS. KOBIALKA:  No objection.

6        THE COURT:  Received and admitted.  Go ahead.

7        (Exhibit DTX-800 admitted)

8    BY MR. PISANO:

9    Q   Could you please turn to the Bates number page Finjan-ESET

10   466908, sir.  And that says -- the first column says for the

11   year ended December 31st, 2006, the loss was $7.6 million,

12   right?

13   A   I do see the operating loss line, yeah, and the number

14   looks correct, yes.

15   Q   And then for the year ending December 31st, 2007, there was

16   a further loss of 17.026 million, correct?

17   A   It looks correct, yes.

18   Q   It was a net loss of 17.76 in that same column, yes, sir?

19   A   Yeah.  I don't know the differences between the operating

20   loss and the net loss, I'm sorry, but the numbers look like

21   they're there on the page.

22   Q   Okay.  So let me ask you to turn to -- I'm sorry.  Could

23   you please turn to the same document and it's a little bit

24   confused here.  This would be PDF page 59 Finjan-ESET 466925.

25   A   Okay.

1   Q   Your Honor, I think we have -- hold on a second.  Yes.

2   Okay.  There we go.

3       Now, Mr. Hartstein, does this page show that Finjan was

4   forecasted between August and September of 2008, they would run

5   out of the money if they did not get a cash infusion?

6   A   Yeah, I think it's reasonable to conclude that, sure.

7   Q   Let ask you to turn to the next document in your exhibit

8   book.  This is JTX-118.

9   A   Okay.

10  Q   If you take a look at it, I think you will recognize that

11  this is it the Microsoft agreement.  2005 Microsoft agreement;

12  is that correct, sir?

13  A   It does appear to be the Microsoft license agreement, yes.

14  Q   So we will be discussing the Microsoft license agreement

15  later during the trial, but I do want to have you verify this

16  is a document that was kept in the ordinary course of business

17  of Finjan, Inc., correct?

18  A   It does look like the license agreement, yes.

19          MR. PISANO:  Okay, Your Honor.  I would like to move

20  Exhibit JTX-118 into evidence.

21          MS. KOBIALKA:  No objection.

22          THE COURT:  It's admitted.

23      (Exhibit JTX-118 admitted)

24  BY MR. PISANO:

25  Q   Mr. Hartstein, do you consider yourself qualified to offer

1   expert opinion on the value of the patents?

2   A   No, I don't think so.

3   Q   Do you know whether as of December 31st 2015, all five

4   asserted patents-in-suit, including the '621 patent and the

5   '755 patent that was just issued in late 2015 were fully

6   advertised?

7            MS. KOBIALKA:  Objection, Your Honor.  I'm not sure

8   how this goes to any of the direct at this point.

9            THE COURT:  Well, if you can answer the question.

10  Overruled.

11           THE WITNESS:  I was going to say I would look to my

12  CFO to answer that question.

13  BY MR. PISANO:

14  Q   All right.  So sir, you do not know then as of

15  December 31st, 2015 that Finjan had accorded a book value for

16  all of the five asserted patents of zero; is that correct?

17  A   I don't actually understand the fundamentals of

18  amortization.  I don't know if it describes it going to zero or

19  that you've already spent all the money you need to spend on

20  it.  I just don't know the distinction.

21  Q   Okay.  So you don't know.  Mr. Hartstein, is your salary

22  paid by Finjan Holdings or Finjan, Inc.?

23  A   I'm paid by the parent company, Finjan Holdings.

24  Q   Is it true your employee agreement provides for a base

25  salary and a discretionary bonus at the end of every four-month

1    period based on your performance?

2    A    I do have a base Salary.  My discretionary bonus is

3    actually evaluated quarterly, and that's done by the

4    compensation committee of the board.

5    Q    What was your last bonus, Mr. Hartstein?

6            MS. KOBIALKA:  Objection, Your Honor.  I don't think

7    this is relevant it.

8            MR. PISANO:  It goes to bias, your Honor.

9            THE COURT:  I will allow it, but rap it up.

10           THE WITNESS:  My last bonus was approximately $18,500.

11   BY MR. PISANO:

12   Q    Mr. Hartstein, will the results of this litigation affect

13   your future compensation for bonuses?

14   A    Sure.  In the broad context for the performance of all of

15   the operations of Finjan, I would expect so.

