NICOLA A. PISANO, CA Bar No. 151282
    NicolaPisano@eversheds-sutherland.com
JOSE L. PATIÑO, CA Bar No. 149568
    JosePatino@eversheds-sutherland.com
JUSTIN E. GRAY, CA Bar No. 282452
    JustinGray@eversheds-sutherland.com
SCOTT A. PENNER, CA Bar No. 253716
    ScottPenner@eversheds-sutherland.com
**EVERSHEDS SUTHERLAND (US) LLP**
12255 EL CAMINO REAL, SUITE 100
SAN DIEGO, CALIFORNIA  92130
TELEPHONE:    858.252.6502
FACSIMILE:    858.252.6503

Attorneys for Defendants and Counter-Plaintiffs
ESET, LLC and ESET, SPOL. S.R.O.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FINJAN, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>ESET, LLC, et al.,<br><br>        Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 3:17-cv-0183-CAB-BGS<br><br>**ESET, LLC AND ESET, SPOL. S.R.O.'S MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT OF PROSECUTION HISTORY DISCLAIMER FOR U.S. PATENT NO. 6,154,844**<br><br>Judge:   Hon. Cathy Ann Bencivengo<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

17cv0183

45111396.4

## **TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................... 1
II. THE '844 PATENT AND PROSECUTION HISTORY ................................. 1
    A. The Disclosure of the '844 Patent ....................................................... 1
    B. The Asserted Claims of the '844 Patent .............................................. 4
    C. Construction of the Terms of the Asserted Claims ............................. 4
    D. Prosecution History of the '844 Patent ............................................... 6
III. ARGUMENT ................................................................................................ 10
IV. CONCLUSION ............................................................................................ 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Area 55, Inc. v. Celeras LLC*,
  No. 09-CV-2755-H (NLS), 2011 U.S. Dist. LEXIS 74157
  (S.D. Cal. May 27, 2011) .................................................................................... 11

*F5 Networks, Inc. v. Radware, Inc.*,
  No. 17-cv-03166-VC, 2018 U.S. Dist. LEXIS 198969
  (N.D. Cal. Nov. 19, 2018) ................................................................................... 11

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................................... 10

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
  438 F.3d 1123 (Fed. Cir. 2006) ........................................................................... 11

45111396.4

## I. INTRODUCTION

Pursuant to this Court's Minute Order of July 23, 2020 (D.I. 802), ESET, spol. s.r.o. and ESET, LLC (collectively, "ESET") file this renewed motion for summary judgment that the asserted claims of U.S. Patent No. 6,154,844 ("the '844 patent") cannot, as a matter of law, be construed to cover network gateways as alleged by Finjan.

The disclosure of the '844 patent and its prosecution history dictate this conclusion because Finjan expressly amended its claims to differentiate the "inspector" from the network gateway described in the "Ji" reference and further to require that the inspector link the DSP to the Downloadable *before* the web server makes the Downloadable available to web clients. In so doing, Finjan evidenced a clear and unmistakable intent to disclaim coverage by claims 1 to 21 of a network gateway. Moreover, only the inspector of the '844 patent described in Figures 1 and 6 "links" a DSP to a Downloadable – this functionality is never ascribed to a network gateway.

## II. THE '844 PATENT AND PROSECUTION HISTORY

### A. The Disclosure of the '844 Patent

Figures 1 and 6 of the '844 patent, reproduced below, correspond to the inventions recited in claims 1 and 15.



45111396.4

In Figure 1, web server 185 is connected to external computer network 105 (the Internet) and hosts web page data 190. Web server 185 responds to a request from web client 135 to retrieve a Downloadable from web server 185 via external computer network 105, network gateway 135, and internal computer network 115. Figure 6 describes the "method for attaching a Downloadable security profile to a Downloadable in accordance with the present invention." '844 patent at 3:20-23. In accordance with that method, developer 120 first creates a Downloadable and then transmits it to inspector 125. *See id.* at Figs. 1, 6 and 8:36-47. Inspector 125 includes content inspection engine 160 that analyzes a Downloadable to generate a DSP and attaches the DSP to the Downloadable. *Id.* at 3:66-4:4. The linked Downloadable is then transmitted by inspector 125 to web server 185 for addition to web page data 190. *Id.* at 5:3-6.