16   Q    Okay.  Then other than a basic semester -- other than a

17   basic computer language training in high school, you have no

18   experience in reading or writing source code; is that correct,

19   sir?

20   A    Maybe with the exception of some web-based code, but yeah,

21   generally in the context you're referring to, I think that's

22   accurate.

23           MR. PISANO:  Thank you, Mr. Hartstein.  Nothing

24   further.

25           THE COURT:  Thank you.  Redirect.

1        MS. KOBIALKA:  I have some brief redirect.

2                    **REDIRECT EXAMINATION**

3    BY MS. KOBIALKA:

4    Q    Mr. Hartstein, you were asked about some SEC filings?

5    A    Yes.

6    Q    Okay.  And those SEC filings are for Finjan Holdings,

7    correct?

8    A    Correct.  They're the parent company and then everything,

9    of course, that that parent governs.

10   Q    And so then it talks about each of the various subsidiaries

11   as well?

12   A    It does, yes.

13   Q    So when you were asked about losses, it was about all of

14   the Finjan companies; is that right?  The stock, it relates to

15   the parent company because everything rolls up?

16   A    So there's some references in there, some silly things

17   about how money gets treated.  So for example, stock-based

18   compensation, you get taxed even though there is no stock being

19   transferred, so some of that translates into an expense.  It

20   would include, for example, all of the development expenses for

21   our mobile security product, our office, our salaries.  You

22   know, all of the public company governance things would also be

23   there in an expense.  Yes, it's everything.

24   Q    I'd like to show you what has been admitted already, that

25   last exhibit, it's number 2 in the binder.  It doesn't have a

1    number, but it's the 10K for 2019, page 10.  I don't believe we

2    actually have a copy.  So all I have is the Elmo.

3              THE CLERK:  I believe the other party identified it as

4    DTX-1039, part of that exhibit.

5              THE COURT:  Is that the one you want?

6              MS. KOBIALKA:  Is that published to the jury?

7              THE COURT:  It is now.

8    BY MS. KOBIALKA:

9    Q   Could you just describe here, what is being discussed?

10   Unfortunately it's a little bit harder on the Elmo.

11   A   So because this is the first public filing, annual filing,

12   after we've acquired this Converted Organics Company and

13   changed its name, now we're responsible for that public

14   business.  This is all in the introductory section where you're

15   describing the two businesses.  So in the preceding pages, you

16   see the descriptions of what the Converted Organics business is

17   and now you're seeing the description of what the Finjan

18   businesses are.

19   Q   I'm actually pointing to the 2019 one.

20   A   Oh, I'm on the wrong one.  This talks a little bit more

21   about some of the other aspects of our business.  So, yes, it's

22   true, we do continue to develop the patents in our Finjan, Inc.

23   pipeline.  We also file for patents in our mobile security

24   business, which you can see invest in internal research and

25   development there.  And it's true, there's a lot of licensing

1  ramification impacts.

2  Q    So there's all of the different businesses, and there's a

3  reference to LES, Licensing Executive Society.  Do you see

4  that?

5  A    I do, yes.

6  Q    What is LES?

7  A    So every industry is going to have its own trade

8  organizations.  If you're a licensing professional, LES is

9  likely the one that you're going to go to.  It's actually named

10  the Licensing Executive Society.  So what LES has done is it

11  has taken what Finjan created as its best practices and

12  licensing and it is now using that as a functional role model

13  for developing standards for how licensing should be conducted

14  in the industry.

15       This started in 2014 when we made the announcement

16  ourselves.  We have spent the better part of five years trying

17  to encourage much larger, much more diversified companies to

18  participate.  And as of last year, that initiative became an

19  ANSI accredited standards development organization, so now it

20  has a governing body.

21       And I have been invited to sit on the board.  So I now work

22  to oversee the creation of these standards about best practices

23  and licensing industry wide, not just in cyber security but for

24  supply chain, for aerospace, for licensing, for valuation, for

25  all of those areas of licensing.

1   Q   And who are the other companies that are participants in

2   LES?

3   A   Microsoft, Raytheon, Boeing, some of the biggest, most

4   recognizable household names.  Licensing is an incredibly

5   common practice not just for small companies where we try to

6   protect the inventors' rights and venture capital investment,

7   but for large companies as well, these are equally important to

8   them.

9   Q   You were asked for a definition of patent monetization and

10  you said it was too narrow.  Could you explain what you meant

11  by you thought that was too narrow?