Figure 6 describes the method by which inspector 125 inspects a Downloadable. As a first step, an uninspected Downloadable is sent to inspector 125 at step 620. *Id.* at 8:47-48. Next, the inspector analyzes the Downloadable to generate a DSP, at step 625, and attaches the DSP to the Downloadable, at step 630. *Id.* at 8:49-66. Once the inspector creates and links the DSP to the Downloadable, the completed Downloadable is "forward[ed] … to the web server 185 for addition to web page data 190 and web engine deployment." *Id.* at 9:13-15. The '844 patent explains that "web client 175 [sic, 135] can access the web page data 190 and thus can retrieve the … Downloadable," i.e., after the Downloadable is hosted on web server 185. *Id.* at 9:16-18.

The web server of the '844 patent is a ***specific*** server, i.e., web server 185 that hosts the Downloadable. The specification teaches that "Figure 8 is a block diagram illustrating details of the web server 185." *Id.* at 10:25-26. The "web server" is the server in the web that contains the web engine, the web page data, and to which the Downloadables are deployed. *See id.* at Fig. 8, 10:39-45; *see also id.* at 5:3-6 and 9:11-16. No other system component, such as network gateway 110 or computer client 130, that a Downloadable transits during download, qualifies as a web server. This is so because the '844 patent provides no disclosure of a network gateway as performing the

45111396.4

functions attributed to inspector 125 or web server 185.

By comparison, the '844 patent describes that network gateway 110 or computer client 130 may include a network protection engine ("NPE") 135 or a computer protection engine ("CPE") 180, respectively, but neither of these links a DSP to a Downloadable. Specifically, the '844 patent describes that "[i]f the incoming Downloadable does not include a signed inspected Downloadable 195, then ***each*** of the network protection engine 135 and the computer protection engine 180 ***must generate the DSP***, and compare the DSP against local security policies (535, FIG. 5)." *Id.* at 5:28-33 (emphasis added). "FIG. 5 is a block diagram illustrating details of a generic protection engine 500, which exemplifies each of the network protection engine 135 and the computer protection engine 180." *Id.* at 7:41-43. The '844 patent describes that generic protection engine 500 intercepts incoming Downloadables (i.e., Downloadable files) for inspection, and determines whether the Downloadable can be trusted in one of two ways: (1) by comparing the Downloadable ID enclosed with the Downloadable to a regenerated Downloadable ID; or (2) by using content inspection engine 525 to generate a DSP that is compared against local security policies. *Id.* at 7:56-8:8. Importantly, ***there is no description that NPE 135 or CPE 180 attaches or links a generated DSP to the Downloadable***; this explains why each of the NPE and CPE must generate a DSP to compare to local security policies as noted above.

Figure 7 describes that, if a Downloadable arrives at network gateway 110 or computer client 130 without a DSP, then NPE 135 or CPE 180 generates a DSP at step 750 and then compares the DSP against the local security policies at step 755. There is no disclosure in the discussion of Figure 7, or indeed anywhere in the '844 patent, that the DSP generated by NPE 135 or CPE 180 is attached or in any way "linked" to the Downloadable. On the contrary, Figure 7 teaches that if the newly generated DSP passes all security policies at step 750, then only the Downloadable is passed to the intended recipient, i.e., either through network gateway 110 or to computer client 130 by re-transmission engine 540: "The content inspection engine 160 in step 760 determines

45111396.4

whether each DSP 215 passes all corresponding security policies 535. If each DSP 215 passes, then the local security policy analysis engine 530 in step 770 instructs the retransmission engine 540 to pass the Downloadable." *Id.* at 10:14-18. Likewise, none of the network gateway claims of the '844 patent (claims 22 to 40 and 44) that recite generating a DSP, if none is present with the received Downloadable, also recite linking of the DSP generated on-the-fly to the Downloadable. *See, e.g.*, claims 27 and 36.

### B.  The Asserted Claims of the '844 Patent

The '844 patent includes 44 claims, including independent claims 1, 15, 22, 23, 32, and 41-44. Claims 1-22 and 41-43 are directed to methods performed by an inspector or inspector system. Claims 23-40 and 44 are directed to methods performed by a network gateway or network gateway system. In this litigation, Finjan asserts claims 1, 7, and 15 against ESET's products.

Independent claim 1 recites a method performed by an inspector that performs each of three required functions: (1) *receiving by an inspector* a Downloadable; (2) *generating by the inspector* a first Downloadable security profile; and (3) *linking by the inspector* the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients. Claim 7 depends from claim 1 and recites that the Downloadable includes a JavaScript script. Claim 15 is directed to an inspector system comprising memory storing a rule set and a content inspection engine that uses the rule set to generate a DSP and link the DSP to the Downloadable "before a web server makes the Downloadable available to web clients." In claim 15, it is implicit that the inspector must first receive the Downloadable before the content inspection engine can analyze it to generate the DSP or link it to the Downloadable.