12  A   So patent monetization, it could easily be mischaracterized

13  as just licensing and litigation.  But the idea about patent

14  monetization is it's an asset that sits on your balance sheet.

15  There's a point when you're developing technology where you

16  have to say, do I want to spend $30,000 to file this patent or

17  hire a new engineer; and because of that, when you get that and

18  you make that decision to pay for that patent, it becomes an

19  asset.

20      So patent monetization as a -- I guess category of, you

21  know, business experts is really all about what do you do with

22  those business assets.  You can trade them, you can

23  cross-license them, you can sell them, you can use them to

24  create joint ventures and partnerships across country

25  boundaries or even across organizations.  It is the whole idea

1    that there should be financing for these ideas, that there

2    should be legal and technical and even valuations experts that

3    can help assist in these, and specific people like technical

4    experts who know how to read the specific patents and help

5    apply them to the specific industries.

6    Q    So you were asked a number of questions -- switching gears

7    to finances.  Finjan in 2005 and 2006, how was Finjan doing

8    financially?  What was it doing?

9    A    I do -- I disagree with the statements that were made about

10   Finjan.  Yes, we raised venture capital.  It's very easy to

11   burn through venture capital.  It happens very quickly.  Finjan

12   continued to finance its operations based on the sales of its

13   own products.  You can easily realize a loss, which will be

14   much greater if you actually weren't generating income.

15       I think about it simply that have you an option to take

16   profit and not grow your business, or you don't take that

17   profit and you reinvest it in your business.  And so to me, all

18   that says in 2005 is that Finjan was continuing to invest in

19   its business.

20       We also at that time had that recent cash infusion from

21   Microsoft, along with that capital investment on the equity

22   side of the business.  We were completing a round of financing

23   with several other companies in that time frame.  And, frankly,

24   the company was actually making a tougher decision to align its

25   resources.  We had been having some problems with another

1    competitor in the space, a direct competitor, and we put our

2    resources behind that initiative.  So, yes, there was a lot of

3    capital expenditure at this time.

4    Q    Was the company experiencing some profits?  I can show you

5    some pages.

6    A    The best accounting I have after looking at the same

7    reports you would go through here is that Finjan sold somewhere

8    between 72 and 75 million dollars' worth of its products.

9    Q    And was utilizing the profits back into the business?

10   A    That's the whole idea, grow the business.

11   Q    Okay.  You were asked a lot of questions relating to what

12   seemed to be settlements litigation, so I was hoping we could

13   pull up the Finjan licensing slide and publish that to the

14   jury.  Does Finjan have a license agreement with Trend Micro?

15   A    We do, yes.

16   Q    Okay.  And was there any threat of litigation, or was that

17   just a negotiation?

18   A    I think on several occasions, not just in person but even

19   in writing, we complimented them on their willingness to

20   engage, and that helped to facilitate probably one of the

21   fastest timelines that we had with a very large, very

22   recognizable company.

23   Q    You said most of your licenses were based on negotiations

24   and there was no threat of litigation or litigation; is that

25   correct?

1    A    Most of our licenses were negotiated transactions.

2    Q    All right.  So the last question I want to ask about was

3    you were asked about the awards and whether or not the awards

4    applied to the patents.  You said you didn't agree; do you

5    recall that?

6    A    Yes.  So one of the things that I know about the patent

7    system is, the way it works is I've got this really great idea

8    and what the Patent Office allows you to do is file that idea

9    and have somebody in that technical area evaluate it.  And what

10   happens with that idea is now you have to go back and build a

11   product around that.

12       And naturally, you're going to learn a lot of things about

13   what does and does not work while you're building that product.

14   And you're also going to get a lot of feedback from the market

15   about what other features and functionality they desire or

16   demand, because they're the ones who are buying the products.

17   And so what happens is, you continue to file for patents on all

18   of the features and functionalities you develop your

19   technology.  And you heard here about a parent.  So our

20   earliest patent was to 1996.  Even though some of those were

21   filed much later, they all have the same expiration date.  So

22   it's not like you're cheating the system.  We agree by filing

23   the later child off an original parent doesn't move that end

24   date.  They all expire at the same time.  So I think that's an

25   important thing to note.