### C.  Construction of the Terms of the Asserted Claims

Prior to trial, the Court construed certain terms of the '844 patent and provided the following claim constructions (D.I. 195 at 3-4):

45111396.4

| Claim Term | Court's Construction |
|---|---|
| Downloadable | a small executable or interpretable application program which is downloaded from a source computer and run on a destination computer |
| before the web server makes the Downloadable available to web clients | before the Downloadable is available on a web server to be called up or forwarded to a web client |

During trial, the Court recognized that there was an unresolved dispute regarding the construction of the claim term "web server," and more particularly, whether a "network gateway" that used ESET's products could constitute the claimed "web server": "The issue that the Court is recognizing that has fundamentally resulted from the claim construction is not the question of before, which was what we were construing, but what a web server and a web client are in this case, which I have never construed." *See* Declaration of Declaration of Nicola A. Pisano in Support of ESET's Renewed Motions for Summary Judgment Regarding U.S. Patent No. 6,154,844 ("Pisano Decl.") Ex. A at 427:19-23. Because that construction informs the proper construction of the other claim terms, Finjan's claim amendments to distinguish over the Ji reference, and the full scope of Finjan's prosecution history disclaimer, ESET respectfully requests that the Court construe the term "web server" in connection with this motion.

In its final written decision in IPR2019-00026 dated April 7, 2020, the Patent Trial and Appeal Board construed the term "web server" under a *Phillips*-type district court standard. In that decision, the PTAB concluded that a "web server" is "a server connected to the Internet and capable of serving documents accessible by a URL on the World Wide Web." Pisano Decl. Ex. B at 18. While finding it unnecessary to decide whether a "network gateway" could be a "web server," *id.* at 20, the PTAB noted that as described in the '844 patent, the "web server" and "network gateway" are distinct entities and "states, for example, that 'web server 185 [is] … coupled to … external computer network 105' (['844 patent] at 3:39–44), that 'web server 185 … **transmits the Downloadable via the network gateway 110** to the computer client 130' (*id.* at 5:11-13

45111396.4

(emphasis added)), and that 'communications interface 825 [of web server 185] couples the signal bus 825 to the external computer network 105' (*id.* at 10:33-34)." Pisano Decl. Ex. B at 18. The PTAB cautioned that the word "web" could not simply be disregarded: "we do not find sufficient support in [the '844 patent] for broadening 'web server' beyond its ordinary meaning to, in effect, read out the word 'web.'" *Id.*

In view of the usage of the term "web server" throughout the '844 patent as discussed above, and Finjan's amendments to overcome Ji, discussed *infra*, ESET submits that the term "web server" should be construed as "a server that serves web pages and is not a network gateway."[1]

### D. Prosecution History of the '844 Patent

The '844 patent matured from U.S. patent application Serial No. 08/995,648, filed December 22, 1997 ("the '648 application"). Finjan contends in this case that the '844 patent is entitled to an earliest filing date of November 6, 1996, the '639 provisional application. The PTAB in IPR2019-00026 rejected that contention, *inter alia*, because the '639 provisional application does not disclose a "web server," and thus provides no support for the limitation "before a web server makes the Downloadable available to web clients." Pisano Decl. Ex. B at 33-35. The PTAB found that the earliest effective filing date for the '844 patent is December 22, 1997.[2]

As originally filed, the '648 application included application claims 1 and 15, reproduced below (Pisano Decl. Ex. C at 65, 67):

---

[1] As noted by Finjan in its unsuccessful motion for reconsideration of this Court's construction of the phrase "before a web server makes the Downloadable available to web clients", Judge Freeman in the *Blue Coat* case construed that phrase as "before the non-network gateway web server makes the Downloadable available to web clients." D.I. 188-1 at 13:1-7. Thus, it appears that even in the *Blue Coat* case the construction of "web server" was a "non-network gateway web server" or in other words "a web server that is ***not*** a network gateway." Such a construction would be dispositive of Finjan's infringement claims directed to ESET's Gateway products for the '844 patent.

[2] In view of the PTAB's imminently sound analysis, ESET hereby renews its motion for summary judgment that the earliest effective filing date of the '844 patent is December 22, 1997. *See* ESET's accompanying motion on that subject and D.I. 483-1 at 3-7.