1          MS. KOBIALKA:  Thank you.  No further questions.

2          MR. PISANO:  Nothing further, Your Honor.

3          THE COURT:  Thank you very much, sir.  You may step

4    down.  Your next witness.

5          MR. ANDRE:  At this time, we have a short deposition

6    video from the founder of Finjan, Mr. Touboul.  It's about

7    a six-minute video.

8          THE COURT:  Perfect.

9          MR. ANDRE:  May we play it now, Your Honor?

10         THE COURT:  If you're all set, yes, go ahead.

11      (Video of Shlomo Touboul played for the jury.)

12         MR. ANDRE:  Your Honor, that's PTX-1084.  I would like

13   to move the transcript into evidence, that clip.

14         THE COURT:  That's fine.

15      (Exhibit PTX-1084 admitted)

16         MR. ANDRE:  Your Honor, our next witnesses is going to

17   be a technical expert.  I don't know if you want to break.

18         THE COURT:  We'll stop for today.  That way you guys

19   can figure out getting home, your best routes.  So we're going

20   to recess for the day.  Please leave your notebooks here on or

21   under your chairs.  Do not discuss the case with anyone.  You

22   can certainly tell people you're sitting on this case and the

23   length of time, but don't discuss the subject matter with

24   anyone.  Don't do any research on your own.

25         We'll see you back here tomorrow.  Now we'll try this

1   schedule.  Hopefully it will work for everyone.  So we'll start

2   at 8:30, we'll take a break at approximately 10:00 for a

3   half-hour, come back at 10:30, and then go to 12:30, two-hour

4   chunk of time, take another half-hour break, finish up the day

5   at 2:30 so you can have most of your afternoon free.

6           To accommodate that, I would recommend you bring

7   something that you can eat, a snack that will sustain you.  You

8   don't need a full-on lunch.  If you do for your metabolism,

9   take care of that.  You will be able to go out, but you'll only

10  have 30 minutes so it's going to be hard to shop for food.  You

11  might want to pick up coffee or something.  You're welcome to

12  bring coffee or tea or morning beverage, as long as it's in a

13  covered container, and you can obviously have water in the jury

14  box.  So with that, you're excused for the day.

15      (Jury in evening recess at 4:08 p.m.)

16          THE COURT:  The jury is in recess for the day.  You

17  all have your schedule.  What are we looking at for tomorrow so

18  everybody knows what the expectation is?

19          MR. ANDRE:  Your Honor, we'll start tomorrow with Dr.

20  Bims, our tutorial expert, followed by the three videotaped

21  depositions of the ESET engineers that we have discussed today,

22  and then we'll bring Dr. Cole, who is doing the infringement

23  analysis of the '844 patent.

24          THE COURT:  Okay.

25          MR. PISANO:  Your Honor, I would ask them not to say

1    tutorial in front of the jury since it's not actually a joint

2    tutorial.

3              MR. PENNER:  We had that discussion at the pretrial.

4              MR. PISANO:  They call it a presentation.

5              MR. ANDRE:  We won't call it a tutorial.  We'll have

6    Dr. Bims take the stand and he'll do his thing.  We won't call

7    it a tutorial.  Finjan's expert.

8              THE COURT:  It's your witness, and he can give his

9    analysis of the history of the art.

10             MR. PISANO:  Very good.

11             THE COURT:  All right. with regard to time, Finjan

12   used 100 minutes this morning.  You have 23 hours and 20

13   minutes.  You guys used 90 minutes, ESET.  You have 23 hours

14   and 30 minutes.

15             MR. PENNER:  If we have questions on the timing?

16             THE COURT:  No.  My timing --

17             MR. PENNER:  Your times.  That's fine, Your Honor.

18             THE COURT:  You had 50 minutes for your opening and 45

19   minutes for your cross.  That's 90 minutes.

20             MR. PENNER:  I --

21             THE COURT:  That's it.  I don't --

22             MR. PENNER:  I appreciate it.  Thank you.

23             THE COURT:  All right.  Anything else?

24             MS. KOBIALKA:  Just, I have to say this for the

25   record.  We had some licensees that want to keep things

1   confidential, so we have moved into evidence JTX-118, the other

2   side did.  We moved in 130.  We didn't disclose any

3   confidential terms.  We didn't close the courtroom, but we

4   would like to have those filed under seal.  I just wanted to

5   say that for the record to make sure there was no problem.