> 1. A method comprising the steps of:
> receiving a Downloadable;
> generating a first Downloadable security profile for the received Downloadable; and
> linking the first Downloadable security profile to the Downloadable.
>
> 15. A system comprising:
> memory storing a first rule set; and
> a first content inspection engine for using the first rule set to generate a first Downloadable security profile that corresponds to a Downloadable, and for linking the first Downloadable security profile to the Downloadable.

In an Office action dated September 2, 1999, claims 1 and 15 were rejected as anticipated by U.S. Patent No. 5,892,904. *Id.* at 29. In an Amendment and Response filed November 23, 1999, Finjan amended claims 1 and 15 to recite that the Downloadable security profile "identifies suspicious code in the received Downloadable." *Id.* at 23, 24.

In a second non-final action mailed February 8, 2000, the Examiner rejected amended claims 1 and 15 as anticipated by Ji, stating (*id.* at 16):

> As per claims 1,2,11,15-17,22,23,32, and 41-44, it is disclosed by Ji of a means of identifying suspicious code in a received downloadable and generates a security monitoring package (downloadable security profile) that is transferred along (linked as an attachment) with the downloadable to the client. A scanner (content inspection engine) examines the downloadable for suspicious operations and contains a rule set that is used for comparison as dictated by a security policy. Once the downloadable is received by the client, the client's web browser examines the security monitoring package and the established security package (as previously identified) is noted and instructions determined to be suspicious are not executed (column 3, lines 10-56). A signature is generated for the downloadable and once received by the client, the signal verifier component (file reader coupled to the interceptor) examines it to determine if it is from a trusted source (column 7, lines 29-31).

45111396.4

In a further Amendment and Response filed June 16, 2000, Finjan amended claims 1 and 15, reproduced below, to specify not only that the steps of generating a DSP and linking the DSP to the Downloadable *were performed by the inspector*, but that these steps were performed *before* a web server makes the Downloadable available to web clients (*id.* at 8):

> IN THE CLAIMS:
>
> 1. (Twice amended) A method comprising [the steps of]:
>    receiving <u>by an inspector</u> a Downloadable;
>    generating <u>by the inspector</u> a first Downloadable security profile that identifies suspicious code in the received Downloadable; and
>    linking <u>by the inspector</u> the first Downloadable security profile to the Downloadable <u>before a web server makes the Downloadable available to web clients</u>.
>
> 15. (Twice amended) A<u>n inspector</u> system comprising:
>     memory storing a first rule set; and
>     a first content inspection engine for using the first rule set to generate a first Downloadable security profile that identifies suspicious code in a Downloadable, and for linking the first Downloadable security profile to the Downloadable <u>before a web server makes the Downloadable available to web clients</u>.

In the Remarks portion of its Response, Finjan characterized its invention as having distinct components for the inspector *and* the network gateway (*id.* at 11):

> Before discussing the rejections of the claims, a brief review of an embodiment of Applicant's invention is helpful. A system *includes an inspector* for generating and linking a Downloadable security profile to a Downloadable before a web server makes the Downloadable available to web clients. The system *also includes a network gateway* which examines the Downloadable security profile for security policy violations if the Downloadable security profile is deemed trustworthy.

It is nonsensical for Finjan to have argued that its system included an inspector *and* also a network gateway if those two distinct elements are the same thing.

Finjan's remarks then distinguished the claimed inspector from the network gateway disclosed in Ji, resulting in allowance of the '648 application (*id.*):

45111396.4

> In paragraphs 3 and 4, the Examiner rejected claims 1-3, 11, 15-17, 22, 23, 32 and 41-44 under 35 USC § 102(e) as anticipated by Ji. Ji teaches a method <u>performed on a network gateway</u> of examining application programs for lines of code that the client computer should monitor for security policy violations. Independent claims 1, 15, 41 and 43 as amended similarly recite generating and linking a Downloadable security profile to a Downloadable before a web server makes the Downloadable available to web clients. Independent claims <u>22, 23, 32</u>, 42 and 44 as amended similarly recite comparing a Downloadable security profile linked to the Downloadable against a security policy, if the Downloadable security profile is deemed trustworthy. Ji does not teach generating the Downloadable security profile or linking the Downloadable security profile to a Downloadable <u>before the web server makes the Downloadable security profile available to web clients</u>. Further, Ji does not teach examining an <u>already linked</u> Downloadable security profile by network gateways, if the profile is deemed trustworthy. In Ji's system, the burden of examining a Downloadable for the suspicious code is always on the network gateway, and must be done every time. In Applicant's system, some of the burden may be transferred to the inspector, and generation of the Downloadable security profile may be performed only once. Applicant therefore requests the Examiner to