6          THE COURT:  That's fine.  Please when you have and

7   you're using a single page that would be then going into the

8   jury as opposed to necessarily the whole document, because I

9   really don't want jury to get the pages that were discussed,

10  would you have a system ready so that we're all on the same

11  page as far as the record.  It's wasting your valuable time,

12  and it also makes Lori crazy.

13         MR. ANDRE:  Your Honor, there's one issue that will

14  come up tomorrow with Dr. Cole, and maybe we can get some of

15  your thoughts on it.  We may want to save you the briefing.

16  That is, they have objected to us showing Dr. Cole some of the

17  transcripts of the videotape of their engineers.  They said

18  even though he relied on the deposition, he didn't pen cite in

19  his expert report those portions.  He said he reviewed the

20  whole expert report, but he didn't pen cite certain pages.  Do

21  you have a policy on that?  I mean, generally speaking, if it's

22  played, he can talk about it, and he reviewed it beforehand.

23  But I didn't know if you have a policy on that.

24         THE COURT:  I do not have a policy.  If he reviewed

25  the deposition transcript but didn't watch the video or didn't

1   identify the specific pages but he said he reviewed the

2   transcript, that's sufficient.

3        MR. ANDRE:  Thank you, Your Honor.  I appreciate it.

4   I think that will save some briefing tonight.  I think that was

5   the only issue that came up.

6        MR. PENNER:  Your Honor, I thinking this goes to our

7   whole question, what was disclosed in his report.  There's no

8   disclosure of his reliance on the deposition.  And to say -- in

9   the back of his report, he listed 5,000 documents and every

10  deposition without ever saying those were actually part of his

11  analysis in the body of his report.  That's what our concern

12  is.

13       The same way with the 3,000 pages of source code where

14  the experts don't pen cite to any pages or lines of them and

15  then have them come in and say, my opinion is now on these

16  lines when there was no disclosure in their reports of that at

17  all.  That's why we had the stipulation it be strictly limited

18  to what you actually disclosed in your expert report and relied

19  on.  These would be clips he didn't rely on because he doesn't

20  have any citation in his report saying this here forms the

21  basis of my opinion, so we wouldn't have known to ask him about

22  those in his deposition.  That's where the issue comes up.

23       MR. ANDRE:  Your Honor, it wasn't in the back of the

24  materials considered.  He said he relied on it in the body of

25  his report.  He does give the very specific analysis in what

1    he -- the deposition transcripts he looked at, reviewed, in

2    forming his opinion.  He also, as far as source code goes, we

3    are disclosing the specific pages or at least the file of

4    source code.  We're not relying on 3,000 pages of one exhibit.

5         THE COURT:  The difference here is you can't -- I'm

6    going to give an absurd example.  You can't say in your expert

7    report, I considered the Library of Congress, but I relied on

8    these two documents and then after you have done your report

9    and given that as the basis for your opinion, come in and

10   testify saying, well, also in the Library of Congress, there

11   are these other 35 things, and while I didn't mention them

12   previously, I had considered them.  So that's kind of what I

13   hear them saying, not quite that extreme.

14        MR. ANDRE:  It's just not true.  The problem is we

15   didn't do that, and we're not doing that.  With source code, we

16   actually did go through and say this file, this source code

17   which is two or three pages printed out.  This file is what we

18   looked at and based his opinion on it.

19        So when it came to the specific testimony at the

20   beginning of his report, he said I looked at this testimony, I

21   considered it in the totality to form my opinion.  Now he goes

22   through the report in different places and gives very specific

23   pages that he looked at and says this shows this and this shows

24   that.  What they're trying to say we're limited to those very

25   specific cites and the pages where they said we looked at this

1    and we looked at that.  All he's going to do, he's going to be

2    sitting here in the courtroom, they're going to play the video

3    of Mr. Malcho, for example, and I'm going to say, did this

4    testimony form your opinion, did it confirm your opinion, or

5    anything like that, and he's going to say what that testimony

6    confirmed.

7         So this is not something that -- I have never had this

8    happen before where they think you have to have actual pen

9    cites to the deposition if you rely on the deposition.  He put

10   it up front, but I have never had this happen before.  So if

11   you have a policy.

12        THE COURT:  Well, no.  I'm less concerned about the

13   deposition because it's a more contained.  If you've reviewed

14   the deposition, you have reviewed it presumably in its

15   entirety.  But the source code issue you've raised is more

16   significant because clearly these things are going to need to

17   tie.  So if it's not the part of the source code that are

18   identified in the report that form the basis of the opinion,

19   you don't get to backfill later.