As set forth above, Finjan distinguished Ji as ***performing the inspection and linking on a network gateway***, as opposed to the claimed ***inspector*** of claims 1 and 15, which "generat[es] and link[s] a Downloadable security profile to a Downloadable before a web server makes the Downloadable available to web clients." As discussed *supra*, there is no disclosure in the '844 patent of NPE 135 both generating a DSP and linking the DSP to the Downloadable. Instead, as described in Figure 7 and throughout the '844 patent, NPE 135 is described only as generating a DSP and comparing it to local policy rules; it is never described as attaching or linking the DSP to the Downloadable.

Finjan's foregoing remarks further argued that "Ji does not teach generating and linking the DSP to the Downloadable ***before the web server makes the Downloadable available to web clients***." The plain meaning of this limitation is that DSP generation and linking to the Downloadable must be performed ***before*** the web server makes the linked Downloadable available to web clients. In the context of the network gateway of

45111396.4

Ji, this limitation required that the inspector **complete** the linking step **before** the Downloadable is made available by the web server to be called up and forwarded to any other computer – thus **excluding** the network gateway of Ji. This is confirmed by Finjan's argument that while in Ji "the burden of examining a Downloadable for suspicious code is always on the network gateway and must be done every time" (like the NPE 135 of network gateway 110 described in Figure 7), in "Applicant's system, some of the burden may be transferred to the inspector, and generation of the Downloadable security profile may be performed only once." *Id.* at 11. The only inspector of the '844 patent that generates and links the DSP to the Downloadable "only once" is inspector 125 of Figure 1.

Finjan has argued in other litigations that developer 120, inspector 125, and web server 185 could be part of an integral site. '844 patent at 3:44-52. But that disclosure provides no disclosure of a network gateway having the capabilities ascribed to the inspector and the web server. As noted by the PTAB in IPR2019-00026, "we do not find sufficient support in [the '844 patent] for broadening 'web server' beyond its ordinary meaning to, in effect, read out the word 'web.'" Pisano Decl. Ex. B at 18. Rather, the only embodiments in the '844 patent that describe a network protection engine located at a network gateway, as in Figures 5 and 7, disclose that a DSP generated on-the-fly is **not** attached to the Downloadable, but instead immediately compared to local security policies to determine whether or not to pass the Downloadable to the intended destination. '844 patent at 8:6-16.

### III. ARGUMENT

The doctrine of prosecution history disclaimer precludes "patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution. This may occur, for example, when the patentee explicitly characterizes an

45111396.4

aspect of his invention in a specific manner to overcome prior art." *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). *See also Area 55, Inc. v. Celeras LLC*, No. 09-CV-2755-H (NLS), 2011 U.S. Dist. LEXIS 74157, at *12-13 (S.D. Cal. May 27, 2011) (holding that a patentee's argument made in response to a rejection by the Patent Examiner that a structural limitation defined its invention and was what made its invention novel over the prior art was a clear and unmistakable disavowal of claim scope); *F5 Networks, Inc. v. Radware, Inc.*, No. 17-cv-03166-VC, 2018 U.S. Dist. LEXIS 198969, at *1-4 (N.D. Cal. Nov. 19, 2018) (granting cross-motion for summary judgment of non-infringement and holding that a patentee's argument during an *inter partes* review that a particular claim term was limited to specific parameters constituted prosecution history disclaimer).

When viewed in context, it is plain that the neither the claimed "inspector" nor the claimed "web server" of claims 1 and 15 of the '844 patent can be construed to cover a network gateway. Only inspector 125 is expressly described as performing the DSP generation and linking functions: there is no disclosure that a network gateway performs **both** of these functions in the '844 patent. The '844 patent makes equally plain that a network gateway cannot be the claimed "web server" of claims 1 and 15, because Finjan specifically disclaimed such coverage in its arguments to distinguish over Ji. As used throughout the disclosure of the '844 patent, the term "web server" refers to a distinct network component from a "network gateway." *See, e.g.*, Pisano Decl. Ex. B at 18.

As discussed above, to overcome the anticipation rejection based on Ji, Finjan expressly argued that its inspector was a distinct and separate element from the network gateway and that the DSP must be linked to the Downloadable before the web server makes the Downloadable available to web clients. In so doing, Finjan unambiguously (and successfully) argued to the Patent Examiner that the linking must be completed before the Downloadable could be accessed **by the network gateway**. Finjan may not now disavow the prosecution history to attempt to recapture that which it disclaimed to secure issuance of the '844 patent.