20        MR. PENNER:  Our concern is -- and Mr. Andre said

21   these are one or two pages long.  That's not true in its

22   entirety.  Some of these source code files are 20 to 30 pages

23   long.  Some have thousands of lines of code in them.  And what

24   we expect is going to happen, Your Honor, is they're going to

25   have their witness get on the stand and testify about where

1    certain things happen in this file that was never revealed in

2    their expert report.  They simply say this document supports my

3    opinion with no evidence anywhere of which part of those

4    documents support their opinion.  And what they're going to

5    have their witness do is say this document supports my opinion,

6    but with nothing more.  That's what was disclosed in their

7    report.  That's what we're okay with and that's what we believe

8    we agreed upon in the stipulation.  You cannot go outside the

9    bounds of what is technically written in their report.

10           MR. ANDRE:  And, Your Honor, let me be very clear with

11   the source code, we actually went through and identified the

12   source code and put it into the expert reports.  ESET's counsel

13   made a motion to Judge Skomal that we violated the protective

14   order and made us take it out of the report.  They actually

15   made us take that source code out because they accused my

16   associates of violating the protective order, which we took

17   very seriously.  We took it out and then had to list the Bates

18   number of the pages.  That's all we could do, and we did so,

19   but we did not -- we would have actually put chapter and verse

20   of the source code in the report because we did it and that was

21   an --

22           THE COURT:  I kind of remember this.

23           MR. PENNER:  So this was the order that Judge Skomal

24   issued identifying that there were, in fact, protective order

25   violations.  That wasn't permissible what they did.  Instead as

1   we explained to them when they were having to redo their work,

2   you can cite the Bates numbers and the line numbers, and we

3   gave an example of how Dr. Spafford did his report where he

4   said these lines, and the variable at line 122 supports my

5   opinion, without revealing the names of the variables or the

6   names of the functions.  And that's how we said if you're going

7   to do that, please include the line numbers so we know what it

8   is your expert is relying on so when we take their deposition,

9   we'll have all the information in front of us.

10       So the other reports had to be destroyed, and

11  presumably the experts don't have their reports and, therefore,

12  cannot rely on the lines that were improperly cut and paste in

13  the reports.  But when they did the reports, they didn't

14  identify any line numbers.  So now when we have to ask their

15  witnesses about it in depositions, the old reports were

16  destroyed, we didn't have them anymore, there wasn't anything

17  we can focus on to figure out what exactly their opinion was.

18       That's where this whole problem arises from because

19  their reports, which are the ones redone, the only ones that

20  exist now because the other ones had been thrown out because

21  they were in violation of the protective order.  The ones that

22  exist today don't have any of those pieces of evidence in them.

23  When they sat for their deposition, they all testified yeah,

24  but there are no line numbers in here, I don't have that in my

25  report, but I expect to testify about these documents in their

 1   entirety and whatever I choose to pick out of the them at

 2   trial, I think I'll be allowed to testify to.  We said that's

 3   not in your report.  It's not fair to us, Your Honor.  Those

 4   reports were destroyed and not in existence for us to even rely

 5   on.

 6            THE COURT:  This is your source code?

 7            MR. PENNER:  It is our source code.

 8            THE COURT:  Why did you destroy it?  You had their

 9   evidence, and, yes, the report needed to edited, but since it

10   was there -- I mean, it seems like -- I don't -- I don't know

11   what Judge Skomal looked at or what he thought about this, but

12   you kind of created a problem of your own making.  They looked

13   at the source code, they identified the pages and the lines,

14   they provided the source code in the report.  They should not

15   have put that in a written document.  They should have done

16   some sort of directory.  Okay.  They fixed that.  But you had

17   what they had.  You didn't need to throw out your own source

18   code.  You could have matched it up.

19            MR. PENNER:  And certainly that's true, Your Honor.

20   In some cases, there were snippets of code and in other cases,

21   again, it was just the full page range without any citation to

22   any lines.  Literally the copy of the entire multipage document

23   into their report without any citation to any liners, just

24   simply this file supports my conclusion, here's copy, copy,

25   copy of eight pages in a row and no explanation with where that

1   happened, which is why we said when you redo it, please

2   identify the line numbers that your experts are relying on on

3   this, and that didn't happen.