45111396.4

To the extent that Finjan intended claims 1 and 15, as originally filed, to cover the content inspection engine at the inspector, the network protection engine at the network gateway, or the computer protection engine at the computer client (and as discussed above, such breadth is unsupported in the '844 patent), its amendments and remarks unmistakably disclaimed such coverage.  After the Patent Examiner cited Ji as providing *scanning* and *linking* at a network gateway, Finjan amended its claims to specify that those functions are performed by the *inspector*, a distinct system component from the network gateway.  For Finjan to now argue otherwise would render those amendments meaningless.  Finjan's amendments further distinguished over Ji by clarifying that the inspector of claims 1 and 15 was ***not at the network gateway*** by adding the claim language "before a web server makes the Downloadable available to web clients."  The plain meaning of this amendment is that it required the claimed inspector to send the Downloadable to the web server that makes the Downloadable available to be called up and forwarded to web clients; that is, the web server in the Internet *upstream* of the network gateway.  Finjan's arguments that all of the functions of the inspector and web server can be collapsed onto the network gateway nullifies all of its amendments, lacks any support in the '844 patent, and violates the public notice function of the disclosure, claims, and prosecution history.

Indeed, one of Finjan's technical experts, Dr. Cole, confirmed at trial that a Downloadable on the Internet can be accessed by ESET's Gateway products only *after* a Downloadable is made available by a web server to be called up and forwarded to web clients.  Thus, when the ESET network gateway downloads a Downloadable from that web server, the ESET network gateway serves as a *web client*.  Pisano Decl. Ex. A at 460:2-4.  Finjan, however, argues that because a web client behind the ESET network gateway cannot access the Downloadable until the ESET network gateway scans the file, then the ESET network gateway serves as both the inspector and web server.  But the same is true also of Ji, which scanned and linked the DSP *before* the Downloadable could be transmitted to the web clients behind the Ji network gateway and thus "make

45111396.4

the Downloadable available to web clients." Thus, Finjan's argument to this Court runs directly contrary to its argument to secure allowance of the '844 patent, and specifically its amendments to distinguish over the inspector in the network gateway of Ji.

Moreover, as discussed *supra*, the '844 patent lacks any disclosure of an embodiment in which the inspector and web server are co-located at a network gateway. The '844 patent does not describe 'linking" of a DSP generated on-the-fly to a Downloadable that arrives without a DSP. Instead, Figure 7 describes in steps 750, 755, and 760 that the generated DSP is immediately compared to the local security policies to determine whether to pass the Downloadable to its intended destination.

Finjan's attempt to collapse all of the functionality of the claimed "inspector" and "web server" of claims 1 and 15 into software located at the network gateway finds no support in the '844 patent. Moreover, Finjan's express disclaimer of scope for claims 1 and 15 as covering a network gateway in view of Ji, as set forth above, requires that the term "web server" in those claims be construed as "a server that serves web pages and is not a network gateway." This construction is required so that the claimed inspector can transmit the linked Downloadable to the web server before the Downloadable is available on the web server to be called up and forwarded to web clients, *including the network gateway of Ji*. As discussed above, the amendments to claims 1 and 15 made by Finjan to distinguish its alleged invention from the network gateway in Ji provide a compelling case for application of prosecution history disclaimer.

## IV.   CONCLUSION

For all the foregoing reasons, summary judgment that the asserted claims of the '844 patent cannot be construed to cover network gateways should be granted.

45111396.4

| | |
|---|---|
| 1  Dated:  August 21, 2020 | Respectfully submitted, |
| 2 | **EVERSHEDS SUTHERLAND (US) LLP** |

*/s/ Nicola A. Pisano*
NICOLA A. PISANO, CA Bar No. 151282
   NicolaPisano@eversheds-sutherland.com
JOSE L. PATIÑO, CA Bar No. 149568
   JosePatino@eversheds-sutherland.com
JUSTIN E. GRAY, CA Bar No. 282452
   JustinGray@eversheds-sutherland.com
SCOTT A. PENNER, CA Bar No. 253716
   ScottPenner@eversheds-sutherland.com
12255 EL CAMINO REAL, SUITE 100
SAN DIEGO, CALIFORNIA  92130
TELEPHONE:      858.252.6502
FACSIMILE:       858.252.6503

Attorneys for Defendants and Counter-Plaintiffs
ESET, LLC and ESET, SPOL. S.R.O.