4           THE COURT:  I don't know how to undo this problem

5   because if you had their disclosure, even if it was pages of

6   source code, then when you deposed him, you could have been

7   specific and said in these eight pages, what are you

8   particularly looking at.  And if that didn't happen, I don't

9   know whose fault that is at this point.

10          MR. PENNER:  At some points, I did, Your Honor,

11   provide source code to the witnesses, and I would say where,

12   and this is your opinion, and a lot of times the answer would

13   be well, it's also over -- or it's, you know, here, here, here,

14   and here, but those weren't in the report itself.  So there was

15   really -- and for those, I'm happy to follow up with them

16   obviously, but for others when we're talking about 3800 pages

17   of source code here, to be able to take a deposition of a

18   witness and to go through 3800 pages to get their opinions on

19   what every opinion is on those 3800 when it wasn't in their

20   report, and we only have seven hours, so that's not a

21   possibility when we have that much without any indication of

22   where it is in their opinions.

23          THE COURT:  Is this for Dr. Cole?

24          MR. ANDRE:  We have Dr. Cole, Dr. Mitzenmacher, and

25   Dr. Medvidovic here.  And they'll sit there and tell you during

1   their deposition, they gave the Bates number of the pages and

2   they said, you show me the source code, I'll tell you where it

3   is.  They wouldn't show the source code during their

4   deposition.  This is something that will probably come up with

5   all three, I'm guessing.  But we actually went through doing

6   what Judge Skomal said with Bates number with the pages on

7   there at these gentlemen's depositions.  They all three said,

8   give me the source code, I'll tell you exactly where it is.  We

9   can talk all day about it.  But it they wouldn't do it.  So now

10  it's a problem of their own making.  We had the code in the

11  report.  I don't know why they destroyed it.  The evidence was

12  there.  They could have asked very specific questions on it.

13  This it their issue.

14      MR. PENNER:  When we had that discussion with

15  Magistrate Judge Skomal, and he did strike the reports for

16  violating the protective order, the question is how can we get

17  this in, and we said on that call with Judge Skomal, all you

18  have to do is put the Bates number and the line numbers that

19  you're relying on.  You can say, for example, the variable at

20  line 52, just the way that Dr. Spafford did.  Instead what they

21  did was pull out all those citations and then left it blank for

22  everyone to guess.  That's the problem, there is nothing in the

23  reports.  We explained precisely how to do it.

24      And also, not true that I did not provide them with

25  source code at deposition.  I did go through multiple pages and

1   multiple source code files with each of them at their

2   depositions.

3        THE COURT:  Do have you the reports?  You probably had

4   them at some point.

5      (Sidebar held, not reported)

6        THE COURT:  The objection regarding the way that the

7   source code disclosure was done is overruled, and the expert

8   can -- all the experts who are talking about source code can --

9   you have the burden of proof.  You're going to have to show it

10  with some specificity, so you're going to need to show where

11  these things are found in these products.

12        MR. ANDRE:  Absolutely, Your Honor.

13        THE COURT:  So.

14        MR. ANDRE:  We appreciate that.

15        THE COURT:  You can go ahead and do that.  I think

16  this was an unfortunate discovery issue, but I'm not going to

17  prevent you from doing that at trial.

18        MR. ANDRE:  Thank you, Your Honor.

19        THE COURT:  All right.  Is there anything else?  I

20  would like counsel here -- I know it's early -- but by 8:15

21  because I'm sure there's going to be something you want to talk

22  about before the jury gets here.

23        MR. ANDRE:  Thank you, Your Honor.  Have a good

24  evening.

25      (Court in recess at 4:26 p.m.)

1          *** *End of requested transcript* ***

2                    CERTIFICATE OF OFFICIAL REPORTER

3

4          I, Mauralee Ramirez, Federal official Court Reporter,

5    in and for the United States District Court for the Southern

6    District of California, do hereby certify that pursuant to

7    Section 753, Title 28, United States Code that the foregoing is

8    a true and correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the regulations

11   of the Judicial Conference of the United States.

12

13          Dated this 30th day of March 2020.

14

15          /S/ Mauralee Ramirez
            Mauralee Ramirez, CSR No. 11674, RPR
16          Federal Official Court Reporter

17

18

19

20

21

22

23

24

25